IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| In Re: | § | Case No. 25-80363-G2-11 |
| | § | |
| ORB Energy Co., | § | (Chapter 11) |
| | § | |
| Debtor. | § | Judge Alfredo R. Perez |

**DEBTOR'S MOTION FOR AUTHORITY TO ASSUME INTEGRATED EXECUTORY CONTRACTS AND TO DETERMINE CURE AMOUNT PURSUANT TO 11 U.S.C. § 365**

*THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS MOTION WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.*

*REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.*

**TO THE HONORABLE ALFRADO R. PEREZ, UNITED STATES BANKRUPTCY JUDGE:**

ORB Energy Co., the Debtor-In-Possession in the above-captioned bankruptcy case (the "**Debtor**") files this, its *Motion for Authority to Assume Integrated Executory Contracts and to Determine Cure Amounts Pursuant to 11 U.S.C. §365* (the "Motion"), and shows:

**RELIEF REQUESTED**

1. The Debtor seeks to assume the integrated executory contracts with Bitmain Technologies Georgia Limited ("Bitmain"). These integrated executory contracts are attached as **Exhibit A-1, 2, & 3.**

2. As part of such assumption, the proper Section 365 cure amounts the Debtor may owe Bitmain must be determined. Bitmain asserts that it would have paid the outstanding invoices the Debtor issued Bitmain if the Debtor would have properly prepared invoices. Moreover, based upon the lack on non-payment by Bitman, the Debtor was forced to mitigate, cover and recoup. Bitmain asserts that the Debtor erred in exercising all such efforts. Determining the proper Section 365 cure amount will likely involve analyzing all such activities.

3. The Debtor is currently evaluating its estimation of the Section 365 cure amount. Such analysis will likely take into consideration the current applicable recoupment rights as to the Bitcoin the Debtor has mined. The Debtor reserves the right to amend and/or supplement this Motion, including the filing of additional legal briefing and supporting evidence. For the reasons set forth herein, granting this Motion is proper. 11 U.S.C. § 365.

**JURISDICTION, VENUE AND STATUTORY PREDICATE**

4. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and venue of the Debtor's chapter 11 case in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory predicates for the relief sought herein are §§ 105 and 365 of the Bankruptcy Code and Rules 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"). This is a core proceeding. 28 U.S.C. § 157(b).

## BACKGROUND

6. On August 5, 2025 (the "***Petition Date***"), the Debtor filed its Voluntary Petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

7. The Debtor remains in possession of its property and is operating its business as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No committee has been appointed in the Debtor's case at this time.

8. The Debtor is engaged in the business of mining Bitcoin.

***Dreams can come true.***

9. Jamieson Zaniewski, the Debtor's founder, principal and president, initially contacted Bitmain to purchase only a couple of Bitcoin mining machines. Multiple discussions ensued. Bitmain informed Mr. Zaniewski in September of 2023 that it was his "lucky day" as Bitmain had selected him to be a "Bitmain Host." As a Bitmain Host, Mr. Zaniewski would ultimately not own just a couple of Bitcoin mining machines, but would instead own thousands. This would result in Mr. Zaniewski becoming a multimillionaire, a vast improvement compared to his then current financial condition. To Mr. Zaniewski this was simply a "*dream come true*," and an opportunity to put to use all his years of hard work and learning in the blockchain industry.

10. Based upon such promises, the Debtor was formed and the parties negotiated and signed the Term Sheet. [See Attached **Exhibit A-1**]. Pursuant to the Term Sheet, the Debtor would essentially be required to complete a period of "*servitude* mining Bitcoin for Bitmain" prior to becoming the proud owner of thousands of Bitcoin mining machines. [See Attached **Exhibit A-1**].

*If you build it, they will come.*

11. The first step for the Debtor on its path to making millions was to acquire rural real property [See Attached **Exhibit B**], to complete significant infrastructure [See Attached **Exhibit C**] and to obtain a contract with an electricity provider [See Attached **Exhibit D**]. Thousands of Bitcoin mining machines consume significant amounts of electricity. The Debtor did all this with its own money based upon Bitmain's promises and the signed Term Sheet.

12. Upon the Debtor proving to Bitmain that it had fulfilled its infrastructure obligations at significant cost to the Debtor in 2024, as contemplated by the Term Sheet Bitmain began negotiating a couple of integrated agreements with the Debtor.

