```
1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3   ORB Energy Co.                 )   CASE NO:  25-80363
                                   )   Houston, Texas
4            Debtor.               )
                                   )   Tuesday,
5                                  )   September 30, 2025
    ------------------------------)

6

7                          FULL HEARING
             BEFORE THE HONORABLE ALFREDO R. PEREZ
8               UNITED STATES BANKRUPTCY JUDGE

9

    APPEARANCES:
10
    For the Debtor:        STEVEN SHURN
11                         Hughes Watters & Askanase
                           TotalEnergies Tower
12                         Total Plaza, 1201 Louisiana Street
                           Houston, TX 77002
13

14  For Jamieson Zaniewski:  KY JURGENSEN
                             BoyarMiller
15                           2925 Richmond Ave., 14th floor
                             Houston, TX 77098
16

17  For Bitmain Technologies Georgia Limited:
                             JACOB SPARKS
18                           KASI CHADWICK
                             MIRANDA GRANCHI
19                           XENNA DAVIS
                             Nelson Mullins Riley & Scarborough
20                           5830 Granite Pkwy #1000
                             Plano, TX 75024
21

22  The U.S. Trustee:      C. ROSS TRAVIS
                           Office of the United States Trustee
23                         515 Rusk Street, Suite 3516
                           Houston, TX 77002
24

25
```

```
 1
    Court Reporter:

 2
    Courtroom Deputy:

 3
    Transcribed by:          Veritext Legal Solutions
 4                           330 Old Country Road, Suite 300
                             Mineola, NY 11501
 5                           Tel: 800-727-6396

 6

 7
    Proceedings recorded by electronic sound recording;
 8  Transcript produced by transcription service.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; TUESDAY, SEPTEMBER 30, 2025
 2                         (Call to Order)
 3         THE COURT:  All right.  Good morning.  It is
 4    Tuesday, September 30th, 2025.  We're here in case number
 5    25-80363, ORB Energy Company, and there are various matters
 6    that are set for hearing.
 7         Why don't we get appearances of Counsel, and then
 8    we can proceed.
 9         MR. SHURN:  Good morning, Your Honor.  Steven
10    Shurn, S-H-U-R-N, Proposed Counsel for the Debtor in
11    Possession.
12         MR. JURGENSEN:  Good morning, Your Honor.  Ky
13    Jurgensen, I'm Counsel for Jamieson Zaniewski, in his
14    individual capacity.
15         THE COURT:  Good morning.
16         MR. SPARKS:  Good morning, Your Honor.  Jacob --
17         THE COURT:  (indiscernible) yep.
18         MR. SPARKS:  Good morning, Your Honor.  Jacob
19    Sparks, Kasi Chadwick, Miranda Granchi, and Xenna Davis on
20    behalf of Bitmain Technologies Georgia Limited.
21         THE COURT:  Okay.  Anyone else wish to be -- make
22    an appearance?
23         All right.  Why don't we -- why don't we take care
24    of the retention first, and then -- Because I don't think
25    that should take very long, and then we will go to the
```

1    motion to assume.

2              MR. SHURN:  Okay, Your Honor.

3              THE COURT:  Okay.

4              MR. SHURN:  I'm not quite sure, would you like me

5    to (indiscernible)

6              THE COURT:  No, no, no.

7              MR. SHURN:  Okay.  Okay.  I have reviewed the

8    declaration with respect to the retainer.  I personally am

9    prepared to sign the order, unless there's some continuing

10   objection.

11             MR. SPARKS:  Your Honor, we can reserve making

12   objections for the fee application.  We believe these are

13   stolen funds, and that's really the bottom line.

14             THE COURT:  Right.  And you know, the

15   representation is that they are personal funds, and if that

16   proves to be incorrect, that's a totally different issue.

17             MR. SPARKS:  Thank you, Your Honor.

18             THE COURT:  All right.  Mr. Travis?

19             MR. TRAVIS:  Good morning, Your Honor.  Ross

20   Travis, for the U.S. Trustee.

21             THE COURT:  All right.  All right.  So --

22             MR. TRAVIS:  And I have no objections pertaining

23   to that.

24             THE COURT:  Okay.  So is there a proposed form of

25   order, or should I just enter the original order again?

1          MR. SHURN:  The original order, Your Honor.

2          THE COURT:  All right.  So let me just take care

3     of that.

4          MR. SHURN:  Thank you.

5          THE COURT:  It will only take a minute.

6          MR. SHURN:  Sure.

7          THE COURT:  All right.  That has been signed, and

8     sent to docketing.

9          MR. SHURN:  Great.  Thank you, Your Honor.

10          THE COURT:  Okay.  So you may proceed.

11          MR. SHURN:  Okay.  Thank you, Your Honor.  If I

12     may, I'd like to have an opening.

13          THE COURT:  Okay.

14          MR. SHURN:  Okay.  Very good, Your Honor.

15          I think it's important here today to put all this

16     in perspective, and the perspective is what essentially the

17     two pleadings are.  I'm going to leave aside the computer

18     ombudsman motion piece that you have said, or whatever we

19     need to call it to keep the U.S. Trustee's Office happy.

20          THE COURT:  Yeah.

21          MR. SHURN:  My whole goal there is just to have

22     the right person inspect the stuff, come back to the Court

23     and say it's good, and do it on a periodic basis.  I don't

24     care the nomenclature we use, but it's got to be an

25     independent person that reports to the U.S. Trustee, and

1    back to the Court.  So I'll just stick all that aside, and

2    really just focus on, to me, which are the two main

3    pleadings today, which is their 362 pleading, meaning either

4    the stay doesn't apply, or if it does apply, it should be

5    modified to allow them to exercise their state law rights.

6    And then also, our motion to assume the contract, and then

7    setting what the cure amount is.

8         So I think the first thing is it's important to

9    put 362 in perspective.  And 362 says, "Any act to obtain

10   possession of property of the Estate or," and this is I

11   think the important part, "of property from the Estate."

12   And I think that's the important point here.  We may bicker

13   back and forth about the nomenclature of things, you know,

14   was it stealing?  Was it exercising recoupment?  Is it they

15   have all right, title and interest to it, and we have

16   nothing?  Or do we have rights, since we expended money and

17   reliance on it, and so therefore, we have the ability to

18   recoup?

19        So you know, factually this stuff is pretty

20   similar, but then when you start talking about the

21   nomenclature of it, it's a little bit different depending

22   upon how you want to color it, and a lot of it's

23   perspective.  If you're from their perspective, I can

24   understand why they say what they say.  From our

25   perspective, I can understand why we say what we say.  And

1    so essentially, a lot of it is a matter of law, because the

2    facts are pretty much, you know, matchy-matchy, so to speak.

3    It's what they mean seems to be the important thing.

4            So with that, under 362, "or an act to obtain

5    possession of property from the Estate."  Now, on the Estate

6    right now, there are containers, there are servers, and the

7    Debtor is also in possession of their Bitcoin, about 12

8    Bitcoin, and I'm not a Bitcoin guy at all, but I think

9    that's worth over $1 million right now in today's market.

10   And I could be wrong, but it's a substantial value of

11   Bitcoin that they have right now, that they mined for

12   Bitmain.

13           Now, as to that stuff, I think the Debtor has

14   certain contractual rights.  They have a contract.  That

15   stuff got delivered to them.  The servers got delivered, the

16   containers got delivered.  So they can have "all right,

17   title, and interest" when those contractors signed, but they

18   delivered the stuff to us.  We don't have possession of it.

19   We don't have contractual rights as to that, and they have

20   obligations under the agreements to us, and as a result of

21   that, we have recoupment rights in it.  If they're not going

22   to pay their bills, we have the ability to liquidate it, and

23   pay those bills, and then figure up a true-up later.  Which

24   is kind of what our cure piece is, is figuring out what the

25   true-up is.  And the State Court, you know, essentially -- I

1    don't want to say adopted everything what we did, but

2    allowed them to liquidate the Bitcoin to pay the bills,

3    tried to maintain the status quo.  So it's not as though our

4    argument is foreign.  The State Court judge found that it's

5    pretty practical, and it made sense.

6              So while we have contractual rights, possessionary

7    rights, recoupment rights, we also have a right of first

8    refusal, in our opinion, as to the servers.  The company

9    went and spent all this money and time for this

10   infrastructure over a one-and-a-half year period, but the

11   idea of at the end, we're going to own these servers.

12   That's why there is a rent-to-own piece, or call it however

13   you like, disguised financing on the containers.  Every

14   month, a certain amount of credit from what the monthly

15   invoices were supposed to have been is a credit towards the

16   containers.  So at the end, the Debtor owns the containers,

17   or maybe even before then, and then has the right of first

18   refusal to exercise later at the end of this.

19              And so the idea is, fine, I'll work for you for

20   three years, but I'm going to end up with the site myself,

21   because they built it for a Bitmain site.  There was plenty

22   of times when they were building this, and they could have

23   turned and gone, we'll do AI instead, we'll do different

24   Bitcoin, we'll do something different.  But at every turn,

25   Bitmain told them, no, no, we want you, we want you, we want

1    you, it's going to be fantastic.  And then, once they were

2    past the point of no return, where they've already made

3    everything, and all the infrastructure solely for their

4    machines, they go, well, maybe you should find somebody else

5    now.  And we said, we can't.  We're past the point of no

6    return.  We need you.  We need you to perform, because it's

7    too late for us now.  And so that's kind of where they found

8    themselves.

9         Now, what Bitmain argues is, look, the contracts

10   terminated pre-petition.  There is nothing left for you to

11   assume.  And we disagree with that.  So one, because they

12   never paid a bill.  They were in material breach from day

13   one when they didn't pay.  We invoiced in September, they

14   didn't pay.  October, they didn't pay.  November, they

15   didn't pay.  December, they didn't pay.  The boots on the

16   ground told my guy, we'll pay, we'll pay, and at one point

17   said, we did pay, you'll get it, and then switch it to, no,

18   we will pay.  And they never paid voluntarily anything.

19   That's a problem.  So because they are in breach, we don't

20   think that they can exercise their right to terminate

21   because they have materially breached, and it excuses our

22   performance under Texas law.

23        The next piece is they say, yeah, yeah, but that's

24   fine and all, but it automatically terminates because you

25   self-mined.  And we say, but we didn't self-mine.  That's an

1  undefined term in the contract.  And we mined, but we did it

2  for you, but you've got to pay for it.  You don't get to

3  just get the Bitcoin and go, ha ha, we don't have to pay for

4  the electricity.  But they say, no, you're wrong.  That is

5  what happens under the contract.  Because we think you self-

6  mined, even though there's no determination in the State

7  Court, or pre-petition, anywhere that they self-mined, just

8  their unilateral position of you self-mined, and because you

9  did, this penalty clause here, this means that you have to

10 give us all the Bitcoin, and we're not responsible for any

11 of the electricity bills.  So now we get the utilities for

12 free, which is $300,000, $400,000, $500,000 a month, and we

13 get all the Bitcoin.  So by you liquidating that Bitcoin,

14 you stole it from us because you self-mined.

15        And it all falls on itself because we didn't self-

16 mine.  We mined for them, but they never paid their bill.

17 And if they don't pay their bill, how are we going to pay

18 for these things?  Well, they want us to die on the vine.

19 And that's why they did a cyber attack in the middle of the

20 night.  What they wanted to do is brick up all the machines,

21 take the Bitcoin, suffocate us so we couldn't pay the bill,

22 and then sneak away in the night and leave these guys

23 hanging.

24        Interestingly enough, Mr. Jamieson, he inherited a

25 lot of money from his family.  He's been successful in other

1    ventures.  So to say, oh, gee whiz, if he has money, he must

2    have stole it, that's why they picked him.  He had the money

3    to do this in the first place.  You have to pick somebody

4    that has money.  You couldn't pick somebody that doesn't

5    have money.  So to say if he has money, he must have stole

6    it is a bit much.

7         So getting past we don't believe that it was

8    terminated -- And here's another reason why.  The purported

9    time of when this termination happened is when the State

10   Court orders were in place.  The State Court orders did not

11   expressly allow a termination of the agreement.  They didn't

12   say status quo, but someone can terminate whenever they

13   want.  It doesn't say anything about termination.  What it

14   says is we're going to keep going and pay, and we're going

15   to figure out where we are.

16        Now, that judge there, this probably isn't the

17   best case for her there.  I think she did a really good job,

18   and she figured it out, but you know, I don't think that

19   that's maybe the best place for that case.  But all that

20   said, if a termination happened, and it happened during the

21   TI, even if they say it's automatic based upon their belief

22   that there was self-mining, that didn't get them there.

23   It's not terminated.

24        So then you're back to, I have a contract, I've

25   got contract rights, I've got possession rights, I've got

1    recoupment rights, I've got right of first refusal rights,

2    and I have credits in the containers.  So I have all these

3    rights.  So to say the stay doesn't apply, we disagree with

4    100%.  We have property interest in that stuff as a matter

5    of law, based upon the documents.  Right?  The documents are

6    the documents that have independent legal significance.

7    They just do.

8           And so that brings us to the next piece of 362, to

9    lift the stay.  So stay is in effect on all this stuff.

10   Then the question is, is there cause?  And we say there's

11   not cause.  We've added them to the insurance.  We want to

12   have the right person out there to report to the Court that

13   the machines are in good stead, that everything's being

14   operated properly.  We're paying the electricity.  Jamieson,

15   out of his own personal funds, just paid the bill this

16   morning for several hundred thousand dollars.  So it's up

17   and running, which is what they want.  They want the data

18   center up and running.  Right?  If it didn't run, it would

19   be a different fight.  You built something, and it doesn't

20   conform.  It doesn't work.  But what we built works.  But

21   it's a matter of paying for it.  So we say cause doesn't

22   exist.  We think they're adequately protected.

23          Now, they'll say, Jamieson's a bad guy.  We don't

24   like dealing with him.  He does this by the seat of his

25   pants, entrepreneur type, he should have had more business

1    people in there.  And I don't disagree that he needed a

2    bookkeeper.  I don't disagree that he needed a CPA I don't

3    disagree that he could have done it better, and had more

4    business people in there, instead of the entrepreneurial

5    mindset, and then having an operations guy, which is Parker

6    Smith over there, with his crew maintaining these things.

7    There was a gap, and they should have filled that gap.

8           But when you think about it, how are they going to

9    fill that gap if their only customer, or main customer is

10   the CPA?  them?  This is a startup.  So they start this

11   thing up, the containers get delivered, within a couple of

12   months, the servers get delivered.  They power them on and

13   go, great, pay us, and they go, no, we're not going to pay.

14   Or it'll be -- check's in the mail.  Well, how are they

15   supposed to operate this startup business?  That's their

16   main customer.  It's completely unfair to say, we put you in

17   this position, and now any twist and turn you do is your

18   fault.  It's your fault.  But they didn't pay, after we

19   relied on them and built all this.  It's just not fair.  We

20   don't think cause exists.  We think they're adequately

21   protected.