13. Bitmain has significant economic leverage. Bitmain exploited its economic leverage.

14. Ryan Zhao a Bitmain Executive told the Debtor: "Jamieson, Please, just sign the contract and make money, Bitmain is a big company and we always pay." The Debtor responded to Bitmain that it had a potential other customer at the time. Mr. Zhao insisted that the Debtor give Bitmain all the available power they had access to. Mr. Zhao also repeatedly represented to the Debtor that this was just the beginning and if the Debtor could find more power, Bitmain would give them 15x more business than the first contract. Ryan quoted multiple times 500 megawatts of demand and business was available for the Debtor, a sum that would make the Debtor a Billion Dollar company, providing 100's of jobs locally in Texas. In conjunction with the above representations, Mr. Zhao asked to be employed with the Debtor with a $300,000 yearly salary.

15. After the execution of the integrated agreements [See Attached **Exhibits A-2 & A-3**] – which are based upon the Term Sheet – and the Debtor having already properly completed the infrastructure to Bitmain's specifications, the Debtor desperately awaited

Bitmain's delivery of the Bitcoin mining machines and ancillary equipment. At this point, the Debtor already expended significant time and money and incurred significant obligations in reliance on the Term Sheet and Bitmain's promises.

16. It's important to note that the infrastructure and ancillary equipment is proprietary to Bitmain and can only be used with Bitmain Bitcoin mining machines. Hence, the debtor was to build a bespoke data center for Bitmain.

***The Debtor completed the infrastructure, at significant cost and expense.***

17. Bitmain was late in delivering the Bitcoin mining machines and ancillary equipment. However, the Debtor was in no position to complain as the Debtor was under Bitmain's economic duress after acquiring and developing the real property at significant time and expense and entering into a take or pay contract with its electricity provider. The Debtor simply sought the benefit of its bargain regardless of Bitmain's delivery delays. The Debtor needed to move on towards the next phases of the Term Sheet.

18. Once the Bitmain mining machines were delivered with the ancillary equipment, the Debtor at Bitmain's instruction and direction "get the machines up and running, ASAP" The ability to cause the "machines to run" was proof positive that the Debtor developed the infrastructure as Bitmain instructed. At that point in time, Bitmain did not provide a "wallet" for the Bitcoin to be "deposited in." As such, the Debtor created a "wallet" in which to deposit the mined Bitcoin.

19. *At this point*, Bitmain was obligated to remit about $740,000.00 to the Debtor pursuant to the integrated agreements. [See Attached **Exhibit E**]. Bitmain repeatedly promised it would; but of course, it never did. Ample excuses were always available.

***Bitmain never paid one penny.***

20. Significant time ensued and Bitmain failed to remit *any* money to the Debtor.

During this period the mining machines operated and mined Bitcoin. The mined Bitcoin were being depositing in the "wallet." A significant amount of electricity and other expenses were being incurred for which *timely* payment was required.

21. Had Bitmain paid the millions of dollars it owed the Debtor, the Debtor could have paid the electricity and other expenses and it would have also began paying certain amounts to Bitmain under the "disguised financing arrangement"[1]. But Bitman failed to remit even one penny to the Debtor. This lack of payment was difficult for the Debtor, creating significant financial problems. The Debor is merely a small business of approximately twelve (12) employees located in South Texas. Bitmain is a $10 billion dollar business and powerful company based in China.

22. The Debtor was forced to mitigate, recoup and cover. The Debtor desperately desired to protect its benefit of the bargain and properly mitigated its damages based upon Bitmain's failure to pay. The Debtor properly liquidated sufficient Bitcoin from the "wallet" to pay the electricity and other operating expenses. The Debtor *did not* use Bitcoin sales proceeds to pay the economic benefits that the Debtor is entitled to under integrated agreements. The Debtor is still analyzing the additional amounts that maybe owed under the contracts.

**Bitmain sought to capitalize and deprived the Debtor of the benefit of the bargain.**

23. Bitmain secretly in the middle of the night remotely "attacked" the mining machines in an effort to take sole control of them and the "wallet." The Debtor's employees at that time believed the mining machines were under cyberattack by "hackers" and took all necessary steps to protect against the attack. The Debtor's efforts prevailed. It was only later that the Debtor learned that Bitmain was behind the attack. This secret attack was disappointing.

---

[1] The Debtor reserves the right to commence a Bankruptcy Rule 7001 adversary proceeding against Bitmain, including without limitation with respect to actual character and nature of the agreement and the parties' relationship.

24. Bitmain again failing to perform, told the Debtor it "needed to pick-up all its stuff and the Bitcoin the Debtor mined and that the Debtor was simply was no longer a desirable Bitmain Host". The Debtor needing to preserve its benefit of the bargain refused to relinquish possession.

***Bitmain loses in State Court.***

25. Bitmain sued the Debtor in state court for possession. Bitmain was unsuccessful. Instead, the State Court issues a series of injunctions in the Debtor's favor permitting the Debtor to retain possession, and to liquidate the "mined and walleted" Bitcoin to pay all expenses [See Attached **Exhibit F-1, F-2 & F-3**]. The State Court injunctions essentially ratified the Debtor's previous mitigation and recoupment efforts and Bitcoin liquidations to pay expenses. The State Court acknowledged that the Debtor would likely prevail on the merits.