22          Also, it's necessary for an effective

23   reorganization.  We built this site to run Bitmain

24   computers.  Rip them all out, I don't think I have a

25   business here.  Maybe during the case, this is early in the

1   case, maybe someone's willing to come in and buy the whole

2   site turnkey.  Maybe there's enough money that makes them

3   happy, and makes us happy.  Maybe there's something out

4   there.  I don't know.  But no one's going to sit here and

5   start looking at it and making bids if hanging over our head

6   is the computers are going to be ripped out any day.  Why do

7   it?  If the stay is imminent to be lifted, or is lifted, no

8   one's going to come in, you can never have a white night,

9   you can never do anything.  And it's early in the case.

10  It's early in the case.

11         So 362 applies, 362(a), because they're trying to

12  take possession either property of the Estate, meaning our

13  interest in those things, right, the contractual rights,

14  possessionary rights, recoupment rights, right of first

15  refusal, and the credits we have in the containers, or

16  merely taking property from the Estate.  And we say they

17  don't meet 362, the stay shouldn't be lifted.

18         So anyway, this is the next piece, the next piece

19  is 365.  And it's, well, in the Debtor's business judgment,

20  did the Debtor properly exercise the Debtor's business

21  judgment to determine to assume the contract?  I say yes.

22  It's their only customer.  They built it for them.  And it's

23  for Bitmain proprietary technology.  Who else is going to

24  bring that many Bitmain computers on the site?  Regardless

25  of the relationship between them, he relied on their

1   statements and built this.  They then delivered the stuff,

2   and were supposed to perform with money, and never did.  I

3   think they're stuck together, and they're joined at the hip.

4   Otherwise, there's substantial loss of going concern.

5            And that's not what the case is about.  They went

6   and got electricity contracts with Jackson Electric for five

7   years in reliance on all this.  And they have ERCOT

8   buybacks, and there's the whole complex Texas, you know,

9   independent grid system, they're wrapped up in it.  They

10   have high demand.  They're pulling a lot.  And then when

11   demand is high, or a hurricane comes, they sell back and

12   shut down.  So the way the system's set up, they're a part

13   of it, and so they did all that relying.  And so it's just

14   hard for me to say, well, that's not a proper exercise of

15   your business judgment, to seek to assume it because y'all

16   don't get along at all.  Well, if they don't get along, I

17   guess we have to come to court in an adversary proceeding,

18   and figure out what it all means.

19            They say, you're wrong.  You can't assume it.  And

20   the reason you can't assume it is that provision in there

21   that says if you self-mine, we don't pay for utilities, and

22   you have to give us all the Bitcoin.  So you can never cure

23   because you've sold a lot of Bitcoin.  And so unless you

24   give us that Bitcoin back, you can't cure.  And our response

25   is, that penalty is unenforceable.  That's an unenforceable

1    penalty.  If there was a breach for self-mining, which we

2    proclaim there's not, and we didn't self-mine, but even if

3    we did, it's not measured to what damages they would have.

4    If they went out into the world and had somebody else run

5    those servers and generate Bitcoin, right, they would have

6    to pay for the electricity.  It's a windfall.  They want to

7    steal.  Right?  They want to steal, and take without paying

8    for it, the electricity, which is then from oil, or from

9    wind, or from whatever it may be.  But they want the

10   resources without paying for it, and they want the Bitcoin.

11           This Bitcoin apparently is worth a lot of money.

12   I don't understand it very well, and I'm not going to

13   proclaim that I do, but it's worth a lot of money.  And I

14   think what this mining stuff is, and everyone will tell me I

15   don't know what I'm talking about, somehow it's the

16   accounting piece of it, the blockchain accounting piece, and

17   that's what these servers do to figure out if other

18   transactions were right, and then when you do it, you're

19   awarded little bits of Bitcoin or something.  I don't fully

20   understand.  But it's not like we're in a coal mine,

21   pickaxing and mining, you know, pieces of stuff that come

22   off.  It's just from doing these accounting transactions, I

23   think.

24           But so for 365, we assert that the Debtor properly

25   exercised the business judgment to assume it.  And then the

1    question becomes, well, what's the cure?  Because if they're

2    right, and that penalty is enforceable, I'm going to agree

3    with them that they don't have $6 million, right, or likely

4    don't have $6 million, if that's the cure.  If that penalty

5    is enforceable, I think they've got a cure problem.  But we

6    say it's not enforceable.  It's a penalty.  Especially in

7    Bankruptcy Court, it's not measured to any damages.  And

8    plus, we didn't self-mine.

9         And so then you go to, well, okay, let's net it

10   out.  Right?  How much Bitcoin did you sell?  How much were

11   the electricity bills?  How much were they supposed to pay

12   you on the spread?  Because there's a delta.  Right?  We go

13   get electricity for X, and they have to pay X plus 3, or X

14   plus 6, or X plus something.  And so when we run all those

15   calculations, we don't owe them anything.  They owe us.  And

16   they go, no, but you have our Bitcoin.  You have 12 Bitcoin

17   right now.  And I go, yeah.  I mean, as part of our cure

18   motion, we'll give you your Bitcoin after we true up what

19   you owe us, and we'll periodically give you your Bitcoin.

20   We'll do whatever we need.  But they say, no, but you don't

21   get it.  You stole our Bitcoin.  You put it in your wallet.

22   And I say, but we didn't steal it.  The machines got

23   delivered.  They got turned on.  It's in December, it's cold

24   outside.  If you let those things just sit out there,

25   they'll freeze.  It's water-cooled.  It's antifreeze-cooled.

1    You've got to run this stuff.  You want to go through a

2    Texas freeze?  You want this to break or that to break, and

3    now you're in breach?

4            It's always, I got you if you do it, I got you if

5    you don't do it, no matter what, you did it wrong.  Had you

6    done your invoice like this, we would have paid it.  Had you

7    done this like that, we would have done it.  It's always too

8    cute, and if you would have done something else, we would

9    have paid, but you didn't do it right.  And you didn't do it

10   right because you're a bad guy.  And that's just what it is,

11   and this guy's got told now for 12 months, you're a crook,

12   you're a crook, you're a crook.  For a year-and-a-half, he

13   was the best guy in the world, and hey, boss, I love you,

14   boss, hey, boss, this is great, keep building it, boss, keep

15   building it, did you get the power, did you get this?

16           And then all of a sudden, when they fire up the

17   machines, and it comes time to pay, they go, you stole

18   because you put it into your test wallet.  And we say, but

19   that's the industry standard, to put it into a test wallet.

20   We're not saying we own the wallet.  I mean, it's not a bank

21   account.  But if I have a bank account, and I have your

22   money in it, there's a presumption that it's my money.  But

23   if we trace it, it's still your money in my account.  And

24   it's even different, there's no presumption with a wallet.

25   You just have access to it.  It's not in somebody's name.  I

1    don't even think there's a presumption.  You may have the

2    keys to it, but we can give them the keys.  We've been

3    willing to give them the keys.  But pay your invoice.

4    You've got to pay.

5          They don't want to pay.  They don't want to pay

6    because Jamieson's a bad guy.  Jamieson stole the money, and

7    gave me a retainer.  He says, not true.  I inherited money,

8    and I've done well in other ventures.  You know, he stole

9    our Bitcoin to pay the electricity, and we shouldn't have to

10   pay the electricity.  It's no matter what, he stole it, he's

11   bad, and so he should be punished.  And we say no.  We say

12   that the cure is zero, except for the fact that we do have

13   12 of their Bitcoin.  That's worth a lot of money, and they

14   deserve their Bitcoin, provided they pay for the

15   electricity.

16         So I think what we have here to kind of sum it up,

17   Judge, the stay applies.  It's early in the case.  They are

18   adequately protected.  They may not like it, but they are

19   adequately protected.  No cause exists to lift the stay.

20   This stuff is absolutely necessary for an effective

21   reorganization.  Maybe it's a sale, maybe it's this -- I

22   don't know.  It's early.  Tons of cases, you get in there

23   and you go, how am I ever going to get out?  Stuff happens.

24   It's the real world out there, you just don't know.  You

25   don't know until you try.  Maybe there's enough money to

1    somehow come in and we can make it all work.  I don't know.

2    But it's early.

3          And as for 365, it's a proper exercises of

4    business judgment.  We're still grappling with, and I think

5    we've come to the landing, but we updated it even yesterday,

6    what we think the cure amount is, and the analysis, and the

7    way that it works.  And I'm happy if we continue the hearing

8    on the cure piece.  I'm not saying, oh, we've got to get our

9    zero cure today.  I'm not saying that.

10          What I think I want to leave here with today is

11    their stay motions denied, and we can carry the motion to

12    assume.  I am absolutely fine with that.  But I've got to do

13    something with the case.  I've got to make this going

14    concern value that I have here from my contract rights and

15    rights of first refusal mean something.  Because I've got

16    other creditors.  I mean, I've got Chase Bank filed claims

17    for $100,000.  I've got the person they bought the property

18    from is owed $90,000 to $60,000.  They were sending

19    cashier's checks, and some may have been cashed, or not.

20    It's a little bit of a mess.  But still, $60,000 or $90,000.

21    Utility company is going to be owed money.  And so there's

22    real creditors that relied on my clients, because my clients

23    relied on them.

24          And so we would like to leave here today with

25    their lift stay denied.  We're more than happy to carry our

1    365 motion, especially on the cure piece.  Because I'll be

2    honest, if Your Honor ultimately rules no, you owe $6

3    million, I can't assume it because I can't cure it.  But I

4    don't know that we have to do that today.  I think what we

5    have to do today is get the right person out there to

6    inspect the computers, and report back and say, hey,

7    everything's a-okay, that they're adequately protected.  And

8    deny their motion to lift stay.  They can come back in 60 or

9    90 days if nothing's happening in the case.

10           I mean, that's why for single-asset real estate,

11    they give the Debtor 90 days and say, hey, you can start

12    paying, or we're going to lift the stay, because at some

13    point, enough is enough.  But we just started this case.

14    And they're a startup, and they've got some cleaning up to

15    do on their books.  And you know, I've got them in touch

16    with an accountant who's been helping them.  We're trying to

17    fix the schedules and SOFAs.  It needs more help.  You know,

18    but when I talk to clients and say, okay, what's your

19    accounting, do you use QuickBooks, they go, yeah, we have

20    QuickBooks.  Well, I need to start asking now, do you use

21    it?  Do you use it all the time, as opposed to do you have

22    it?  Because better could have been done.  Best practices

23    were not followed.  They weren't.

24           But that doesn't mean they're crooks.  It just

25    means they're -- you know, you've got a technical guy that's

1    on the ground, dealing with the computers, and then you've

2    got another guy who's a math and science guy, who's an

3    entrepreneur type.  These aren't accounting type people.

4    They're just not.  But just because they don't know the

5    answers, or get them wrong, doesn't mean they stole.  It

6    just means they don't have the information at their

7    fingertips, and they need a good CPA, which is why I

8    recommended them to Ken Wood and Associates, and David Bott,

9    because that's who all the Trustees use here in town.  Or a

10   lot of the Trustees.  I don't want to say all of them,

11   because you know, Jim Smith's gone, and everyone else is

12   gone.  It's a very limited pool of CPAs in town that

13   understand bankruptcy, and we just need to figure it out.

14          But even if they did some stuff that's accounting

15   bad, or should have disclosed more transfers, or this or

16   that, what's that got to do with their lift stay?  I don't

17   think it does.  It doesn't fit the elements.  It's not for

18   cause.  You know, if Jamieson beats up little kids and kills

19   kittens, that's not for cause.  I may not like him for doing

20   that, but that doesn't mean that they get to lift the stay

21   and get their stuff.  You know, if he failed to register

22   with the Texas Secretary of State, and he thought that he

23   did, he thought he had done everything because of entering

24   into the utility contract and stuff, and then it turns out,

25   no, you needed to do one more step, well, he asserts he

```
 1    didn't sell any Bitcoin last year anyway, so maybe his first
 2    franchise tax return is due this year anyway.  You know, for
 3    franchise tax, it would be due this year anyway.  And he's
 4    already accepted.  If we owe something, I'll pay it.
 5              So they've got to take some corrective steps as
 6    far as housekeeping goes.  I did not realize that it was in
 7    as big a disarray as it is until we started going through
 8    this exercise, and it needs some help.  But again, that's
 9    not a lift-stay issue.  Right?  That's not we're going to
10    rip the value, the going concern value from this Estate.
11    It's they need to tidy up their stuff a bit.  And they do.
12              So Your Honor, I'll sum it up very quickly.  The
13    stay applies, they're adequately protected, no cause exists.
14    This stuff is necessary for an effective reorganization, and
15    we want to assume the contract as long as it's a cure that
16    we can afford.  And we believe it's a zero cure, but you
17    know, I'll say, you know, for them, you know, I gave them
18    this amended cure last night.  I don't think it's fair for
19    them to sit here and have to analyze it today.  I think we
20    can stick a pin in that piece.  I think due process probably
21    requires it.  I'm not trying to run them over, I'm just
22    trying to administer them.
23              Thank you, Your Honor.
24              THE COURT:  Thank you.
25              MR. SPARKS:  Thank you, Your Honor.  Jacob Sparks,
```

1     on behalf of Bitmain Technologies Georgia Limited.

2          I suspect, and we've gotten a preview, that today

3     is going to involve ORB relying heavily on its CEO's

4     testimony, and perhaps its COO's testimony, to try to

5     establish a multitude of contested facts.  They have to rely

6     on the testimony of the officers because the available

7     documentary evidence, including the party's communication,

8     tells a very different story.  But most of the facts are

9     going to end up being irrelevant for today's purposes

10    anyway.  We've really got two questions.  That is, was the

11    contract terminated prior to the petition date?  And who has

12    right, title, and interest in the miners?  So the two

13    primary motions are the motion to assume the executory

14    contract by ORB, and the motion to confirm the stay is

15    inapplicable, or in the alternative, to lift the stay by

16    Bitmain.

17         Whether Bitmain owns the property should be

18    uncontested because the party's agreements are crystal clear

19    on that point, and ORB has never alleged that they purchased

20    the property.  They have no right, title, and interest in

21    the miners, and when they talk about things like their

22    rights in the miners or their right of first refusal,

23    they're ignoring the agreements entirely.  There is no

24    language in the agreements giving them any right of first

25    refusal, any option of any kind of purchase, any kind of

1    financing.  There is nothing like that in the agreements.

2    They give them the option to purchase the containers, these

3    cooling containers that the miners are inside after the end

4    of the hosting sale period.  And that period has not ended,

5    and at this point that's not possible because they have

6    breached the agreements.

7            Whether the parties' agreements were terminated

8    prior to the petition date, also the evidence is

9    overwhelming, because Bitmain sent multiple notices of

10   breach starting in December of 2024.  It sent a notice that

11   it was withdrawing the Bitcoin mining servers when they

12   could not get this resolved.  And by the way, how they

13   wanted to resolve it?  Bitmain said, just deduct the self-

14   mining proceeds, the Bitcoin that you've stolen, just deduct

15   that from the deposit, and we'll send you a check, let's get

16   back on track.  They wouldn't do it.  They wouldn't give

17   back the stolen property.