26. The State Court ordered mediation. The Debtor participated in the mediation in good faith. No settlement was reached. The Debtor was simply being "outspent" in the State Court by Bitmain's gaggle of lawyers. The Debtor essentially only had one lawyer. Based upon the failed mediation and *prior to* the expiration of the State Court injunctions, the Debtor filed this Chapter 11 case.

***The Debtor requires the Protections of the Bankruptcy Code – Assumption and Cure is proper.***

27. The Debtor simply needs a "breathing spell." 11 U.S.C. 362. The Debtor needs the protections of the Bankruptcy Code. The Debtor seeks to assume the integrated agreements and to cure any and all defaults as part of such assumption. 11 U.S.C. § 365. The Debtor requests that this Court determine the appropriate cure under the integrated agreements. 11 U.S.C. § 365. The Debtor "built it; so they will come." The Debtor and its creditors will be punished if the Debtor is unable to cure and assume these integrated agreements. The Debtor is entitled to the

benefit of its bargain. Assumption is proper. 11 U.S.C. § 365.

## ARGUMENT AND AUTHORITIES

28.     Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). The Debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g., Richmond Leasing Co. v. Cap. Bank N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) (apply a business judgment standard to debtor's determination to assume an unexpired lease); *COR Route 5 Co. v. Penn Traffic Co.* (*In re Penn Traffic Co.*), 524 F.3d 373, 383 (2d Cir. 2008) (explaining that the business judgment test "rather obviously presuppose that the estate will assume a contract only where doing to will be to its economic advantage"); *In re Del Grosso*, 115 B.R. 136, 138 (Bankr. N.D. Ill. 1990) ("[T]he standard to be applied for approval of the assumption [of an executory contract] is the business judgment standard. . ."). Accordingly, any assumption of the integrated contracts is an exercise of the Debtor's sound business judgment as these integrated contracts are the basis of the Debtor's current business operations.

29.     Section 365(b) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee [debtor-in-possession] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)     cures, *or* provides adequate assurance that the trustee [debtor-in-possession] will promptly cure, such default
> ...
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a part other than the

      debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

  (C) provides adequate assurance of future performance under such contract or lease.

*See* 11 U.S.C. § 365(b)(1).

  30. As part of such assumption, the proper Section 365 cure amounts the Debtor may owe Bitmain must be determined. Bitmain asserts that it would have paid the multiple outstanding invoices the Debtor issued Bitmain if the Debtor would have properly prepared invoices. Moreover, based upon the lack on non-payment by Bitman, the Debtor was forced to mitigate, cover and recoup.  Such efforts were all allowed by the State Court.  Bitmain asserts that the Debtor erred in exercising all such efforts. Determining the proper Section 365 cure amount will likely involve analyzing all such activities. The Debtor is currently evaluating its estimation of the Section 365 cure amount. Such analysis will likely take into consideration the current applicable recoupment rights as to the Bitcoin the Debtor has mined.

## RESERVATION OF RIGHTS

  31. Nothing contained herein and the *proposed* form of order is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtor, (ii) a waiver or limitation of the Debtor or any party in interest's right to dispute the amount of, basis for, or validity of any claim, (iii) a waiver of the Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable non-bankruptcy law, (iv) a waiver of the obligation for any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under Section 365 of the

Bankruptcy Code, or (iv) an implication or admission of consent, or modification or waiver of any rights, including consent rights. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or waiver of the Debtor's or any other party in interest's rights to dispute such claim subsequently.

## NOTICE

32.     Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rules 9013-1(d).

## CONCLUSION

**WHEREFORE**, Debtor moves the Court for an order approving this Motion and determining the cure amount, if any, and for any such other relief as to which the Debtor may be entitled.

DATED August 6, 2025.

Respectfully submitted,

*/s/ Steven Shurn*
Steven Shurn TBN 24013507
sshurn@hwa.com
HUGHESWATTERSASKANASE, LLP
Total Plaza
1201 Louisiana, 28th Floor
Houston, Texas 77002
(713) 590-4200 Telephone
(713) 590-4230 Facsimile
(713) 410-2139 Cell Phone

**PROPOSED COUNSEL FOR DEBTOR-IN-POSSESSION, ORB ENERGY CO.**

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing *Motion* has been served on all parties in interest listed on the attached "Service List" by either electronic means via the Court's CM/ECF system or otherwise by U.S. first class mail postage prepaid on August 6, 2025.

*/s/ Steven Shurn*
Steven Shurn