18           So after Bitmain said it was going to withdraw the

19   miners, they refused to let them do it, the lawsuit was

20   filed.  At the last hearing, the judge in the State Court

21   said unequivocally to ORB, you're going to have to return

22   their property.  So before the next hearing, they filed

23   bankruptcy.  And a month before the bankruptcy -- well, on

24   July 16th, 2025, because ORB kept telling the State Court

25   that the contracts hadn't been terminated, Bitmain sent a

1    written notice telling them unequivocally the agreements

2    were terminated.

3              The agreements had been terminated prior to that

4    because the agreement says that when they self-mine, the

5    agreements can be terminated automatically, and they started

6    self-mining the day after they received the miners.  When

7    they got them set up for the first time, they started

8    stealing immediately, because ORB was upset that Bitmain

9    hadn't paid a deposit invoice.  ORB had never issued an

10   invoice to the correct Bitmain entity.  Bitmain is a Chinese

11   company with an American affiliate.  The invoice had to be

12   issued to the American affiliate.  First, they started

13   issuing an invoice two months before it was going to be due,

14   and then they issued a series of incorrect invoices, and

15   never issued a correct invoice to the correct entity until

16   after they had already started self-mining.

17             That's why they didn't get their invoice paid, and

18   that's the genesis of this entire dispute, them receiving

19   the miners, being angry that an invoice, an incorrect

20   invoice hadn't been paid, and saying, well, we're just going

21   to steal all the Bitcoin.  We're going to set these up,

22   we're going to direct these miners to a pool that we

23   control, and then we're going to send it to a wallet that we

24   control.  The agreements say over and over and over again,

25   there is no circumstance where you can do that, and they did

 1   it anyway, and they did it immediately.

 2        But ORB says that Bitmain couldn't terminate the

 3   agreements because Bitmain had already breached the

 4   agreements first.  That's what they say.  Essentially, it's

 5   that because Bitmain didn't pay their deposit invoice, they

 6   could just take the miners, and they could take all the

 7   Bitcoin, and they could just keep it all forever,

 8   apparently.  We've never really had any explanation of how

 9   this argument makes any sense, but it's incorrect, legally

10   and factually.  Bitmain didn't breach, because of the

11   invoice issue.

12        But if Bitmain had breached first, then ORC could

13   have terminated, or they could have continued performing and

14   waived the default.  They could have continued performing,

15   and demanded money damages.  They have remedies under the

16   law.  They didn't do those things.  They didn't continue

17   performing.  That's for sure.  They breached the agreements

18   immediately.  So it wasn't recoupment, it was theft.  And

19   there's Texas cases directly on point that say, if you do

20   what they did, you act as judge, jury, and executioner

21   because you're upset about a contract breach, that's

22   conversion.  It's not recoupment.  To exercise recoupment

23   properly, you have to be able to do so without breaching the

24   contract.  That's the exact opposite of what they did.  But

25   it doesn't really matter who breached first, if the

1    contracts were terminated prior to the petition date.  We

2    don't even have to decide that today.  And they were.  They

3    were terminated at the very latest at July, but likely much

4    earlier.

5         Opposing Counsel said in his opening that ORB was

6    excused from performance.  ORB was only excused from

7    performance if they terminated.  So their argument, whether

8    they know it or not, or like it or not, seems to be that

9    they did terminate at some point.  If you decide that it

10   does matter, though, Your Honor, who breached first, ORB

11   breached first.  If you decide that Bitmain didn't

12   terminate, and that ORB didn't breach first, then Bitmain

13   would be entitled to adequate protection, prompt cure,

14   adequate assurance of future performance, and everything

15   else that's in the statute.

16        Because ORB started self-mining immediately after

17   receiving Bitmain's miners, they've stolen $7 to $10 million

18   worth of Bitcoin.  And the contract says that all mined

19   Bitcoin has to be returned to Bitmain within seven days, and

20   it says that if they engage in self-mining, they have to

21   bear the fees, the hosting fees, not Bitmain.  Instead,

22   they're trying to offset all of their expenses against the

23   stolen Bitcoin, saying they owe Bitmain next to nothing, a

24   couple hundred thousand dollars instead of the $7 to $10

25   million.  And the reason I say $7 to $10 is we're not really

1    sure because they had one thing in their statement of

2    financial affairs and schedules before last night, when they

3    amended to try to fix the material misrepresentations that

4    were revealed during Mr. Zaniewski's deposition.  Because

5    the statements were false.  He gave false testimony at the

6    meeting of creditors, and they amended last night to try to

7    fix it before the hearing today.

8         So I'll point out, Your Honor, that Opposing

9    Counsel used an analogy of a bank account.  And that analogy

10   could work.  That analogy would be a business hires a

11   service provider to provide a service, the service provider

12   gains access to the business's bank account, and they steal

13   all of their money.  And then, when they get caught, they

14   claim it was because the business didn't pay an invoice, and

15   then they filed bankruptcy to try to avoid repaying the

16   debt.  That's the only bank account analogy that makes any

17   sense here today.

18        Thank you, Your Honor.

19        THE COURT:  Thank you.

20        MR. SHURN:  You Honor, may I rebut, or would you

21   like to talk?

22        THE COURT:  No -- I mean, you can go ahead and

23   rebut.  Yeah.  I mean, I want to -- Before we get started, I

24   want to understand kind of what we're going to focus on for

25   the next couple hours.  Because there are lots of different

1    issues, both factual and legal, and I just want to make sure

2    we're using our time wisely.

3            MR. SHURN:  Yes, sir.  Agreed.  I just want to

4    make the point that there is a right of first refusal in the

5    term sheet, there are three agreements, the term sheet has a

6    term of three years.  It's our position that that term sheet

7    is not a letter of intent, it's the deal.  And then they

8    enter into other -- it's the mothership, and then they enter

9    into other contracts over time.  And in there it says, yeah,

10   you have a right of first refusal.  Okay?  They're going to

11   say, yeah, but we signed these other documents, and they

12   have integrated contract clauses in them.  And I'll go,

13   yeah, but it says for the stuff that's addressed in there.

14   So if it's over here and it's addressed in there, I think

15   they're right, it deals with it here.  But if it says it

16   here, you have a right of first refusal, and it's not in the

17   other documents, it's not barred.  It still exists.  It's a

18   three-year contract.

19           So I just wanted to make that clarity point, that

20   they're focusing on the two contracts, where I say that

21   there's three contracts that are integrated agreements.

22   Because when my guy went to Hong Kong, they promised him a

23   term sheet.  And this isn't the term sheet he was promised,

24   but it was still a term sheet that was going to govern the

25   relationship.

1          That's all, Your Honor.  I just wanted to clarify

2     that point.  I apologize.

3          THE COURT:  All right.  So it's -- And I want to

4     understand, but it seems to me that kind of the first

5     question is to determine whether we have an existing

6     contract.  And so I think the focus on that probably makes

7     the most sense to me, because I think if we have a contract,

8     then we do one thing -- And obviously, I agree with you, we

9     can defer the cure and the assumption until after we deal

10    with the motion to lift stay.

11         MR. SPARKS:  Thank you, Your Honor.

12         THE COURT:  And then, you know, we've got

13    basically 'til noon today, so we've got two more hours.

14    Let's use that time efficiently, and then I'm sure we'll

15    find some time, you know, later this week.  I want to make

16    sure that we get all of the documents and evidence and

17    whatever testimony we need with respect to the contract

18    issue first.

19         MR. SPARKS:  Great.

20         MR. SHURN:  May I, Your Honor?

21         THE COURT:  Yes.

22         MR. SHURN:  Okay.  Thank you, thank you.

23         So if we stick a pin in the 365 piece, which I

24    think makes sense for a number of reasons that we discussed,

25    then it comes down to, like you said, is there a contractor,

1   or is there not?  I will stipulate that we have three

2   contracts.  And we can admit them into evidence.  I think

3   they have independent legal significance.  I don't think

4   they're business records of anybody.  I think that those are

5   the contracts between the parties.  Now, we may argue that

6   some provisions are unenforceable, and they may so, you

7   know, they're all enforceable, which is the legal argument.

8            THE COURT:  Right.

9            MR. SHURN:  Right?  But as far as the three

10   contracts go, you know, I don't think they dispute there was

11   a term sheet, they just say it's superseded by the other two

12   agreements.  I say, well, I disagree.  But to figure that

13   out, you need all three of them in evidence, and then for

14   Your Honor to make a legal determination.  So I'll stipulate

15   that all three can come in.

16            MR. SPARKS:  Your Honor, do you mind if I use this

17   in times like this, or would you like (indiscernible)

18            THE COURT:  Yeah, no, that's fine.  Yes.

19            MR. SPARKS:  We will stipulate to the

20   admissibility of the term sheet, and then the two

21   agreements.

22            THE COURT:  Okay.  All right.  So then, those

23   three are admitted.  Let's just make sure, let's get the

24   right numbers for them.

25            MR. SHURN:  Yes, sir.  And I believe I have them

1    in my exhibit list already (indiscernible)

2              I'm sorry, Your Honor (indiscernible) just has to

3    put up with me.  Is it this one?

4              So Your Honor, I believe in my exhibits --

5              THE COURT:  39-1, 39-2, and 39-3.

6              MR. SHURN:  You are correct, sir.

7              THE COURT:  Okay.

8              MR. SHURN:  You are correct, sir.

9              THE COURT:  All right.  So then, those three

10   agreements will be admitted.

11             MR. SHURN:  Okay.  All right.

12             THE COURT:  Okay.  So now we had contracts, so

13   then the issue is, were the contracts terminated pre-

14   petition?

15             MR. SHURN:  Right.  So I think then what we also -

16   - And I suspect we can stipulate as to this too, that we

17   ought to include all three State Court orders that were

18   entered.  Because to me, that's relevant.  Because if you

19   say, now look, it was in March, and it was automatic, well,

20   then those orders aren't relevant.  But if somehow it

21   becomes, oh, no, no, wait, it was during when the TI was,

22   then they become relevant.  So I think we need those three

23   admitted as well.  But the probative value depends on, you

24   know, the argument.  So I'll leave that to you, sir.

25             MR. SPARKS:  We agree to admit the temporary

1    restraining order, the amended temporary restraining order,

2    the temporary injunction, and the order clarifying temporary

3    injunction.

4         THE COURT:  Okay.  So I have 39-12 is the amended

5    temporary restraining order?  Is that the clarification

6    order?

7         MR. SHURN:  Yes.  Yes, sir, it is.  Our book is

8    out of order, Your Honor, and I apologize for that.  I think

9    that 13 and 14 should have been flipped, I think.  But I'll

10   let Mr. Sparks tell me if I'm wrong.

11        MR. SPARKS:  No, Your Honor.  There was a

12   temporary restraining order that was entered sua sponte

13   without a -- well, I mean, I guess ex parte, without a

14   hearing.

15        THE COURT:  Okay.

16        MR. SPARKS:  Then there was an amended temporary

17   restraining order that was also entered ex parte, without a

18   hearing.

19        THE COURT:  Oh --

20        MR. SPARKS:  Then there was a temporary

21   injunction.  Then there was a party on -- or there was a --

22   a party, there was a hearing on ORB's noncompliance, and

23   after that, the judge entered an order clarifying temporary

24   injunction.

25        MR. SHURN:  So Your Honor --

1           THE COURT:  Where he said he was mistaken -- Is
2      that the one?  Is that the order where he said --
3           MR. SHURN:  No, they're not flipped.  I have the
4      one not in my book that he's mentioning.  So we're going to
5      have to admit 39-12, 13 -- I mean, 12 -- Okay, I apologize.
6      For 39-12, 39-13, and 39-14, but then we're also going to
7      have to admit the order he referenced, that's not in my
8      book.  So we'll do these three first, and then we'll get
9      that one in too, Your Honor.
10          THE COURT:  Okay.  So that one is -- I think I
11     read that order.
12          MR. SPARKS:  I don't know that we're going to use
13     the original TRO, Your Honor.  If we do, we'll bring it up
14     later.  But for now, we can just enter the ones that are in
15     Opposing Counsel's exhibit book.
16          THE COURT:  Okay.  All right.  So that's -- So
17     then we'll admit exhibits 39-12, 39-13, and 39-14.
18          MR. SHURN:  Okay.  So then it becomes this issue.
19     And I'm trying to avoid fighting, because a lot of this is
20     the contract is the contract is the contract, and we
21     probably don't need to spend hours with people testifying
22     and wasting the Court's time.
23          They sent a series of letters that, you know, I'll
24     assert were made in anticipation of litigation.  They were
25     sent by lawyers.  I think that they're hearsay.  I think

1    they're self-serving.  But I do believe that it's probative

2    value.  At the very least, I'll admit that, that the

3    statements were made by them, that they made the statements

4    to the Debtor and said, hey, look, our position is X, our

5    position is Y, and the Debtor received those letters.  So I

6    mean, I will admit that those need to come in.

7         However, you know, the probative value and the

8    weight of them is different, you know?  If I say, Judge, I

9    write you a letter and go, Judge, remember last week you

10   promised to buy me a Ferrari, and I put it in a letter and

11   send it to you, it doesn't make it so.  It just means I put

12   it in a letter.  But it has value because I wrote it, and

13   you got it.

14        So I will admit that those can come in, but for

15   limited probative value for the fact finder.  And maybe the

16   fact finder ultimately says, yeah, your limited value, no,

17   it's full.  But I'm willing to admit that those come in, so

18   we try to have a full record, because those statements were

19   made.

20        MR. SPARKS:  We agree, Your Honor.  And I can give

21   you those exhibit numbers, if you'd like.

22        THE COURT:  Yes, sir.

23        MR. SPARKS:  So Exhibit 15.  Our Exhibit 15, Your

24   Honor.

25        THE COURT:  Okay.  So what's the docket number on

1    it?

2            MR. SPARKS:  I don't have the file-stamped copies

3    in front of me.

4            THE COURT:  No, no, just give me the -- Is it 44,

5    or is it?

6            MR. SPARKS:  44, yes, Your Honor.

7            THE COURT:  Okay.  So your Exhibit 15 is the

8    notice of breach, dated December 12th, 2024.

9            MR. SPARKS:  Yes, Your Honor.

10           THE COURT:  Okay.  Now, but I didn't see that --

11   where is -- Is that attached to your motion to lift stay?

12   Because it's not attached to the exhibit list.

13           MR. SPARKS:  I believe it was attached to the

14   response to their motion to assume.

15           THE COURT:  Okay.  Let's see if we can find where

16   it actually is.

17           MR. SHURN:  And Mr. Sparks, what are y'all looking

18   for?  I'll try to help.

19           MR. SPARKS:  The December 12th, 2024 notice of

20   breach.

21           MR. SHURN:  I don't think I (indiscernible)

22           THE COURT:  No, you didn't.  No.  So it would be -

23   -

24           MR. SPARKS:  Exhibit 38 on our witness and exhibit

25   list.

```
 1                THE COURT:  Yeah, it's Exhibit 38, but it's -- it

 2    is --

 3                MR. SPARKS:  Well, the three exhibits that we're

 4    talking about on our exhibit list are 15, 17, and 38.  Are

 5    you looking for them as an attachment to a motion or

 6    response?

 7                THE COURT:  Yes.  Yeah, that's what I'm looking

 8    for.

 9                MR. JURGENSEN:  (indiscernible) but our Exhibit

10    31-14 is an extension of (indiscernible) I don't know if he

11    had offered the clarifying order (indiscernible)

12                MR. SPARKS:  And we're agreeable to admitting the

13    order extending the temporary injunction as well.

14                MR. SHURN:  So I missed two, Your Honor,

15    unfortunately.  I have three in there, and there's two more.

16    And so now both have come to you, and so they'll

17    (indiscernible)

18                THE COURT:  Okay.  I just need to find the

19    documents.

20                MR. SHURN:  Yes, sir.  And I'll leave that to Mr.

21    Sparks, to identify them, Your Honor.

22                MR. SPARKS:  They were all attached to ECF 14,

23    which was our response to the motion.

24                THE COURT:  Okay.  Let me go over to that.  I

25    thought they were --
```

 1            MR. SPARKS:  And those specifically are in

 2    Appendix 2.

 3            MR. JURGENSEN:  Mr. Sparks, I'm showing your

 4    Exhibit 42 is your clarifying temporary amendment, going off

 5    of your witness list, ECF number 44.

 6            THE COURT:  Yeah, all I need to do is just match

 7    where in the record each of those exhibits are, because

 8    they're not -- there's a few attached, but not all of them.

 9            Okay.  What page would this one be?  Because

10    Appendix 2 is 83 pages, and they're mostly the contracts.

11    And then, the verified emergency motion for application.

12            MR. JURGENSEN:  (indiscernible)

13            MR. SPARKS:  Okay, Your Honor.  I apologize this

14    has taken so long.  I'm looking at ECF 14, Bitmain's

15    response to the Debtor's motion for authority.

16            THE COURT:  Right.

17            MR. SPARKS:  In our appendix, we are talking about

18    what we have as Tab R, the December 14th, 2024 notice of

19    breach.

20            THE COURT:  Tab R.  What's the ECF number on that?

21    Do you have that?

22            MR. SPARKS:  They're in the appendices, the

23    volumes of the appendices.

24            THE COURT:  Right.

25            MR. SPARKS:  That begins on -- I could give you

 1     the Bates number on the bottom of it.

 2              THE COURT:  Yeah, go ahead.  Okay, so it's -- is

 3     it 572?

 4              MR. SPARKS:  Yes, Your Honor.

 5              THE COURT:  Okay.  Okay, Tab R --

 6              MR. SPARKS:  Then the next one is the March 27th

 7     notice of breach, which is Tab S, and that is 573, Bates

 8     label 573.

 9              THE COURT:  Okay.  Got that.  That's the March

10     29th one.

11              MR. SPARKS:  Yes, Your Honor.

12              THE COURT:  I'm sorry, March --

13              MR. SPARKS:  27th.

14              THE COURT:  27th.

15              MR. SPARKS:  Yeah.  Then, the next one is the

16     withdrawal notice, which is at Tab P, and that's Bates

17     number 569.

18              THE COURT:  That's April --

19              MR. SPARKS:  Yes, Your Honor.  They're actually

20     all right next to each other, and in that appendix, they're

21     just not in chronological order, unfortunately.

22              THE COURT:  All right.

23              Any objection to the admission of these three

24     documents, Mr. Shurn?

25              MR. SHURN:  So Your Honor, as I said a moment ago,

1    they are hearsay.  They were made in anticipation of

2    litigation.  However, you know, those statements were made.

3    My client does not dispute that they received those.  So I

4    mean, I don't want them to come in to be the truth of the

5    matter asserted, obviously.  But aside from that, no, Your

6    Honor, I think they definitely have at least some probative

7    value at the least.

8         THE COURT:  All right.  So -- And so let's just

9    make sure when we look at, when we go to your exhibit,

10   witness an exhibit list --

11        MR. SPARKS:  And there's one more, Your Honor, and

12   it's immediately after that withdrawal notice.  That's the

13   reaffirmation of contract termination from July.

14        THE COURT:  Okay.  And which -- Is it --

15        MR. SPARKS:  It's Tab Q, at 571.

16        THE COURT:  Right.

17        MR. SPARKS:  So in that appendix to the response,

18   they are all for an order.  They're just not chronological

19   order.

20        THE COURT:  Okay.  And what date was that one?

21        MR. SPARKS:  July 16th?  July 16th, Your Honor.

22        THE COURT:  All right.  So when I go to your

23   exhibit list --

24        MR. SPARKS:  When you go to our exhibit list, Your

25   Honor, the December 12th notice of breach is Exhibit 15, the

1    March 27th notice of breach is Exhibit 17, the April 3rd

2    notice of withdrawal is Exhibit 21, and the reaffirmation of

3    contract termination is Exhibit 38.

4              THE COURT:  All right.  Mr. Shurn, with the caveat

5    that you put in there, any objection to --

6              MR. SHURN:  No, Your Honor.

7              THE COURT:  Okay.  All right.  So I will admit

8    Exhibits 44-15, which is found at ECF 14, Bates number --

9    starting with Bates number 572, 44-17, which is Tab S in ECF

10   number 14, starting at Bates number 573.  I will admit 44-

11   21, which is Tab P, starting at 14, ECF number 14, starting

12   at page number 569, and Exhibit 44-38, behind Tab Q, which

13   is ECF 14, starting at page number 571.

14             MR. SPARKS:  And if I may, Your Honor?

15             THE COURT:  Yes.

16             MR. JURGENSEN:  I believe it's ECF 44-42, which is

17   the order clarifying temporary injunction.

18             THE COURT:  440 -- okay.

19             MR. JURGENSEN:  And Mr. Sparks, I'm sorry, I don't

20   know where else that's attached to your pleadings, or where

21   else that might be in the record.  I know it's on their

22   exhibit list as Exhibit 42, so that's ECF 44-42, I think.

23             MR. SPARKS:  We know that it's attached to Exhibit

24   13, Your Honor -- I'm sorry, ECF 13, but we're having a hard

25   time pulling up documents right now.

1            So on ECF-13, in the supporting appendix, it's Tab

2     I, and the Bates number is 00505.

3            THE COURT:  Okay.  All right, I found it.  Now,

4     which, what -- It's Exhibit 42?

5            MR. SPARKS:  Yes, Your Honor.

6            THE COURT:  Okay.  So I'm going to admit Exhibit

7     44-42, which is at ECF 13-3, with Bates number starting with

8     -- It's behind Tab I, which starts at Bates number 505, or

9     000505.

10           MR. SPARKS:  That's it.

11           THE COURT:  So that's admitted as well.

12           MR. SPARKS:  Thank you, Your Honor.

13           THE COURT:  Okay.

14           MR. SHURN:  That said, Your Honor, you know, I'm

15    obviously not going to limit Mr. Sparks (indiscernible)

16           THE COURT:  No, no, no.  Obviously, it's his

17    motion at this point, so --

18           MR. SHURN:  Yeah, yeah.

19           THE COURT:  At least let him put on the case.  But

20    I wanted to get these --

21           MR. SHURN:  Very good.

22           THE COURT:   -- get the documentary evidence in.

23           MR. SHURN:  Very good.  Very good.  Thank you,

24    Your Honor.

25           THE COURT:  Yep.

1          MR. SPARKS:  We will call Jamieson Zaniewski.

2          THE COURT:  Okay.

3          Please raise your right hand.

4          Do you solemnly swear or affirm to tell the truth,

5     the whole truth, and nothing but the truth?

6          MR. ZANIEWSKI:  I do.

7          THE COURT:  All right.  Please be seated.

8          MR. SPARKS:  May I begin, Your Honor?

9          THE COURT:  Yeah, why don't you come to the

10    podium, because we can get you better there.

11    DIRECT EXAMINATION

12    BY MR. SPARKS:

13    Q    Please state your name for the record.

14    A    Jamieson Zaniewski.

15    Q    And what is your position at ORB Energy?

16    A    President and CEO.

17    Q    You're the founder of ORB Energy?

18    A    Yeah.

19    Q    Let's take a look at --

20         MR. SPARKS:  Your Honor, may I approach?

21         THE COURT:  Yeah, go ahead.

22         MR. SPARKS:  Thank you.

23    BY MR. SPARKS:

24    Q    Please turn to Exhibit 5.  Do you have it, Mr.

25    Zaniewski?

1   A    Yes, sir.

2   Q    This agreement is dated April 11th, 2024.  Right?

3   A    Correct.

4   Q    And this is a term sheet?

5   A    Correct.

6   Q    And in this term sheet, there in box 1, party A is

7   Bitmain.  Correct?

8   A    Correct.

9   Q    And party --

10        THE COURT:  Just -- excuse me.  If there is

11   another -- if you have another binder, if you gave it to my

12   clerk, that would be great.

13   BY MR. SPARKS:

14   A    Just for clarification, Mr. Shurn, it's -- That party A

15   would be Bitmain Technologies Georgia Limited, or Bitmain

16   Development Limited?  Or its affiliates.

17   Q    Thank you.  And party B is ORB Energy?

18   A    Correct.

19   Q    Let's turn to page 8, please.  And you see in the box

20   where it says "Environmental requirements?"

21   A    Yes, sir.

22   Q    And in that paragraph 1, do you see where it talks

23   about AntSentry?

24   A    Yes, sir.

25   Q    And this agreement requires ORB to provide a network

1    environment containing RJ45 interfaces for AntSentry's

2    servers.  Correct?

3    A    That's what it says.

4    Q    AntSentry is Bitmain's monitoring software.  Correct?

5    A    Yes, sir.

6    Q    And that's the software that goes on the servers?

7    A    No, sir.  It's a software that sits on a separate

8    dedicated computer.

9    Q    It allows Bitmain to monitor and control the Bitcoin

10   mining servers.  Correct?

11   A    It's one of the ways that they are able to, yes,

12   correct.

13   Q    Turn to page 9, please.  Do you see here in box 19,

14   where it says "Ownership of miners?"

15   A    Yes, sir.

16   Q    And number one, where it says, "Party B acknowledges

17   and agrees that the hosted miners are assets of Property A,

18   or any third party designated by Property A, and Owner shall

19   have the proprietary interest in the miners."  Do you see

20   that?

21   A    Yes, I see it on the page.

22   Q    So under this term sheet, ORB acknowledged that the

23   Bitcoin mining servers were owned by Bitmain.  Correct?

24   A    That's what it says on the page.

25   Q    Is that a yes?

1    A    Yes.

2    Q    Please turn to page 11.  In box 22, do you see where it

3    says, "Security of mining proceeds?"

4    A    Yes, sir.

5    Q    And do you see in number 1 here, where it says, "Party

6    B is not authorized under any circumstances to use the

7    hosted miners for self-mining purposes, or to change the

8    miner ID settings within the hosted miners or the management

9    systems?"

10   A    Yes, I see it right there.

11   Q    So this means that ORB is not authorized under any

12   circumstances to use the hosted miners for self-mining

13   purposes, or to change the miner ID.  Correct?

14   A    To the best of my understanding.

15   Q    Do you see number two here?

16   A    Yes, sir.

17   Q    Where it says that, "If Party B uses Party A's hosted

18   miners for self-mining purposes, Party B shall return the

19   proceeds of the mining to Party A within seven days."  So is

20   it your understanding that that means that if ORB used the

21   servers for self-mining, it would have to return all

22   proceeds to Bitmain within seven days?

23   A    That's what it says on the page, yes.

24   Q    Okay.  And do you see where it has two subparts here

25   that start with the word "Additionally?"

1   A     Yes, A and B.

2   Q     Yes.

3   A     Three.  There's A, B, and C.

4   Q     Oh, good point.  Do you see those three subparts?

5   A     Mm-hmm.

6   Q     You see where it says, "Party B shall bear all hosting

7   fees?"

8   A     Yes, I see that.

9   Q     Good.  Is it your understanding that this means that if

10   ORB used the miners for self-mining purposes, ORB would have

11   to bear all the hosting fees for that billing period?

12   A     That's what it says on the page.

13   Q     Is that a yes?

14   A     It's not 100%.  My understanding, it's just what it

15   says on the page.

16   Q     So it's what the term sheet says, but you believe it

17   might be different?

18   A     I believe we have some other conclusions that legally,

19   my team has come to.

20   Q     Your attorney has come to some different conclusions?

21   Is that what you're saying?

22            MR. SHURN:  Objection, to the extent it seeks to

23   invade attorney-client privilege.

24            THE COURT:  Sustained.

25   BY MR. SPARKS:

 1    Q    Do you see subsection C here?

 2    A    Mm-hmm.

 3         THE COURT:  Just -- you need to say yes

 4    (indiscernible)

 5         MR. ZANIEWSKI:  Oh, I'm sorry.  Sorry.

 6    BY MR. SPARKS:

 7    A    Yes, sir.

 8    Q    So when it says, "Party A has the right to immediately

 9    terminate all or part of the hosting cooperation without any

10    breach of contract liability," do you understand that to

11    mean that if ORB engages in self-mining, Bitmain has the

12    right to immediately terminate all or part of the hosting

13    cooperation, without any liability for breach of contract?

14         MR. SHURN:  Objection, Your Honor.  It calls for

15    legal conclusion.

16         THE COURT:  That's sustained.

17    BY MR. SPARKS:

18    Q    Do you understand what this means?

19    A    I'm able to understand the words on the page, yes.

20    Q    Let's turn to exhibit -- Well, actually, turn please to

21    page 16.

22    A    Page 16, sir?  Or Exhibit?

23    Q    Page 16 of that same exhibit.  Exhibit 5, page 16.  Is

24    that your signature?

25    A    Yes, sir.

 1   Q    Okay.  Let's turn to Exhibit 7, please.  You're

 2   familiar with this agreement.  Correct?

 3   A    Yes, sir.

 4   Q    Please turn to the last page, which is marked at 63

 5   down at the bottom.

 6   A    I'm sorry, which exhibit are we on?

 7   Q    Seven.

 8   A    We're on 7.  Sorry.

 9   Q    Is this your signature?

10   A    Yes, sir.

11   Q    And then, how about page 58?  Is that your signature as

12   well?

13   A    Yes, sir.

14   Q    This agreement addresses many of the same terms as that

15   hosting -- or that term sheet we just looked at.  Correct?

16           MR. SHURN:  Objection.  Calls for legal

17   conclusion.

18           THE COURT:  Sustained.

19   BY MR. SPARKS:

20   Q    Is it your understanding that this agreement between

21   the parties was intended to address many of the same things

22   that we just looked at in the term sheet?

23           MR. SHURN:  Same objection, Your Honor.

24   BY MR. SPARKS:

25   A    Yes.  It --

1          THE COURT:  Hold on a second.  Just hold on.

2          Can you rephrase the question?  I mean, it is kind

3   of calling for this -- Ask him a factual question, you know,

4   as opposed -- Because it is calling for a legal conclusion,

5   as to what the agreement says.

6          MR. SPARKS:  Understood.  Thank you, Your Honor.

7   BY MR. SPARKS:

8   Q    You negotiated this agreement with Bitmain.  Correct?

9   A    To a certain extent, yes.

10  Q    Did anybody besides you at ORB negotiate this agreement

11  with Bitmain?

12  A    Yeah.  We had a person that was helping us negotiate

13  the agreement on our side, yes.

14  Q    Who was that?

15  A    His name is Harry.

16  Q    Did you negotiate that term sheet with Bitmain?

17  A    For -- Yes, but most of it was -- most of it was

18  presented to me as sort of take it or leave it.  When I met

19  with Ryan Zhao for the first time in Hong Kong in 2023, he

20  presented me with a term sheet, and then the terms sort of

21  kind of kept changing on a monthly or bimonthly basis.

22  Q    Do you see the date of this hosting sale agreement, at

23  the top of the first page?

24  A    Are you referring to the June 19th date, sir?

25  Q    Yes, the June 19th date.

1    A    Yes.

2    Q    So you signed this agreement approximately two months

3    after the term sheet?

4    A    Yes, sir.

5    Q    And the purpose of this agreement between ORB and

6    Bitmain, from ORB's perspective, was to more completely

7    document the party's rights and obligations.  Right?

8            MR. SHURN:  Objection.  Calls for a legal

9    conclusion.

10            THE COURT:  I think he's asking him the purpose.

11    I don't think he's asking -- I mean, it's not what the legal

12    effect of it is.

13            MR. SHURN:  It's the piece, Your Honor, of to

14    more, like, put meat on the bones as to the term sheet.  I

15    just want to make sure that we're not getting into, oh, you

16    just admitted it replaced the term sheet.

17            THE COURT:  No, and that's a legal conclusion that

18    I have to determine.  I think you can ask him, you know, why

19    he -- why did you sign this agreement?  I think that's the

20    question that's really being asked.

21            MR. SHURN:  And if that's the question, Your

22    Honor, I'm fine.

23            THE COURT:  That's the way I'm interpreting the

24    question.

25            MR. SHURN:  Okay.  Thank you.

1    BY MR. SPARKS:

2    Q    Why did you sign this agreement?

3    A    Yeah, I signed this agreement because Bitmain basically

4    was telling me that I was going to become a big partner of

5    theirs, and make a lot of money.

6    Q    Did you read this agreement before you signed it?

7    A    Absolutely.

8    Q    Let's take a look at page 20, Section 13.1.  Do you see

9    where -- the provision that starts with, "The entire

10   agreement and amendment?"

11   A    Yes, sir.

12   Q    Do you see where it says that "This agreement

13   constitutes the full and entire understanding and agreement

14   between the parties, and supersedes all other agreements

15   between or among any of the parties with respect to the

16   subject matter hereof and thereof?"

17   A    Yes, I see it in there.

18   Q    That was the purpose behind you signing this agreement.

19   Correct?

20         MR. SHURN:  Objection, Your Honor.  Calls for a

21   legal conclusion.

22         THE COURT:  Yeah, that's true.  Sustained.

23   BY MR. SPARKS:

24   Q    Let's go back to page 1.  So in this agreement, ORB is

25   referred to as the hosting provider, or service provider.

1    Correct?

2    A    In this one, it's the service provider.

3    Q    After the parties signed this agreement, Bitmain's

4    2,700 Bitcoin mining servers were delivered to ORB Energy's

5    facility in Van Vleck, Texas.  Correct?

6    A    Yeah, about six months after.

7    Q    And those servers were delivered on November 25th,

8    2024, the Monday before Thanksgiving?

9    A    Yeah, the Monday or the Tuesday.

10   Q    And in this agreement, the Bitcoin mining servers are

11   referred to as the hosted servers.  Correct?

12   A    I don't see where it says that, but I'll take your word

13   for it.

14   Q    Go to page four, please.

15   A    Sure.

16   Q    Do you see the definition of hosted servers?

17   A    Yes, sir.

18   Q    That's referring to Bitmain's 2,700 Bitcoin mining

19   servers.  Correct?

20   A    To the best of my knowledge, yes.

21   Q    Okay.  If I refer to those Bitcoin mining servers is

22   the hosted servers today, you're going to know what I'm

23   referring to.  Right?

24   A    Yes, sir.

25   Q    Those servers are Bitmain's property.  Correct?  They

1    belong to Bitmain?

2              MR. SHURN:  Objection.  Calls for a legal

3    conclusion, Your Honor.  Ownership is a legal issue.

4              THE COURT:  Sustained.

5    BY MR. SPARKS:

6    Q    Bitmain did not agree to sell those hosted servers to

7    ORB.  Correct?

8    A    I would not agree with that.

9    Q    Is that in this agreement?

10   A    It is in the term sheet, which we've looked at before.

11             MR. SPARKS:  Objection.  Non-responsive.

12             THE COURT:  Sustained.

13   BY MR. SPARKS:

14   Q    Is it in this agreement?

15   A    That's not in this agreement.  This agreement is the

16   sale contract for the cooling systems, as a matter of fact.

17   Q    There is not a separate agreement like this for the

18   hosted servers.  Correct?

19   A    Not yet, no.

20   Q    As Bitmain's -- or as ORB's CEO, you're aware of what

21   assets ORB owns.  Correct?

22   A    Yes, sir.

23   Q    ORB doesn't own the hosted servers, does it?

24             MR. SHURN:  Objection, Your Honor.  Calls for a

25   legal conclusion.

```
 1                  THE COURT:  Sustained.
 2    BY MR. SPARKS:
 3    Q    Does ORB list the hosted servers on its financials?
 4                  MR. SHURN:  Objection, Your Honor.  This is just a
 5    backdoor way to try to get an answer admitted
 6    (indiscernible)
 7                  THE COURT:  I think that's a factual question.
 8                  MR. SHURN:  Okay.  Thank you, Your Honor.
 9                  THE COURT:  Yeah, I mean, that's just a factual
10    question.
11                  MR. SPARKS:  Thank you, Your Honor.
12    BY MR. SPARKS:
13    A    I believe we listed them on the SOFAs, since they're
14    sitting on our property.
15    Q    On the statement of financial affairs, you believe you
16    listed Bitmain's Bitcoin mining servers?
17                  MR. SHURN:  Objection, Your Honor.  In the
18    question it says it's Bitmain's mining servers, just saying
19    that they own it to try to get the witness to admit that he
20    owns it.  We're doing the same thing over and over again.
21                  THE COURT:  Yeah, why don't you just rephrase the
22    question.
23    BY MR. SPARKS:
24    Q    I'm not asking about SOFA    I'm asking about ORB
25    Energy's financial statements.  Does it list these servers
```

```
 1   as an asset of the company on its financial statements?
 2   A    I don't believe it has, no.
 3   Q    Let's look at page 39, please.  At the bottom of the
 4   page, do you see the section titled, "Title and Ownership of
 5   Hosted Servers?"
 6   A    Yes, sir.
 7   Q    And let's turn the page.  Do you see Section 5.1?
 8   A    Yes, sir.
 9   Q    And you read this before you signed this agreement.
10   Correct?
11   A    Yes, sir.
12   Q    In this case, is ORB asserting that it owns the hosted
13   servers?
14            MR. SHURN:  Objection, Your Honor.  Calls for a
15   legal conclusion.  (indiscernible)
16            THE COURT:  Well, I think he's only asking what
17   the assertion -- what the assertion is.  If he knows.  I
18   mean, it's --
19            MR. SHURN:  It's just, you know, when you talk
20   about the heating (indiscernible) you're talking about the
21   bundle of sticks.  Right?  If I have a stick for this, and a
22   stick for that --
23            THE COURT:  Yeah.  But that's legal argument, so -
24   -
25            MR. SHURN:  Okay.  Thank you, Your Honor.
```

```
 1                  THE COURT:  I mean, he can -- you can answer the
 2     question, if you know.
 3     BY MR. SPARKS:
 4     A    Okay, yeah.  So I believe -- I believe through all of
 5     this, we do have interests in the servers.  But again, I'm
 6     not a lawyer, so that's -- I think that's a question for the
 7     lawyers to sort of argue.
 8     Q    Did ORB ever pay the purchase price to Bitmain for the
 9     hosted servers?
10     A    I've never been given one.
11     Q    So there was no purchase price?
12     A    Well, there is a purchase price for servers located on
13     Bitmain's website at all times.
14     Q    The hosted servers that are at ORB's facility in Van
15     Vleck, Texas, Bitmain has never made an offer to sell those
16     to ORB?
17     A    I believe they have made an offer to sell them to other
18     people.  But we never received a written confirmation of an
19     order -- or of an offer from Bitmain.  This whole debacle
20     has kind of been going on since the beginning.
21     Q    So ORB never paid a purchase price to Bitmain for the
22     servers?
23     A    No, sir.
24     Q    Do you see subsection B of Section 5.1?
25     A    Yes, sir.
```

1    Q    Is ORB claiming any common law lien or right of

2    distress in the hosted servers?

3            MR. SHURN:  Objection to the extent it calls for

4    legal conclusion nomenclature.

5            THE COURT:  Yeah, if he knows, I mean -- Or if he

6    -- you know, it's a factual question.

7            MR. SHURN:  Thank you, Your Honor.

8    BY MR. SPARKS:

9    A    Yeah, I'm -- I'm just going to have to sort of pass

10   that question off to the legal team.  I'm so sorry.

11   Q    As the CEO, have you ever claimed a common law lien or

12   right of distress in the hosted servers?

13   A    Again, same answer.

14   Q    But you don't know whether you, as the CEO, have ever

15   made that claim?

16   A    Have I written a lien?  No, I have never done such.

17   Q    Do you see subsection C here, where it says, "Hosting

18   provider will not claim any right, title, or interest in any

19   of the Bitmain property?"

20   A    I see it on the page, sir, yes.

21   Q    Have you as the CEO ever claimed any right, title, or

22   interest in any of the Bitmain property?

23           MR. SHURN:  Objection.  Calls for a legal

24   conclusion.

25           THE COURT:  Again, I think it's a factual

1  question.

2          MR. SHURN:  Thank you, Your Honor.

3          THE COURT:  Not a legal conclusion.  If he knows

4  what that means, then --

5  BY MR. SPARKS:

6  A    Okay.  Would you mind asking the question again?

7  Q    Have you, as the CEO, ever claimed any right, title, or

8  interest in any of the Bitmain property?

9  A    As the CEO, personally?  No.

10  Q    Do you see Section 5.3 on that same page?

11  A    Yes, sir.

12  Q    You see where it says, "Hosting provider shall not

13  under any circumstances utilize the hosted servers for self-

14  mining purpose, or change the hosted server's ID settings

15  within the hosted servers or the management systems?"

16  A    Yes, sir.

17  Q    Do you remember seeing an almost identical provision in

18  the term sheet?

19  A    I'm looking at this page right now.  I can't really

20  look at the other page.  If you'd like me to, we could go

21  back.

22  Q    Look at Section 5.4, please.

23  A    Okay.

24  Q    Do you see here where it discusses the consequences of

25  hosting provider utilizing Bitmain's hosted servers for

1    self-mining purposes?

2    A    Yes, sir.

3    Q    ORB, after it received the Bitcoin mining servers on

4    November 25th, 2024, set them up.  Correct?

5    A    Yes, sir.  As quickly as possible.

6    Q    And you directed the hashrate to a test pool.  Correct?

7    A    Yes, that's correct.

8    Q    And then you directed the mining proceeds from the test

9    pool to a wallet.  Correct?

10   A    Yes, sir.

11   Q    And that's a wallet that ORB owns.  Correct?

12   A    It's a wallet that we controlled, yes.  Or we had the

13   keys to.

14   Q    And then from that wallet, you transferred funds into

15   different exchanges, like Coinbase.  Correct?

16   A    Eventually.

17   Q    And then you sold those Bitcoin.  Correct?

18   A    Yes, correct.

19   Q    Let's look back at this page, 5.4-A    Actually, let's

20   look at the last sentence of 5.4, before subsection A  Do

21   you see where it says, "Hosting providers will return the

22   proceeds of the mining to Bitmain within seven calendar

23   days?"

24   A    Yes, sir.

25   Q    ORB never returned the proceeds of the mining to

1    Bitmain.  Correct?

2            MR. SHURN:  Objection.  Calls for a legal

3    conclusion.  It was an involuntary sale, and they applied it

4    to the invoice.  So that is a return.  They got credit.

5            MR. SPARKS:  Well, it's a theft (indiscernible)

6            THE COURT:  Actually, why don't you just ask him,

7    was any money ever sent back to Bitmain?  I mean, I think

8    that's a factual question.

9            MR. SPARKS:  Thank you.  Your Honor, I would also

10   take the opportunity to point out that at -- Jamieson, his

11   deposition took over two days because the first one started

12   later in the day, Mr. Shurn objected 213 times at the first

13   one, and 396 times at the second one, and it lasted a period

14   of about four hours.  So this is something -- I believe all

15   of these objections have been waived, but we didn't have

16   time because we were doing the depositions on an expedited

17   basis to get a motion in front of you about the

18   inappropriate deposition conduct.  But they have objected to

19   virtually every single question I've asked in two

20   depositions, and then now doing the same thing in court.

21           THE COURT:  Well, I don't fault lawyers for trying

22   to protect the record, and to the extent that you're asking

23   him a factual question, I'm going to let him do it.  But to

24   the extent you're asking him to interpret the contract, I

25   think those objections are proper.  So I mean, if you just

1    ask him, did you send any money, or did you send the money

2    from the wallet, that's one thing.  But to the extent you're

3    asking a legal conclusion, whether they complied with the

4    contract, that's a different thing in my mind.

5         MR. SPARKS:  Understood.  Thank you, Your Honor.

6    BY MR. SPARKS:

7    Q    Did you send any money back to Bitmain?

8    A    No, we've never sent any money to Bitmain, or have been

9    given a place to send it.

10   Q    You don't know who Bitmain is?

11   A    No, I don't have ACH info, I don't have wire info, and

12   I don't have a wallet address, or any sort of way to send

13   Bitmain anything.

14   Q    So all of the times that they demanded you return the

15   money, did you ever ask them for any of that information?

16   A    Yes, sir.

17   Q    So you were going to give all of that Bitcoin back when

18   they demanded it?

19   A    I -- So in the circumstances, or in the situation which

20   you're sort of referring to, I think it's important to have

21   a little bit of clarity.  Bitmain --

22   Q    Your attorney is going to cross-examine you, so you can

23   give him all of the clarity you want.  I would just like you

24   to answer my questions.

25         THE COURT:  Well, let him finish what he was

1   saying.  You can move to strike.  But let him finish what

2   he's saying, and then you can move to strike.

3   BY MR. SPARKS:

4   A    Yeah.  Sure.  So in the situation that you're referring

5   to, which was in December, I don't know, maybe 14th, mid-

6   December of 2024, Bitmain asked for an offset in their

7   deposit, and then we told them all of the losses that we

8   incurred due to their failure to pay, and lack to pay, and

9   time to pay.  So in that sort of piece of this, the

10  negotiation, there was -- you know, it wasn't just

11  necessarily, like, black and white, like did we or didn't

12  we.  We were in active discussions to resolve the dispute --

13  or I'm sorry, to resolve the dispute, and come up with a

14  reconciliation.

15       And to the matter of fact, you know, months later,

16  Bitmain agreed to pay damages because they admitted that

17  their invoices were never paid.  And also, Ryan Zhao

18  admitted to me that two people in the invoicing department

19  were also fired over not paying our bill on time.

20            MR. SPARKS:  Objection, non-responsive.  Move to

21  strike everything after the word "No."

22            THE COURT:  I'm going to sustain that.

23  BY MR. SPARKS:

24  Q    Do you see 5.4, subsection A?

25  A    Yes, sir.

1   Q    It says, "Hosting provider shall bear all the hosting

2   fees for the current billing period."  Correct?

3   A    That's what it says on the page, yes.

4   Q    ORB has sold the Bitcoin to pay for the hosting fees.

5   Correct?

6   A    Correct, yes.

7   Q    And then on the next page, do you see subsection C?  It

8   says, "Bitmain shall have the right to immediately terminate

9   all or part of this agreement without incurring any

10  liability for breach of this agreement?"

11  A    Yes, sir.

12  Q    Bitmain relayed to ORB, and to you as CEO, multiple

13  times that they were terminating this agreement because of

14  ORB's self-mining.  Correct?

15  A    No.

16  Q    Okay.  Then let's take a look at -- Exhibit 38.  You're

17  familiar with this notice.  Correct?

18  A    Yes, sir.

19  Q    And in this notice, Bitcoin -- Bitmain told ORB that it

20  was terminating the agreement because of self-mining.

21  Correct?

22  A    No, sir.  This document, to the best of my

23  understanding, looks -- or seeks to affirm that the term --

24  that the  agreements, or some of the agreements, the HSA and

25  -- and the hosting sale agreement -- Oh, it's just the HSA,

1    was terminated automatically.  This is not a letter, to the

2    best of my knowledge, and keep in mind, guys, I'm not a

3    lawyer of termination.

4              MR. SPARKS:  Objection, non-responsive.  Move to

5    strike everything after "No."

6              THE COURT:  I'm going to overrule that.  I think

7    he can tell us what he thinks the document is.  Obviously,

8    the document speaks for itself.

9              MR. SPARKS:  Thank you, Your Honor.

10   BY MR. SPARKS:

11   Q    When it says, "As previously discussed orally and in

12   writing between the parties on several occasions," this

13   followed a hearing where Bitmain stood up in court and said

14   unequivocally that the agreement had been terminated.

15   Correct?

16             MR. SHURN:  Objection.  Hearsay.

17             THE COURT:  Wait.  Hold on a second.

18             Where does this say that in Exhibit 38?

19             MR. SPARKS:  It's not in Exhibit 38.  It was at a

20   hearing, before this was sent.  And it's not for the truth

21   of the matter asserted.  Just like this notice, it's simply

22   the fact that it was said.

23             THE COURT:  All right.  Okay.  Ask your question

24   again, because I thought you were referring to Exhibit 38.

25   BY MR. SPARKS:

```
 1    Q    This notice was sent following a court hearing where

 2    Bitmain stated in court that the agreement had been

 3    terminated.  Correct?

 4    A    Incorrect.  Bitmain has never, not in court, orally

 5    communicated that the agreement was terminated.

 6    Specifically, myself and my legal team at that time, and

 7    everybody that was witness to those hearings, we asked

 8    multiple times whether Bitmain had terminated the agreement,

 9    or wanted to terminate the agreement, and your legal firm,

10    Kasi Chadwick, did not.

11    Q    You were at the hearing that resulted in the order

12    clarifying temporary injunction.  Correct?

13    A    Correct.

14    Q    You sat in there the entire time, and listened to what

15    was said.  Correct?

16    A    Oh, correct.

17    Q    You heard Bitmain say, unequivocally, the agreement has

18    been terminated.  Correct?

19    A    No, I did not.

20              MR. ZANIEWSKI:  Is it possible, could I grab my

21    water?

22              THE COURT:  Yes, go ahead

23              MR. ZANIEWSKI:  Okay.  Thanks you.

24              THE COURT:  In fact, why don't we -- We've been

25    going for -- Let's take a five-minute, or ten-minute break.
```

1    We'll come back at 11:15.

2              MR. ZANIEWSKI:  Thank you, Your Honor.

3              THE COURT:  And then, maybe if you all could talk

4    and see what -- how long you think this is going to take.

5    Because if we stop around noon, and you know, figure out --

6    I'm going to need to find some time.  And I know I have time

7    later in the week, but I'm just going to need to find some

8    time, because today, unfortunately, this afternoon is just

9    completely jam-packed.

10             MR. SPARKS:  Understood.  Thank you, Your Honor.

11             THE COURT:  All right.  We're in recess until --

12   (Brief recess.)

13   (Back on the record.)

14             THE COURT:  Please be seated.

15             All right.  Go ahead.  You may continue.

16             MR. SPARKS:  Thank you.

17             THE COURT:  We're back on the record in case

18   number 25-80363.

19   BY MR. SPARKS:

20   Q    Let's go back to Exhibit 7, please, and let's go back

21   to page 41.  Do you see section 5.6?

22   A    Yes, sir.

23   Q    And it refers to AntSentry.  Right?

24   A    Yes, sir.

25   Q    ORB used a different program besides AntSentry.

```
 1   Correct?

 2   A    Yes, sir.

 3   Q    And what was that called?

 4   A    Foreman.

 5   Q    So after the hosted servers were delivered to the

 6   facility on November 25th, 2024, you said ORB set them up.

 7   Right?

 8   A    Yes, sir.

 9   Q    And directed the hashrate to a test pool?

10   A    Yes, sir.

11   Q    And you were the one who directed the hashrate to the

12   test pool.  Right?

13   A    Yes, sir.

14   Q    Do you remember testifying on September 11th, 2025, at

15   the meeting of creditors?

16   A    Yes, sir.

17   Q    You testified that day as the corporate representative.

18   Right?

19   A    Yes, sir.

20            MR. SHURN:  (indiscernible)

21            MR. SPARKS:  May I approach the witness, Your

22   Honor.

23            THE COURT:  Sure.

24   BY MR. SPARKS:

25   Q    (indiscernible) down there at the bottom
```

1    (indiscernible) where it say, "In December of 2024, did

2    someone at ORB redirect the hash power from the servers

3    (indiscernible)

4              THE COURT:  Are you trying to impeach him?

5              MR. SPARKS:  Yes, Your Honor.

6              THE COURT:  Okay.  And so, what was the question

7    that --

8              MR. SPARKS:  In December of -- The question

9    (indiscernible)

10             THE COURT:  Yeah but why don't you get at the mic,

11   because it's not going to pick up.

12             I'm sorry, which answer are you trying to impeach?

13             MR. SPARKS:  The last one, where he said he

14   directed the hash power from the servers.

15             THE COURT:  Okay.  And so at a prior time, he said

16   that he hadn't directed it?

17             MR. SPARKS:  Yes, Your Honor.

18             THE COURT:  Okay.  All right.

19             MR. SPARKS:  Yes, at the Section 341 meeting of

20   creditors on September 11th, 2025.

21             THE COURT:  Okay.  So -- okay.  So you can ask

22   him, did I ask you this question, and was this your

23   response, and see what he says.  Why don't you just read it

24   out loud, if you're trying to impeach?

25   BY MR. SPARKS:

1   Q    At that meeting, I asked you, "In December of 2024, did

2   someone at ORB redirect the hash power from those servers?"

3   A    Yeah, and my answer was, I'm not sure.  Partially

4   because we never redirected.  In December 2024, we directed

5   the hash rate to a test pool.  To the best of my knowledge,

6   we never redirected it.

7            MR. SHURN:  Your Honor, if I may, and this is just

8   my stupidity, I need to make sure I understand.  I think we

9   keep saying hash power and hashrate.  I don't know if these

10  are the same thing, or different things, and they're

11  interchangeable.  I don't understand.

12           THE COURT:  Yeah, I don't know what hash power is.

13  I know what hashrate is.

14           MR. SHURN:  Okay.  I'm just making sure it's

15  apples to apples, because I'm a little confused.  That's

16  all.

17           THE COURT:  Well, and you can clean that up on

18  cross.

19           MR. SHURN:  Okay.  Very good.  Thank you, Your

20  Honor.

21  BY MR. SPARKS:

22  Q    And you directed the benefits from that mining pool to

23  a wallet controlled by ORB?

24  A    Yes, sir.

25           MR. SHURN:  Objection to the extent "controlled"

1   is a legal conclusion, like dominion and control, as opposed

2   to I had the access to it, and sole access --

3          THE COURT:  That's the way I think it was

4   intended.  That's the way I understood it.

5          MR. SHURN:  Very good.  Thank you.

6   BY MR. SPARKS:

7   Q    Do you recall me asking you that question at the

8   meeting of creditors in December of 2024, did the servers

9   begin directing the benefits to a wallet controlled by ORB?

10  A    I mean, I don't necessarily remember.  But if you asked

11  me the question, then yes.

12  Q    Do you remember testifying that you didn't know who

13  caused that to happen?

14  A    Well, so at the farm, there is -- You know, as we were

15  getting the thing set up, you know, it was basically like me

16  and Parker running around, getting the whole thing done.  So

17  the direction of the hash power went to a place, I 100% set

18  up the test pool, and created the test wallet for the funds

19  to go to.  We were instructed by Bitmain staff to get the

20  site running up as soon as possible, ASAP.  We were

21  continued to be told that the, you know, the check was

22  coming, the check was coming, and we wanted the site to have

23  100% capacity as soon as Bitmain paid so that we could

24  promptly transfer 100% of the site over to Bitmain, so that,

25  you know, nothing was lost.

```
 1   Q    You never transferred the site over to Bitmain, did

 2   you?

 3   A    No, sir.

 4   Q    Look at page 31, please, of Exhibit 7.

 5   A    What page again, sir?

 6   Q    Thirty-one.  Do you see Roman numeral IV here in the

 7   middle of the page?

 8   A    Yes, sir.

 9   Q    Do you see where it says, "Under no circumstance shall

10   hosting provider be entitled to redirect the hash power of

11   the hosted servers to it's own wallet -- "

12   A    Which -- which Roman numeral are you looking at?

13   Q    IV, in the middle of the page.

14   A    Okay.

15   Q    And do you see the sentence that starts with, "Under no

16   circumstance?"

17   A    Okay.  Yes, I see that.

18   Q    Bitmain did not give you the test pool information that

19   you used.  Correct?

20   A    No, sir.

21   Q    By the time the servers were delivered, you believed --

22   or ORB had already believed and taken the position that

23   Bitmain was in breach of the contract.  Correct?

24   A    That's correct.

25   Q    But you unloaded the servers, set them up, directed the
```

```
 1   hashrate to a test pool, and directed the mining proceeds

 2   from the test pool to a wallet controlled by ORB anyway.

 3   Right?

 4   A    That's what we did, sir.  Yes.  Would you like me to

 5   provide clarity?

 6   Q    Let's take a look at Page 8 and 9.  No, thank you.

 7   Start on page 8.

 8   A    Same agreement?

 9   Q    Still Exhibit 7.  Actually, go to the very top of page

10   9, and look at subsection A   Do you see that?

11   A    Yes, sir.

12   Q    Do you see where it says that "Bitmain shall be

13   responsible for the installation of the products at the data

14   center facility?"

15   A    Yes, sir.

16   Q    And you see where it says, "Bitmain shall be

17   responsible for the operation and maintenance of the hosted

18   servers?"

19   A    I think you skipped something.

20   Q    I'm asking you if you see the language that I'm asking

21   you about.

22   A    Yeah -- Oh, yes, sir.

23   Q    ORB believes that it's entitled to payment for serving

24   as the operation and maintenance provider since December.

25   Correct?
```

1   A    Yes, sir, but we -- Since there was nobody sent to the

2   site that actually performed maintenance, the site requires

3   24-hour personnel, so you know, we were there, making sure

4   everything was running properly, fixing all of the systems,

5   testing them, making sure that they ran properly.  Bitmain,

6   you know, to the extent of their help, they basically

7   cataloged the miners, and scanned the miners, and determined

8   which miners actually showed up at the site.  For most of

9   that time, they didn't really do any help installing the

10   thing, and then they didn't really do any maintenance

11   either.

12   Q    Bitmain hired NexaNode to help install the products.

13   Correct?

14   A    That wasn't necessarily what actually happened.

15   NexaNode showed up, two people -- or three people, I'm

16   sorry, James, Tommy Lee, and Ming.  Tommy Lee and Ming, they

17   -- again, like I said, they cataloged the servers, and I

18   believe somebody actually told them not to do any of the

19   installation work, so they didn't.  They just sort of

20   cataloged the servers, as my team put them on the rack and

21   got the glycol installed, and got the cooling systems up and

22   running.

23   Q    Do you recall testifying differently at your

24   deposition?

25   A    If there's any difference, I'm sure it's minute.  I

1  could tell the story a few ways, I'm sure.

2  Q    Okay.  Bitmain hired NexaNode in connection with the

3  unracking -- or I'm sorry, the unloading and racking of the

4  servers at the facility.  Correct?

5  A    No.

6  Q    Your people kicked NexaNode out of the facility, and

7  claimed that they had destroyed miners.  Correct?

8  A    Yes.  Well, no, I'm so sorry, let me clarify.  So as we

9  were testing the systems, one of the NexaNode employees,

10  Tommy Lee, is a gentleman who didn't speak very much

11  English, he went into one of the cooling systems, and he

12  changed the display on the system to show Chinese

13  characters.  And then he turned the cooling system into

14  manual mode, which bypasses many safety features of the

15  cooling system, and the system shut off.  And since there

16  was no water circulating through the systems, I believe

17  about 50 servers cooked.

18  Q    But NexaNode was testing the systems after setup?

19  A    They were learning how to use the hydro cooling system.

20  So both Tommy Lee and James -- oh, and I believe the guy's

21  name was James, they had no prior experience utilizing hydro

22  cooling systems, specifically the HK6V3.  But they were, you

23  know, partially trained on the job by a gentleman by the

24  name of Park, who had a lot of experience in these hydro

25  cooling systems.  But Park almost immediately got pulled off

1    the job, after one or two days of light training.

2          MR. SPARKS:  Objection, non-responsive.  Move to

3    strike.

4          THE COURT:  Well, I'm sorry, what was the original

5    question?

6          MR. SPARKS:  NexaNode was on site to test the

7    equipment, I believe.

8          THE COURT:  I think his answer was no.  Right?

9          MR. SPARKS:  Right.

10          THE COURT:  And so after the no, I'll strike.

11          MR. SHURN:  Your Honor, I believe the question

12    was, "You kicked them off the site."  That was the question.

13          THE COURT:  Right.  And I think his answer said

14    "No."

15          MR. SHURN:  Oh, okay.  I thought he said yes.  I

16    apologize.

17          THE COURT:  No, no.

18          MR. SHURN:  Okay, I'm sorry.  I'm not trying to

19    mess with the record (indiscernible)

20          MR. ZANIEWSKI:  So there were two questions.  One

21    was, was NexaNode there to perform the installation -- the

22    installation and inspection, whatever, of the things?  And

23    the answer to that question was, like, no.  Like, they

24    didn't do the job.  At most, they just cataloged the

25    machiners -- the machines.

1              And then, did we kick them off the site?  That

2    answer is also no, because we informed Bitmain that these

3    incompetent -- And this was at the advice of Ryan Zhao, who

4    was my -- like, the corporate representative of Bitmain sort

5    of telling me how to navigate the conglomerate that is this,

6    you know, $10 billion company.  He calls me up and he says,

7    "Jamieson, this happened?  Then here's what you do.  You

8    send a WhatsApp message, and you say, 'These people that

9    Bitmain sent are incompetent.  Please send competent human

10   beings to run the site.'"

11             This site is a, you know, for all intents and

12   purposes, an incredibly dangerous, you know, sort of

13   facility.  Right?  We're pulling 15 megawatts of power.

14   That's the equivalent of 30,000 homes.  Right?  And so when

15   people are messing with equipment that, you know, each box

16   could be filled with, you know, $1 million, or $500,000 or

17   $1 million worth of servers, it's very important that the

18   people who are maintaining these things have due care and

19   competence in the systems, and/or, you know, proper

20   training.

21             MR. SPARKS:  Objection, hearsay, and move to

22   strike everything after whatever his initial answer was.  I

23   think it was "No."

24             THE COURT:  Sustained.

25   BY MR. SPARKS:

1    Q    ORB was not the operation and maintenance provider at

2    the facility.  Correct?

3    A    We did provide operations and maintenance services.

4    Q    Under the agreement, ORB was not the operation and

5    maintenance service provider.  Right?

6    A    So the way that it works, or the way it was described

7    to me as it works, is Bitmain's employees would come to the

8    site, they would train members of our staff on how to

9    basically use the cooling systems, and maintain the miners,

10   etc.  And then, after a period of about three months, they

11   would then sort of, like, relinquish this ability to us, or

12   this task, and in exchange for that, we would get a little

13   bit of extra hosting revenue in the amount of 0.003 cents a

14   kilowatt.

15        And so for our business model, being the service

16   provider, and you know, that our staff are there 24/7

17   managing and maintaining these things, for all intents and

18   purposes, I would say that we were the people providing

19   service and maintenance to not just the cooling systems, but

20   also the servers themselves.

21        MR. SPARKS:  Objection, non-responsive.  Move to

22   strike everything except the end, where he said he believes

23   they were the operation and maintenance people.

24        THE COURT:  Well, I think I'm going to overrule

25   that.  I mean, it kind of asked an open-ended question, and

1    I think he's responding to that.  So if it were a specific

2    question, then I think I would sustain it, but I think I'm

3    going to overrule that.

4    BY MR. SPARKS:

5    Q    Specifically, ORB is not the operation and maintenance

6    provider under this hosting sale agreement attached as

7    Exhibit 7.  Correct?

8              MR. SHURN:  Objection.  Calls for a legal

9    conclusion.

10              THE COURT:  I think he's just asking him what B

11    says on page 9.

12              MR. SHURN:  And that I'm okay with.

13              THE COURT:  Yeah.

14              MR. SHURN:  What it says on page 9, it says

15    (indiscernible) No problem.  That I don't have a problem

16    with.

17              THE COURT:  I mean A on page 9.

18    BY MR. SPARKS:

19    A    You want to ask another -- the question again, or maybe

20    rephrase?

21    Q    ORB is not the operation and maintenance service

22    provider under this agreement.  Correct?

23    A    I wouldn't necessarily agree with that statement.

24    Q    Let's take a look at page 12, section 5.2.  You see

25    where it says, "Bitmain shall be responsible for the

1    operation and maintenance of its hosted servers, and shall

2    bear its costs and expenses in connection with such

3    operation and maintenance activities of the hosted servers?"

4    A    Yes, sir.

5    Q    In the next sentence, "Upon the conclusion of the

6    hosting sale period, Bitmain shall provide necessary

7    training on the operation and maintenance of the products to

8    the staff of hosting provider without charging extra fees."

9    Is it your understanding that ORB was going to become the

10   operation and maintenance provider?

11   A    It was part of the original outlying agreement, and the

12   basis of the fundamental discussions between ORB and Bitmain

13   all throughout that we would operate the site, because the

14   0.003% spread that is paid for service equated to, you know,

15   probably a 20% increase in our net profit on the site.  So

16   while we were, you know, negotiating this thing, and we went

17   back and forth, I read in some of the emails just last night

18   that you submitted to the Court, there was, you know, back

19   and forth as to how long Bitmain's staff would remain on

20   site performing the maintenance operations before the site

21   would -- or before Bitmain would pay us for the service.

22   Q    So when it says, "Bitmain shall provide necessary

23   training on the operation and maintenance of the products to

24   the staff of hosting provider," what's your understanding of

25   what products Bitmain was going to provide ORB with the

1  necessary training and operation and maintenance of?

2  A    So they did provide operation instruction.  Park was

3  sent to our site in order to train both Parker and I in the

4  operation and maintenance of the hydro cooling systems.

5  Q    Okay.

6  A    And he also gave us a rundown on how to maintain the

7  servers.  But my business partner, Parker, since he had been

8  running a data center for three years, he was already well-

9  versed in the maintenance of Bitcoin mining machines.

10  Q    So my question was about the products referenced in

11  this sentence.  What was your understanding of what the

12  products are that Bitmain was going to provide the necessary

13  training and operation and maintenance of?

14  A    The Bitmain products that arrived at our site were

15  Antminer -- I'm sorry, Bitmain's Antminer S19 XP Pro Hydro,

16  and AntSpace HKV6 -- or I'm sorry, I forget the acronym of

17  the AntSpace.

18  Q    So you believe the products are the miners and the

19  cooling systems?

20  A    That would be the products that they would be providing

21  training to.

22  Q    Let's look back at page 7.  Do you see the definition

23  of "products?"

24  A    Yes, sir.

25  Q    Those are just the containers.  Correct?

```
 1   A     So in this agreement, the hosting sale agreement, the
 2   product in question in this agreement, it specifically -- it
 3   specifically deals with that.  I believe in the hosting
 4   service agreement, if there's an exact same clause, since
 5   these contracts are nearly identical, the product would then
 6   be the servers.
 7              MR. SPARKS:  Objection.  Non-responsive.  Move to
 8   strike everything when he started talking about the service
 9   agreement.
10              THE COURT:  I'm going to overrule that.  I mean, I
11   think he's -- I think he answered your question.  Yes, this
12   deals with the hosting, the containers.
13   BY MR. SPARKS:
14   Q     Let's go back to page -- let's turn to page 12, please.
15   ORB and Bitmain never entered into a separate operation and
16   maintenance service agreement.  Correct?
17   A     So there's the hosting services agreement, which was
18   signed.
19   Q     I asked about an operation and maintenance service
20   agreement.  They never entered into a separate operation and
21   maintenance service agreement.  Correct?
22   A     From what my understanding is, that's the -- like, that
23   is the hosting services agreement.  That's operations and
24   management.
25   Q     You believe that the hosting services agreement is an
```

1   operation and maintenance agreement?

2   A    Yes.

3   Q    Please turn to Exhibit 6.  And let's go to page 21 of

4   the hosting services agreement.  And do you see subsection E

5   on that page?

6   A    Yes, sir.

7   Q    Do you see where it says, "In the event that service

8   provider provides operation and maintenance services for

9   Bitmain, the parties shall execute a separate operation and

10  maintenance service agreement?"

11  A    I see that.

12  Q    Parties never executed a separate operation and

13  maintenance service agreement.  Correct?

14  A    No, sir.

15  Q    Let's go back to Exhibit 7, and go back to the

16  definition of "products" on page 7.  Do you see where it

17  says, "Details of which are set out in Schedule D?"

18  A    Yes, sir.

19  Q    Let's go to Schedule D, which begins on page 47.  The

20  products referenced in this agreement listed here on

21  Schedule D do not contain -- or consist of any Bitcoin

22  mining servers.  Correct?

23  A    Correct.

24  Q    Is it ORBs contention that there's a right of first

25  refusal in this hosting services agreement?

1    A    Not inside of this hosting services agreement, no, sir.

2    Q    And where is that right?

3    A    It's in the term sheet.

4    Q    ORB has taken the position that the hosting services

5    agreement never became effective.  Correct?

6         MR. SHURN:  Objection (indiscernible) calls for a

7    legal conclusion.

8         THE COURT:  Well, I mean, I think -- I think if

9    the question is, has ORB ever stated that the hosting

10   services agreement ever became effective, I mean, I think

11   you can ask him that question.  It's a perfectly appropriate

12   question.

13   BY MR. SPARKS:

14   Q    Has ORB taken the position that the hosting services

15   agreement never became effective?

16   A    I'm -- That just sounds like something I think where --

17   I think that's a legal conclusion.

18        THE COURT:  I don't think he's asking you for

19   legal conclusion.  I mean, are you aware of any circumstance

20   in which ORB has said in writing or orally that the services

21   agreement never became effective?

22        MR. ZANIEWSKI:  I do not believe so, sir.

23        THE COURT:  All right.

24   BY MR. SPARKS:

25   Q    Do you remember filing a verified original answer in

1   the Matagorda County case in which you declared under

2   penalty of perjury that the statements were true and

3   correct?

4   A    Yes, sir.

5   Q    Do you remember pleading to know that there was a

6   failure of consideration with respect to the hosting

7   services agreement and hosting sale agreement?

8   A    I mean, my pleading was my pleading.

9   Q    Did you remember?

10  A    I'm not a lawyer, so I don't know what "failure of

11  consideration" really, like --

12  Q    Do you read things before you sign them under oath?

13  A    Oh, absolutely.  Yes, sir.

14  Q    And make sure that they're true and correct before you

15  sign them under oath?

16  A    Yes -- yes, sir.

17           THE COURT:  Is that one of your exhibits?

18           MR. SPARKS:  It's not, Your Honor.

19           MR. ZANIEWSKI:  I'm sorry, the way you asked the

20  question was a little bit misleading, since you didn't use

21  the terms of what I said in that document.

22           MR. SPARKS:  Objection.  Non-responsive.  Move to

23  strike.

24           THE COURT:  Yeah, there was no question pending,

25  so I'm going to strike that.

1    BY MR. SPARKS:

2    Q    So because ORB believed that Bitmain had breached the

3    contract before the miners were delivered, ORB did not

4    believe it needed to perform under the contract.  Right?

5            MR. SHURN:  Objection calls for a legal

6    conclusion.

7            THE COURT:  Sustained.

8    BY MR. SPARKS:

9    Q    Because ORB believed that Bitmain had breached the

10   contract before the miners were delivered, you decided not

11   to honor the obligations in the contracts.  Right?

12   A    I would disagree.

13           MR. SHURN:  Objection (indiscernible)

14           THE COURT:  Yeah, why don't you just ask them what

15   they did, as opposed to referencing what the legal aspect of

16   what the obligations were under the contract.  So I think

17   it's a perfectly appropriate factual question.

18   BY MR. SPARKS:

19   Q    Because you believed Bitmain had breached the contract

20   before the miners were delivered, after they were delivered,

21   you did not comply with the contract.  Correct?

22   A    I would disagree with that, because underneath the

23   contract, we were -- there were tons of things that we were

24   required to do, including providing 24-hour security, you

25   know, a reliable power supply, keep the things safe, keep

1    the things maintained, etc.  And so I would say --

2         And listen, you know, most of this time that we were

3    working with Bitmain, we were trying to sort out a

4    resolution.  And there was a few points where we got really,

5    really close to signing a resolution, and we even came to an

6    agreement.  So our company, we 100%, you know, serviced the

7    facility, and made sure that, you know, we wouldn't be in

8    flagrant breach for, you know, shutting the entire facility

9    down, and letting weeds go, and not provide security.  We --

10   It was, you know, our intention the entire time that we were

11   going to create a big business with Bitmain, and grow and

12   become, you know, a multi-million, if not billion-dollar

13   company.

14   Q    But your intention was to do that without Bitmain.

15   Correct?

16   A    No, sir.

17   Q    But you kept all of the mining proceeds since you set

18   the miners up in November to date.  Correct?

19             MR. SHURN:  Objection.  Argumentative.

20             THE COURT:  Sustained.  That really wasn't a

21   question.

22   BY MR. SPARKS:

23   Q    Let's look at Exhibit 15.  You received this notice of

24   breach.  Correct?

25   A    Yes, sir.

1   Q    And you were aware that Bitmain was alleging that the

2   self-mining constituted a severe breach of the agreement.

3   Correct?

4   A    Well, that's what it says, yes.

5   Q    Bitmain asked you to immediately stop self-mining.

6   Correct?

7   A    Yes, sir.  Oh, no, I'm sorry.  We never self-mined.  We

8   were mining for Bitmain.  You threw a term in there, and I

9   just answered quickly.  I'm so sorry.

10  Q    So when you were mining to a test pool --

11  A    Right.

12  Q    When you directed the hashrate to a test pool, and then

13  directed the proceeds to a wallet owned by ORB, that was for

14  Bitmain?

15  A    Controlled -- controlled by ORB.  I mean, Bitmain never

16  paid a bill.  So you know, it was a very hairy time, and --

17  yeah.

18  Q    And when you sold those Bitcoin, and used them to pay

19  ORB's expenses, you did that for Bitmain?

20  A    We did that to pay the light bill, and make sure that

21  the facility had 24-hour surveillance, maintenance, etc., so

22  that we would, you know, not be in flagrant breach of our

23  fiduciary duty to maintain the servers.

24  Q    And when you had ORB pay your personal credit card

25  bills, was that for Bitmain?

1          MR. SHURN:  Objection, Your Honor.  It's outside

2    the scope of whether there is or is not a contract.

3          THE COURT:  What's the relevance?

4          MR. SPARKS:  He's saying that he was doing this

5    all for Bitmain, but he was paying his personal credit card

6    bills.  So that is definitely outside the contract.  The

7    contract prohibits self-mining.  He self-mined, claimed he

8    did it for their benefit, but he was paying his own bills.

9          THE COURT:  Well, there's no evidence that he was

10   paying his own bills.  Maybe you could start with that.

11   BY MR. SPARKS:

12   Q    You caused ORB to pay your personal credit card bills.

13   Correct?

14   A    In the light of our -- our disagreement and whatnot,

15   there were a lot of bills that this facility incurred.  It's

16   a very high-stakes data center.  Right?  The electricity

17   bill can be anywhere from $400,000 to $600,000 a month, and

18   to staff that, and to make everything go, it costs a

19   significant amount of money.

20   Q    ORB had its own credit cards.  Correct?

21   A    We did.

22   Q    And you had personal credit cards.  Correct?

23   A    As does anybody in this room, I'm sure.

24   Q    And you caused ORB to pay your personal credit cards.

25   Correct?

1    A    At times, I've spent money on personal credit cards for

2    the benefit of ORB.  And listen, you know, we may have not

3    done everything correct, right, and our accounting may have

4    not been squeaky.  But I don't think that changes the facts

5    that we, you know, kept the facility running, and kept our

6    staff paid, you know, we kept maintenance up.  It cost us

7    $1,000 to mow the lawn at the facility.

8    Q    You did all that by moving the Bitcoin from the wallet

9    that ORB controlled, into your personal Coinbase account.

10   Correct?

11   A    That is how the money eventually arrived at the ORB

12   Energy account, yes, sir.

13   Q    The money went from the wallet ORB controlled to your

14   personal Coinbase account.  Correct?

15   A    Yes, sir.  ORB did not have a --

16   Q    And did you --

17   A    ORB was not registered with an exchange to do such on

18   its own.

19   Q    And then you sold the Bitcoin on your personal Coinbase

20   account.  Correct?

21   A    That's where it got sold, yes, sir.

22   Q    And then you moved other Bitcoin to other exchanges,

23   and then you sold the Bitcoin on the other exchanges.

24   Correct?

25   A    There was a multitude of -- Like I mentioned in that

1    deposition, we used a multitude of exchanges in order to

2    convert Bitcoin into some fiat-like equivalent, a stable.

3    Q    You also moved the Bitcoin into multiple different

4    wallets.  Correct?

5    A    Sometimes, yes.

6    Q    You formed ORB Energy in November of 2023.  Right?

7    A    Yes.  November 16th, I believe.

8    Q    It's a Delaware company?

9    A    That's correct.

10   Q    But it's headquartered in Texas, isn't it?

11   A    That's our only facility, correct.

12   Q    So this is the only place ORB can transact businesses,

13   in the State of Texas?

14   A    Currently, yes.

15   Q    The only place where it has any assets is the State of

16   Texas.  Right?

17   A    Yes, sir.

18   Q    ORB didn't file a federal tax return for 2023, did it?

19   A    No, sir.

20   Q    Or 2024.  Right?

21   A    No, sir.

22   Q    You didn't personally file a federal tax return for

23   2024, did you?

24   A    No, sir.

25   Q    ORB didn't file a franchise tax report with the State

1   of Texas for 2024, did it?

2   A    Yeah, we actually did.

3   Q    When?

4   A    I believe over this weekend I got that all squared

5   away.

6   Q    After your deposition?

7   A    It would have been after the deposition, yeah.

8   Q    ORB didn't designate a registered agent for service of

9   process in Texas, did it?

10   A    I did.

11   Q    When?

12   A    I guess it would have been on Saturday I think I filed

13   the -- or cleaned up the Texas stuff.

14   Q    ORB hasn't paid any franchise taxes in the State of

15   Texas, has it?

16   A    $2,250.

17   Q    And when was that?

18   A    I believe on Saturday.

19   Q    Did ORB file a public information report with the State

20   of Texas?

21   A    I don't know what that is.  I couldn't answer.

22       MR. SHURN:  Again, Your Honor, I let it go for a

23   second, but this is outside is there a contract, is there

24   not a contract.  So I object.  It's beyond the scope of is

25   there, or is there not?  This is, let me smear him.

 1           THE COURT:  What's the relevance to contract

 2    question?

 3           MR. SPARKS:  The relevance is to the motions,

 4    because we would like to strike their motion, and their

 5    response to our motion, because they do not have a right to

 6    defend -- or to defend in in Texas courts, or to file

 7    motions, because of their failure to comply with Texas law.

 8           THE COURT:  All right.  I'm going to sustain the

 9    objection.

10    BY MR. SPARKS:

11    Q    You say your employees were working for ORB to benefit

12    Bitmain.  Correct?

13    A    I don't believe I made that statement.

14    Q    You used the mining proceeds to pay your employees.

15    Right?

16    A    Yes.  Correct.

17    Q    You've never issued a W-2 to employees, have you?

18    A    No, sir.

19    Q    And you've never issued a 1099 to an independent

20    contractor.  Correct?

21    A    No, sir.  But we do have a public -- or a CPA now to

22    help us clean up all our books.

23    Q    But ORB does have employees and independent

24    contractors.  Right?

25    A    Yeah.

1   Q     You said, or your attorney, in opening, talked about a

2   malware incident with Bitmain.  Do you remember that?

3   A     Yes, sir.

4   Q     He's referring to when Bitmain tried to install its own

5   software on its miners.  Correct?

6   A     We found out that that was the -- actually what the

7   cyber attack was, yes.

8   Q     You're -- When you say cyber attack, you're referring

9   to Bitmain trying to put its own software on its own miners?

10          MR. SHURN:  Objection, Your Honor.  Asked and

11   answered.

12          THE COURT:  Sustained.

13          MR. SPARKS:  Your Honor, it's noon.  How much

14   longer would you like me to go?

15          THE COURT:  How much longer do you have?

16          MR. SPARKS:  Honestly, Your Honor, because the

17   answers are so much different from the depositions, quite a

18   bit.

19          THE COURT:  Okay.  Why don't we -- Can we

20   reconvene Thursday afternoon at 1:30?

21          MR. SHURN:  Yes, Your Honor, I can.

22          THE COURT:  Is that doable?

23          MR. SPARKS:  Yes, Your Honor.

24          THE COURT:  Okay.  All right.  And then, we can go

25   as late in the day.  I have something at 1:00, which should

1    take a little bit of time.

2             MR. SHURN:  Very good.  Thank you, Your Honor.

3             MR. SPARKS:  Oh, Your Honor, I'm sorry.  Our

4    witnesses will not be available that day because it's a

5    public holiday in China.

6             THE COURT:  All right.  How about Friday?

7             MR. SHURN:  Yes, Your Honor.  That's fine.

8    Friday's fine.

9             MR. SPARKS:  It's actually until the 8th, it's a

10   public holiday, and they will not be at work.

11            THE COURT:  Okay.  So can we just finish then with

12   Mr. Jamieson, and come back on --

13            MR. SPARKS:  Yes, Your Honor.

14            THE COURT:  Okay.

15            MR. SPARKS:  And we have another witness also that

16   we can put on, besides those two.

17            THE COURT:  Okay.  All right.  So let me just look

18   at on -- Does the 8th actually work, or is it the 9th?

19            MR. SPARKS:  The 9th would be the first day that

20   they would be available.

21            THE COURT:  That's what I figured, Okay.  Okay.

22   If they're in China, so 1:30 is like, 1:30 in the morning.

23   That doesn't work.  I've actually represented people from

24   deposition in China starting at, you know, 11:00 at night,

25   so --

1              MR. SHURN:  Your Honor, and just so you know, Mr.

2      Jurgensen is unavailable on the 9th.  He was available on

3      the other dates, but he has a TI hearing (indiscernible)

4              THE COURT:  Okay.  Yeah, no, let's -- we'll find

5      something here.

6              MR. SHURN:  Very good, Your Honor.

7              Your Honor, may the witness step down?

8              THE COURT:  Yeah, yes, go ahead.  You can step

9      down.  And we'll come back -- we'll come back and finish you

10     Thursday, at 1:30.

11             MR. ZANIEWSKI:  Okay.  Is that --

12             MR. SHURN:  Thursday, at 1:30.  Yes.

13             THE COURT:  Yes.

14             MR. ZANIEWSKI:  Oh, okay.  Okay, okay.

15             THE COURT:  Two days from now.

16             MR. SHURN:  And Your Honor, do you have

17     instruction for him as a witness, as to --

18             THE COURT:  Yeah.  Yeah, you're not -- you can't

19     talk about your testimony with anyone.

20             MR. ZANIEWSKI:  Okay.

21             THE COURT:  Okay?  Including your lawyer.

22             MR. ZANIEWSKI:  Okay.

23             THE COURT:  Okay.  Thank you.

24             MR. SHURN:  Thank you, Your Honor.

25             MR. ZANIEWSKI:  (indiscernible) like, pause -- ?

1          THE COURT:  Yeah, pause.  You know, you're on the

2   stand -- just assume you're on the stand.  You can talk

3   about the weather, you can talk about other stuff, but you

4   can't talk about your testimony.  You can talk about the

5   case, but you can't talk about your testimony.

6          MR. ZANIEWSKI:  Okay.  Okay.  Thank you, Your

7   Honor.

8          MR. SHURN:  Thank you, Your Honor.

9          THE COURT:  Yep.

10          MR. SPARKS:  And Your Honor, we pre-admitted all

11   of the exhibits when we said that nobody was opposed.

12   Correct?

13          THE COURT:  Yes, all of those exhibits.  But I

14   have a ton of other exhibits.  So what are we going to do

15   with those?

16          MR. SPARKS:  Would you like us to bring them --

17   bring them back next time, or --

18          THE COURT:  No, no, no.  We can keep them.  I

19   mean, we can keep them.  But are we going to admit those?

20   What's going to happen with the rest of the exhibits?

21          MR. SPARKS:  I'll confer with (indiscernible)

22          THE COURT:  Yeah, why don't you confer, and then

23   if you just file a stipulation, I'll admit them.  But I'm

24   trying to figure out --

25          MR. SHURN:  I'll need to probably introduce my

1    invoices and stuff anyway.  I didn't think about that

2    (indiscernible)

3            THE COURT:  No, that's fine.  I mean, I'm going to

4    give you as much time as you need.  It's just we're going to

5    have to find it.  So let's plan on Thursday going as late as

6    we can, and get everything out except your witnesses.  And

7    unfortunately, we -- The 10th -- And your witnesses are

8    going to be remote.  So I'm overruling your objection.

9            MR. SHURN:  Very good, Your Honor.

10           THE COURT:  So the 10th, I have an all-day

11   mediation, starting at 8:30 in the morning.  The 13th is

12   Columbus Day, which is a federal holiday.

13           MR. SHURN:  The 14th, Your Honor -- Hold on, I've

14   got a status (indiscernible)

15           THE COURT:  Oh, the 14th I have an all-day in-

16   person mediation.

17           MR. SHURN:  Understood, Your Honor.  Understood.

18   I'm available -- I'm not trying to take control of your

19   calendar.  I'm available the 15th (indiscernible) the next

20   day, and I know I have a hearing (indiscernible) THE COURT:

21   No, it --

22           MR. SHURN:   -- it's under Judge Perez, but

23   (indiscernible)

24           THE COURT:  Well, I'll tell you what.  If -- Gow

25   long do you think your witnesses are going to be?

1          MR. SPARKS:  We can prepare written directs for

2    the Chinese witnesses.  So I think we can probably get that

3    done pretty quickly, and then it would be just a matter of

4    cross.

5          THE COURT:  I mean, if we start --

6          MR. SHURN:  Yeah, I've never done a written

7    direct.  Is that a proffer?

8          THE COURT:  Yeah, it's a proffer.  Yeah, proffer,

9    and then it would be a matter of cross.  We could start at

10   7:30 on Wednesday the 15th.  I know that's early for some.

11         MR. SHURN:  It's fine.  I can do it, Your Honor.

12         THE COURT:  Okay.

13         MR. SHURN:  Since I had to do their depositions at

14   6 a.m., I'm still getting up at 4 a.m.  I can't break the

15   cycle.  So that's fine.  I won't break the cycle.

16         THE COURT:  So I just -- Ms. Haus, does that work

17   for you, 7:30 on the 15th?  Okay.  7:30 on the 15th.

18   Obviously, it's going to be virtual.  That will be, I guess,

19   7:30 at night, or maybe 8:30 at night over there?  Are we 11

20   or 12 hours difference right now?

21         UNIDENTIFIED SPEAKER:  Thirteen.

22         THE COURT:  Thirteen.  Okay.

23         MR. SHURN:  It's good, Your Honor.

24         THE COURT:  Okay.  All right.  Well --

25         MR. SPARKS:  They will -- I see my client on the

1    computer, I know they're very anxious to have this hearing.

2    So I'm sure --

3            THE COURT:  Yeah, so why don't we start at 7:30 on

4    the 15th.  I've got a couple hours.  I should have 'til

5    10:00 that day.  So that's about three hours.  I'm going to

6    have a -- one interruption at 9 a.m.

7            MR. SPARKS:  Our client actually said they would

8    do it on the Chinese holiday of the 8th.  I'm sorry to go

9    back on this now.  But if that's a day that you have

10   available, I have it available, then the client will appear

11   during the holiday.

12           THE COURT:  Okay.  That's perfect.  Let's start at

13   8:00 -- 7:00 -- let's start at 8:00.  That way, we'll have,

14   unfortunately -- Okay, 8:00 on the 8th.  And unless there's

15   something wrong with my calendar, we can finish that day,

16   because I have the whole day.

17           MR. SPARKS:  Excellent.

18           MR. SHURN:  Good, Your Honor.  So I'll take off

19   then, starting on the 15th.  I owe my wife another vacation

20   because we've only been out four days in four years, and I'm

21   going to try to plan it during that week.

22           THE COURT:  Got it.

23           MR. SHURN:  (indiscernible)

24           THE COURT:  All right.  Okay.  So basically, right

25   now we're coming back on the 2nd, at 1:30, to finish

1  everything else -- everything else that we can.  And then on

2  the 8th, we'll start at 8:00, and finish all the rest of the

3  evidence.

4          MR. SPARKS:  Got it.

5          THE COURT:  All right.

6          MR. SHURN:  Very good, Your Honor.

7          THE COURT:  All right.  So we're in recess 'till

8  1:00.  Thank you.

9          MR. SHURN:  Great.  Thank you, Your Honor.

10         MR. ZANIEWSKI:  Thank you, Your Honor.

11

12                  (Proceedings adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3

4      I certify that the foregoing is a correct transcript from

5      the electronic sound recording of the proceedings in the

6      above-entitled matter.

7

8

9

10

11     Lindsay Peacock

12

13

14

15

16

17

18

19     Veritext Legal Solutions

20     330 Old Country Road

21     Suite 300

22     Mineola, NY 11501

23

24     Date: October 2, 2025

25