```
 1                UNITED STATES BANKRUPTCY COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                      HOUSTON DIVISION

 3                              )  CASE NO: 25-80363-arp
                                )
 4   ORB ENERGY CO.,            )  Houston, Texas
                                )
 5          Debtor.             )  Thursday, October 2, 2025
                                )
 6                              )  1:30 PM to 4:14 PM
     ------------------------------)
 7
                          MOTION HEARING
 8
             BEFORE THE HONORABLE ALFREDO R. PEREZ
 9                UNITED STATES BANKRUPTCY JUDGE
     APPEARANCES:
10
     For Debtor:             STEVEN DOUGLAS SHURN
11                           Hughes Watters Askanase
                             1201 Louisiana Street
12                           Houston, TX 77002

13   For Jamieson Zaniewski: KY JURGENSEN
                             Boyar Miller
14                           2925 Richmond Avenue
                             Houston, TX 77098
15
     For Bitmain Technologies JACOB SPARKS
16   Georgia Limited:        KASI NICOLE CHADWICK
                             XENNA K. DAVIS
17                           MIRANDA C. GRANCHI
                             Nelson Mullins Riley & Scarborough
18                           LLP
                             5830 Granite Parkway
19                           Plano, TX 75024

20   Court Reporter:         AKEITA HOUSE

21   Courtroom Deputy:       AKEITA HOUSE

22   Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
23                           Mineola, NY 11501
                             Tel: 800-727-6396
24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

1                          INDEX

2   DEBTOR'S WITNESSES    DIRECT    CROSS    REDIRECT    RECROSS

3   JAMIESON ZANIEWSKI              4

4

5

6

7   BITMAIN'S EXHIBITS                        RECEIVED

8   Exhibit 10                                  19

9   Exhibit 12                                  25

10  Exhibit 54                                  27

11  Exhibit 13                                  30

12  Exhibit 14                                  39

13  Exhibit 18                                  48

14  Exhibit 21                                  55

15  Exhibit 22                                  65

16  Exhibit 23                                  65

17  Exhibit 28                                  65

18  Exhibit 36                                  68

19

20

21

22

23

24

25

```
 1              HOUSTON, TEXAS; DAY, MONTH DATE, YEAR; TIME

 2                        (Call to Order)

 3          THE COURT:  All right, good afternoon.  It is

 4     Thursday, October 2nd, 2025.  We're here for the continued

 5     hearing in Case Number 25-80363.  Why don't we get

 6     appearances of counsel and then we can proceed.

 7          MR. SHURN:  Good afternoon, Your Honor.  Steven

 8     Shurn, S-H-U-R-N, on behalf of the Debtor, ORB Energy.

 9          MR. JURGENSEN:  And good afternoon, Your Honor.

10     Ky Jurgensen.  I'm individual counsel for Jamieson

11     Zaniewski.

12          MR. SPARKS:  Good afternoon, Your Honor.  Jacob

13     Sparks, Kasi Chadwick, Xenna Davis, and Miranda Granchi here

14     for Bitmain Technologies Georgia Limited.

15          THE COURT:  Thank you.  All right, so Mr.

16     Zaniewski was on the stand.  Are there any announcements or

17     should we just continue the examination?

18          MR. SPARKS:  I think continue, Your Honor.

19          THE COURT:  Okay.  All right.  Why don't you come

20     back up.  All right, you're still under oath.  No, no,

21     you're still under oath.

22          MR. ZANIEWSKI:  Oh, okay.

23          THE COURT:  Go ahead.

24          MR. SPARKS:  Your Honor, may we have permission to

25     share our screen with the exhibits?
```

```
 1                  THE COURT:  Sure.  All right.  You may proceed.

 2                  MR. SPARKS:  Thank you, Your Honor.

 3            CONTINUED CROSS-EXAMINATION OF JAMIESON ZANIEWSKI

 4    BY MR. SPARKS:

 5    Q    Mr. Zaniewski, last time we were here, you testified

 6    that you directed the hashrate of the hosted servers to a

 7    test pool after Bitmain delivered those servers to the

 8    facility in Van Vleck, Texas, correct?

 9    A    Correct.

10    Q    How many bitcoin mining servers are in that test pool?

11    A    Are you referring to currently?

12    Q    How about at the time you set it up?

13    A    When we set it up, I would say most of them worked like

14    straight at the beginning.

15    Q    So it's just a host -- it's just a mining pool

16    consisting of the hosted servers?

17    A    Yes, that's correct.

18    Q    And it's a mining pool that you set up.

19    A    Yes, sir.

20    Q    And the hosted servers had been part of that mining

21    pool continuously since around November 25th of 2024?

22    A    Yes, sir.

23    Q    So when you describe it as a test pool, that's a label

24    that you use to describe the mining pool that you set up,

25    but that wasn't just to run a test, right?
```

1    A    It was.  So it's, you know, kind of industry standard

2    to, you know, get these systems up and running.  We had

3    brand new hydro systems, you know, that the hydro cooling

4    systems you have to install piping and there's, you know,

5    possibility of leaks and other sort of, like, little miner

6    things that once they're actually running and doing their

7    job, you have to sort of like work out the kinks.

8    Q    When did that test end?

9    A    So we never stopped that.

10   Q    So you're still testing the servers, the hosted servers

11   today.

12   A    They're still going to the test wallet.

13   Q    That mining pool that you set up has been generating

14   rewards that are directed to a wallet controlled by Orb

15   since November of 2024, correct?

16            MR. SHURN:  Your Honor, I object.  Same as

17   yesterday with regard to the word control to the extent it's

18   access and not the legal term dominion in control.  I just

19   want to make it clear.  I'll just have the standing

20   objection to that so I don't have to keep standing up and

21   sitting down.

22            THE COURT:  All right, understood.

23            MR. SHURN:  Thank you, Your Honor.

24            THE COURT:  All right.  You can answer the

25   question.

1   BY MR. SPARKS:

2   A    I'm sorry, what was the question?

3   Q    That mining pool that you set up has been generating

4   mining revenue that's directed to a wallet that Orb controls

5   since November of 2024, right?

6   A    Correct.

7   Q    Let's look at Exhibit 7, Section 3.16.

8   A    Which binder is it?

9        THE COURT:  The big binder.

10       MR. SPARKS:  It's the one that says Bitmain

11  Technologies Georgia Limited hearing exhibits.  It's also on

12  the screen in front of you.

13       THE WITNESS:  Okay.  Should I just look at the

14  screen or...

15       MR. SPARKS:  Sure.

16       THE COURT:  You can look at either one.

17       THE WITNESS:  Which exhibit is this?

18       MR. SPARKS:  7.

19  BY MR. SPARKS:

20  Q    In Section 3.16, do you see the sentence that starts

21  with under no circumstances?

22  A    Yes, sir.

23  Q    Bitmain never gave Orb written authorization to set up

24  that mining pool, correct?

25  A    There was no written authorization, although I was told

1    by Ryan Zhao to get the site up and running ASAP.  And in

2    order to test the cooling systems, there has to be something

3    heating them up.

4              MR. SHURN:  Objection.  Non-responsive.  Move to

5    strike after there was no written authorization.

6              THE COURT:  I'm going to overrule that objection.

7    Go ahead.

8    BY MR. SPARKS:

9    Q    Bitmain never gave Orb written authorization to

10   interfere with Bitmain's monitoring of the hosted servers,

11   correct?

12   A    No, sir.

13   Q    And Bitmain never gave Orb authorization to interfere

14   with Bitmain's operation of the hosted servers.

15   A    No, sir.

16   Q    You're familiar with the third-party firmware called V-

17   N-I-S-H?

18   A    Yes, sir.

19   Q    If I pronounce that vanish, you'll know what I'm

20   talking about?

21   A    It's pronounced Vnish, or at least that's how we would

22   call it.

23   Q    Orb installed Vnish on the hosted servers, correct?

24   A    Yes, sir.

25   Q    Bitmain never gave Orb authorization to installed Vnish

1    on the hosted servers, right?

2    A    No, sir.

3    Q    Who at Orb specifically installed Vnish on the hosted

4    servers?

5    A    Parker.

6    Q    Vnish allowed Orb to boost the hashrate of the hosted

7    servers, right?

8    A    Incorrect.

9    Q    Vnish allows the user to boost the hashrate of bitcoin

10   mining servers, correct?

11   A    Not to the way that we were using it, no.

12   Q    That is one of the intended uses of the firmware,

13   correct?

14   A    No.

15   Q    I'm sorry.  I didn't hear your answer.

16   A    No.

17   Q    Vnish also allowed you to redirect a small percentage

18   of the hosted servers hashrate to a different wallet, didn't

19   it?

20   A    No.

21   Q    There's a dash rate on Vnish's website that shows the

22   hashrate allocation, right?

23   A    I'm losing you here on this one.

24   Q    There's a dashboard on Vnish's website that shows the

25   hashrate allocation, correct?

1   A    Not to my knowledge.

2   Q    You've never provided any information about Vnish or

3   the hashrate allocation to Bitmain, have you?

4   A    Still, I'm lost as to what you're saying.

5   Q    Last time we were here, you testified that Orb provides

6   operation and maintenance services for the hosted servers,

7   right?

8   A    Correct.

9   Q    Let's look at Exhibit 6, Page 21.  We are looking at

10  subsection (e).  Do you see the reference in that section to

11  a separate operation and maintenance service agreement?

12  A    Yes, sir.

13  Q    Orb has never had a separate operation and maintenance

14  agreement with Bitmain, correct?

15  A    It -- so in all honesty, I thought the hosting services

16  agreement was the service agreement.  But, you know, in

17  further reflection, I guess it reads that it just says that

18  we will execute another service agreement at the time.  I

19  didn't realize that it was a contract of contracts.

20  Q    There's not a separate operation and maintenance

21  agreement, correct?

22  A    Correct.

23  Q    And you did know that operations and maintenance was

24  never going to be turned over to Orb until some period of

25  time and it was going to be a minimum of three months,

1    correct?

2    A    Yes.  When we came into the deal, you know, Ryan told

3    me, you know, we'll be there for the first three months to

4    make sure you guys, you know, get it all going, you know,

5    your staff is trained to do the service and maintenance and

6    you guys know what you're doing and then we'll hand it off.

7    Q    And that handoff never occurred, correct?

8    A    I guess it didn't -- it didn't end up percolating due

9    to the circumstances.

10   Q    Look at Section 5 - I'm sorry -- Section 8.4 on Page

11   25, please.  And in --

12   A    8.4, sir?

13   Q    8.4, yes.  And do you see subsection (b)here?  You see

14   where it says, if Orb utilizes the hosted servers for self-

15   mining purposes, any operation and maintenance service

16   agreement would have terminated automatically?

17   A    Yes, sir.

18   Q    And Bitmain had a right under the hosting sale

19   agreement to designate a third-party operations and

20   maintenance provider, correct?

21   A    To the best of my knowledge or recollection.

22   Q    Let's look at Exhibit 7, Page 36, please, subsection

23   (b), that big block in the middle of the page.  Do you see

24   all of Orb's obligations here?

25             MR. SHURN:  Objection.  Calls for a legal

1   conclusion.

2           THE COURT:  What part of that are you referring

3   to?

4           MR. SPARKS:  Are you asking me, Your Honor?

5           THE COURT:  Yes.

6           MR. SPARKS:  Little Roman numeral (i) through

7   (viii).

8           THE COURT:  Why don't you just ask him what -- if

9   that's what did the necessary support in cooperation for the

10  operation, as opposed to obligations.  Sustained to that

11  extent.

12          MR. SPARKS:  Thank you, Your Honor.

13  BY MR. SPARKS:

14  Q    Do you understand that this is listing the necessary

15  support and cooperation that Orb was required to provide to

16  Bitmain or its designated third-party operation and

17  maintenance service provider?

18  A    Yeah.  This is part of the -- kind of like the

19  checklist to prepare the site for operation.

20  Q    And you were aware that Bitmain had hired a company

21  called NexaNode to perform certain services related to the

22  hosted servers, right?

23  A    Yeah.  NexaNode, or I believe they also went by

24  Dataprana.  I don't know if it's -- I think it's the same

25  company, maybe it's not.

1    Q    And Orb kicked NexaNode out of the facility, correct?

2    A    So he didn't -- we didn't kick them out.  But after

3    they blew up the machines, I sent a request to Bitmain

4    saying that if they could send some competent people to the

5    site in order to do their -- you know, whatever they were

6    requesting to do because, you know, they blew up the

7    machines.  And also, they potentially damaged and ruined a

8    cooling system, which, you know, under this agreement, you

9    know, those are to be ours to own.  So if, you know, these

10   Bitmain staff are coming in and damaging the cooling

11   systems, that wasn't really cool to me.

12   Q    You told Bitmain that NexaNode would not be allowed

13   back on the property, correct?

14   A    On about -- yeah.

15   Q    On Page 36 here, do you see where it says that Orb was

16   required to provide all necessary support and cooperation

17   for the operation and maintenance of the hosted servers by

18   O&M personnel, including handling or repairing any hosted

19   servers that may be deemed -- I'm sorry -- may be damaged,

20   defective, malfunctioning or not operating.

21   A    Where are you reading, sir?

22   Q    Roman numeral V.

23   A    I see it there now.

24   Q    NexaNode could not handle or repair the hosted servers

25   without being able to physically access the hosted servers,

1    correct?

2    A    In order to repair something, typically, you have to

3    touch them.  Although at the time that NexaNode was there,

4    they were given full access.  They touched the machines;

5    they could do whatever they want.

6    Q    They could not, if you would not let them return, fix

7    the machines that were broken, correct?

8    A    If they were not there, they could not fix the

9    machines, yes.

10    Q    And when you say they blew up some of the hosted

11    servers, you don't mean that anything physically exploded,

12    correct?

13    A    I do.

14    Q    You mean that they physically exploded?

15    A    Yeah, so I believe I described this two days ago.  So

16    when the cooling system was put into manual mode and the

17    pump stopped, the miner is essentially cooked.  And so,

18    there's a bunch of plastic tubing and the plastic tubes

19    exploded.

20    Q    Are the plastic tubes part of the cooling system?

21    A    The parts that actually exploded, I believe, were the

22    tubes that were on the miners.  There's an inlet and there's

23    an outlet and then there's about six tubes that circulate

24    the water inside the machine and you can see the plastic

25    tubes on the outside.  And those are, like, part of the

1    internal components and those are the tubes that just sort

2    of exploded.

3    Q     The tubes can be replaced, correct?

4    A     Yes, tubes can be replaced.  But when the circuit

5    boards fry from overheating, those systems likely needed to

6    go to a repair depot for any sort of repair if there was a

7    repair possible.

8    Q     NexaNode could not take them to a repair depot if you

9    would not let them into the facility to access the hosted

10   servers, correct?

11   A     I would agree with you.

12   Q     You previously testified that Bitmain had breached the

13   contracts before the hosted servers were ever delivered by

14   failing to pay the deposit invoice, right?

15   A     Yes, sir.

16   Q     You were the person at Orb in charge of preparing

17   invoices for Bitmain, correct?

18   A     Yes, sir.

19   Q     And you were the person in charge at Orb of sending the

20   invoices to Bitmain.

21   A     Yes.

22   Q     The amount of that deposit invoice was around $740,000?

23   A     $740,275.80, I believe.

24   Q     And Orb believed that Bitmain was obligated to pay that

25   deposit invoice after the facility passed inspection, right?

1    A    So there's two points in this story.  I was told by

2    Ryan Zhao that the invoice would be paid within 10 days of

3    us receiving the cooling systems, which we received the

4    cooling systems on or about, I believe, September 9th; that

5    never happened.  And, you know, further reflection and

6    review of the contract, we began to understanding, like, oh

7    okay, the deposit will be paid within seven days of the

8    system passing inspection, and Ryan didn't really tell us

9    that.  But after we reviewed the contract, we were, like,

10   okay, once the site passes inspection and it's ready to

11   energize, they've got seven days to pay and they will.

12   Q    So your understanding is that Bitmain was obligated to

13   pay the deposit invoice after the facility passed

14   inspection, correct?

15   A    Yes, sir.

16   Q    Orb believed that the facility passed inspection in

17   early to mid-November, right?

18   A    Yeah.  I believe the 10th of November.

19   Q    And Orb's position is that Bitmain's failure to pay the

20   invoice within seven days after November 10th constituted a

21   breach of the contracts, right?

22   A    Correct.

23   Q    You first sent that invoice to Ryan Zhao on September

24   4th, right?

25   A    Around that time, yes.

1    Q    Let's look at Exhibit 9.  Do you see this email at the

2    top of the page?

3    A    Yes, sir.

4    Q    This email address, jh@jamiesenhill.com; that's your

5    personal email address, right?

6    A    That's the email address that I registered with Bitmain

7    for the deal, so Orb Energy KYC'd through this email

8    address.

9    Q    How long have you had this email address?

10    A    20 plus years?

11    Q    So this has been your personal email address for 20

12    plus years.

13    A    Yes, sir.

14    Q    And here where it lists the attachments, you attached

15    Invoice 1002 to this email on September 4th, correct?

16    A    Yes, sir.  Oh, also, the email would have been sent or

17    the invoice would have been sent directly from QuickBooks as

18    well.

19    Q    Let's look at Exhibit 10.  You re-sent the same invoice

20    to Ryan Zhao on November 27th, correct?

21    A    Yes, sir.

22    Q    And this time, you included another email address,

23    hostingsupport@bitmain.com, right?

24    A    Yes, sir.

25    Q    And that was the email address that you were instructed

1   to send invoices to, correct?

2   A    At that time, Ryan asked me to send it to them, yes.

3   Q    This email says, "We are estimated full power on

4   ability in two days."  So Orb powered on the hosted servers

5   on November 29th, right?

6   A    This email would have been referencing that all of the

7   miners would have been and cooling systems running and

8   everything like that.  I believe on the 27th, we -- I would

9   probably guess that maybe 50 percent of the 2700 miners were

10  installed at this point.

11  Q    Let's look at Invoice Number 1002 on the next page.

12  Under the bill to section in the top right-hand corner of

13  this page, this invoice is billed to Ryan Zhao, correct?

14  A    Ryan Zhao, Bitmain, and then the address for Bitmain.

15  Q    Let's look at the next page.  This is Invoice Number

16  1014, right?

17  A    Yeah, 1014.

18  Q    Again, billed to Ryan Zhao, correct?

19  A    Ryan Zhao, Bitmain, and then the address of Bitmain.

20  Q    This was for the rack on fee, correct?

21  A    Yes, sir.

22  Q    And the last one, 1002, was for the deposit, correct?

23  A    Correct.

24  Q    The contracts says that Orb can charge an on rack fee

25  of $20 per hosted server, correct?

1    A    Correct.

2    Q    There's sales tax on this invoice, right?

3    A    Yes, sir.

4    Q    The contract with Bitmain said that the $20 fee is

5    inclusive of taxes and expenses, correct?

6    A    Yes, sir.

7    Q    So this invoice was incorrect, wasn't it?

8    A    Ryan told me that it was incorrect, yes.  Or, you know,

9    Bitmain didn't really want to pay tax for anything.

10    Q    Let's go back to Exhibit 7, Page 45.  If you want to

11    hold that page there, we'll be going right back to it.  Do

12    you see Section 2.8?

13    A    2.8, yes.

14    Q    Do you see where it says that the services provided by

15    service provider or the payment of any amounts made by

16    Bitmain are inclusive of any applicable tax, including, but

17    not limited to, sales and use tax?

18    A    Yes, sir.

19    Q    And do you see a couple of lines lower where it says

20    service provider shall not charge any additional taxes in

21    relation to the services rendered under this agreement?

22    A    I don't see where you're reading that.

23    Q    Section 2.8, third line from the top.

24    A    Oh, yeah, and hence, yeah.  It's that run-on sentence.

25    Q    So that invoice was incorrect, wasn't it?

1    A    Sure.

2    Q    Let's go back to Exhibit 10, and we're going to look at

3    the last page of that exhibit, which is Invoice 1013.  You

4    also put Ryan Zhao under bill to on this invoice, correct?

5    A    Ryan Zhao, Bitmain and the Bitmain address.

6    Q    Let's look at Exhibit 54, Page 17.

7            MR. SPARKS:  And, Your Honor, at this time, I

8    would like to offer Exhibit 10 into evidence.

9            THE COURT:  Any objection.

10           MR. SHURN:  No objection, Your Honor.

11           THE COURT:  All right.  Exhibit 10 is admitted.

12           (Bitmain's Exhibit 10 admitted into evidence)

13           THE WITNESS:  What page?  They're not numbered.

14           THE COURT:  We are looking at Page 17.

15           MR. SHURN:  So, Your Honor, I (indiscernible)

16   which exhibit we're on.  I'm on their Exhibit 54 and it

17   looks different than the screen, so I want to make sure that

18   I'm apples to apples.

19           THE COURT:  I'm sorry, one moment.  That is not

20   the correct exhibit.  Oh, yes, that is the correct exhibit.

21   This is -- the declaration is the declaration of the

22   interpreter and the messages are the WeChat messages between

23   Bitmain and Orb.

24           MR. SHURN:  So, Your Honor, I object to the

25   admission of this document.  During all the depositions,

1    there was grave debate between the interpreter for my court

2    reporting service and their interpreter, and it was nothing

3    debate between each of them what was said and what not was

4    said and it made a material difference as to the answers.

5    So for us to agree to the admission of this, I would need to

6    go hire an interpreter and have them interpret it and make

7    sure that it's correctly interpreted.

8            THE COURT:  All right.  Well, these are all in

9    English.  What was being interpreted?

10           MR. SPARKS:  The messages that were in Mandarin

11   Chinese, which were interpreted to English, Your Honor.

12           THE COURT:  I still haven't found the page you

13   want me to look at.

14           THE WITNESS:  That's interesting.  When these

15   messages came to --

16           THE COURT:  There's no pending question.

17           THE WITNESS:  Sorry.

18           THE COURT:  I'm still looking for the page.

19           MR. SPARKS:  I'm sorry, Your Honor.  I didn't

20   realize that we did not have these numbered.  If you're

21   flipping through the messages, we're looking for November

22   28th of 2024.

23           THE COURT:  Okay.  So are the two messages on --

24   okay, I found the page.  Are these in Mandarin or are these

25   -- were these in English?

1          MR. SPARKS:  These were in English, Your Honor.

2          MR. SHURN:  Your Honor, to the extent what was

3    said between these parties, obviously, from both sides,

4    right, their admissions by a party opponent.

5          THE COURT:  Right.

6          MR. SHURN:  So I'm not going to object under

7    hearsay right now.

8          THE COURT:  Okay.

9          MR. SPARKS:  There are notes in here when it was

10   translated, Your Honor.  So when we get a couple of pages

11   in, you'll see that it says -- there's a note that says,

12   translation supported by.

13         MR. SHURN:  And so, it's only as to the

14   translation ones at this point in time that I have a pending

15   objection, Your Honor.

16         THE COURT:  Okay.  All right.  Have you found the

17   page?

18         MR. SPARKS:  Yeah.  I found the page that's on the

19   screen, yup.

20         THE COURT:  All right, go ahead.

21         MR. SPARKS:  And we can flip forward a couple of

22   pages, Your Honor, to where it's on November 29th, and we'll

23   put the right one up on the screen.

24         Are you ready for me to proceed, Your Honor?

25         THE COURT:  Yes, go ahead.

1   BY MR. SPARKS:

2   Q    Do you see these messages from Wang, Mr. Zaniewski?

3   A    Yes, sir.

4   Q    And Wang works at Bitmain, correct?

5   A    I would assume so.

6   Q    Look at the bottom of this page on November 29th.  Do

7   you see his message here where he's sending you a

8   screenshot?

9   A    Yes, sir.

10  Q    And then let's flip to the next page.  Do you see where

11  he's telling you the invoice is not titled by an individual?

12  A    Yes, sir.

13  Q    And right above that, he's got a screenshot of your

14  invoice where it has Ryan Zhao's name, correct?

15  A    I believe -- it's really small to see, but I believe

16  so, yes.

17  Q    And he's asking you to change it to the name of the

18  company, correct?

19  A    Yes, sir.

20  Q    And he tells you that if you change it today, we'll be

21  able to pay soon, right?

22  A    Yes, sir.

23  Q    If we flip to the next page, you're asking him if you

24  should remove the name Ryan Zhao, correct?

25  A    Yes, sir.

1   Q    And then you agree to issue a new invoice, right?

2   A    I believe I'm agreeing to revise a name on an invoice.

3   Q    Okay.  You agreed to issue a revised invoice, correct?

4   A    That's what they were asking me to do.

5   Q    We'll come right back and start where we just left off,

6   but please flip through Exhibit 12.  After you received that

7   message -- those messages that you exchanged, you issued

8   updated invoices, correct?

9   A    Yes, I revised them.

10   Q    And you emailed them here to hostingsupport@bitmain.com

11   and Ryan Zhao and said, "Hi.  Here are the updated

12   invoices," correct?

13   A    Yes, sir.

14   Q    Let's look at the next page.  This is your revised

15   Invoice Number 1002, right?

16   A    I can't tell.  There's no date on this.

17   Q    Do you see where it says invoice details, Invoice 1002?

18   A    Yes, sir.

19   Q    And this time under bill to, it just says Bitmain,

20   correct?

21   A    Yes, sir.

22   Q    So even though Wang gave you the complete correct name

23   that should be in the bill to line, Bitmain Technologies

24   Georgia Limited, you revised the invoice and just put

25   Bitmain in the bill to line, correct?

```
 1    A    Yes.  This is the order of events.

 2    Q    Let's flip to the next one, the next page, which is

 3    Invoice Number 1014.  Also, in the bill to line, it just

 4    says Bitmain, correct?

 5    A    Yes, sir.

 6    Q    But you did remove the taxes, correct?

 7    A    Yeah.  This one says 1126, so I'm not sure when this

 8    one was created.

 9    Q    You did remove the taxes, correct?

10    A    Yes, at the request of Bitmain.

11    Q    And then you have also never remitted any sales taxes

12    until -- what -- last weekend, correct?

13    A    Sales tax?

14    Q    Yes.

15    A    You mean the franchise tax that we paid?

16    Q    Actually, I'm just talking about sales taxes.  You've

17    never remitted any sales taxes to the state, have you?

18    A    No, sir.

19    Q    Let's look at this last page of this Exhibit 12, your

20    Invoice Number 1013.  This one also you just changed bill to

21    to just Bitmain, correct?

22    A    Yes, sir.

23         MR. SPARKS:  Your Honor, I would move to admit

24    Exhibit 12 into evidence.

25         THE COURT:  Any objection?
```

1          MR. SHURN:  No objection, Your Honor.

2          THE COURT:  Admitted.

3          (Bitmain's Exhibit 12 admitted into evidence)

4    BY MR. SPARKS:

5    Q    Let's go back to 54 and pick up where we left off.  And

6    let's flip to the next page and look at the messages from

7    December 2nd, 2024.  Do you see the message -- oh, I'm

8    sorry, it does start on the prior page here.  The first

9    message of December 2nd of 2024, do you see that message

10   from Wang?

11   A    Yes, sir.

12   Q    And now he's screenshotting the invoices that we just

13   looked at, correct?

14   A    Yes, sir.

15   Q    And he's asking you to use the full name of the

16   company, correct?

17   A    Yeah, that's what it says.

18   Q    And he told you that just Bitmain can't pass a

19   financial audit, correct?

20   A    It doesn't necessarily say that on the page, but I

21   believe that's what it would be intended.

22   Q    And let's flip to the next page.  And here, Zhao from

23   Bitmain asks you to provide the invoice according to the

24   format specified, correct?

25   A    Yes.

1    Q    And he said, "We're ready in advance and can complete

2    the payment within one working day after you provide the

3    correct invoice," correct?

4    A    That's what it says on the page.

5    Q    And then on two pages later starting on December --

6              THE WITNESS:  Is it possible to ask a question?

7              THE COURT:  No.  Your counsel can come back and

8    ask you a question.

9              THE WITNESS:  Okay.

10   BY MR. SPARKS:

11   Q    Starting on December 3rd, he asked you again for a

12   revised invoice, correct?

13   A    Yes, sir.

14             MR. SPARKS:  Your Honor, we'd move to admit

15   Exhibit 54.

16             THE COURT:  Although sections that -- only those

17   sections that have been referred to.  It would be good if we

18   could get it numbered and then, you know, just enter a

19   stipulation.

20             MR. SPARKS:  Yes, Your Honor, we'll take care of

21   that.

22             THE COURT:  Mr. Shurn.

23             MR. SHURN:  And just to be clear so I understand.

24   All the sections that were read, none of those were

25   translated sections; those are all English sections.

```
 1              THE COURT:  Right.  So Exhibit 54, to the extent
 2    that we've looked at it and the witness has testified to it,
 3    those will be admitted.  And we can either just specify --
 4    stipulation specifying which pages or just file an amended.
 5    Exhibit 54, that might be easier, with just those pages.
 6              MR. SHURN:  I think that makes sense, Your Honor.
 7    Thank you.
 8              THE COURT:  Okay, thank you.  So Exhibit 54 with
 9    that limitation is admitted.
10              (Bitmain's Exhibit 54 admitted into evidence)
11              MR. SPARKS:  Thank you.
12    BY MR. SPARKS:
13    Q    And let's go back to Exhibit 13.  And by back, I just
14    mean the other way in the binder.  We haven't talked about
15    this one yet.
16    A    I'm sorry.  I can't -- there just seems something off
17    about this.
18              THE COURT:  Well, your counsel can ask you.
19              THE WITNESS:  Okay.  How do I remember?
20              THE COURT:  How do you --
21              THE WITNESS:  I might forget, like...
22              THE COURT:  Yeah.  I mean, if you -- Mr. Shurn, if
23    you want to give him a piece of paper for him to write on.
24              MR. SHURN:  Yes, Your Honor, I will.  Here's, just
25    so everybody knows, two blank pieces of paper and a pen.
```

1              THE WITNESS:  Okay.  Thank you so much.

2              MR. SHURN:  It's a brand-new pan.

3              THE WITNESS:  Thank you.  Sorry about that.  I

4     know I would forget.

5     BY MR. SPARKS:

6     Q    May I see Exhibit 13?

7     A    Yes, sir.

8     Q    This email down below where it says forwarded message,

9     that email address, orbenergyco@gmail.com, that is Orb

10    Energy's email address, correct?

11    A    Yes, that's the email connected to our QuickBooks.

12    Q    And you created revised invoices on this day, December

13    7th, correct?

14             MR. SHURN:  Objection, Your Honor.  We can't tell

15    from the face of when they were created.  All we can tell is

16    we knew it was sent.

17             MR. SPARKS:  That's why I'm asking the witness.

18             THE COURT:  Okay.  Is that -- what kind of -- is

19    that an objection?

20             MR. SHURN:  Your Honor, it doesn't say on the face

21    of it, Your Honor.  I'll withdraw the objection, Your Honor.

22             THE COURT:  Okay.

23             MR. SHURN:  I'll withdraw it.

24    BY MR. SPARKS:

25    Q    So on December 7th, you created corrected invoices,

1    correct?

2    A    All I see is a forwarded message.  I'm really unsure

3    with this little information.

4    Q    You sent an email from yourself -- from the Orb Energy

5    Co email address to your personal jamiesenhill.com email

6    address on December 7th, correct?

7    A    It seems to say that on the page, yes.

8    Q    And then you forwarded that email with the subject

9    line, "Invoices corrected to hosting support at Bitmain.com

10   and Ryan Zhao," correct?

11   A    I believe so.

12   Q    Let's look at the next page, please.  And this is the

13   revised Invoice 1002, correct?

14   A    Yes, sir.

15   Q    And under bill to, this is the first time you've ever

16   put the complete name of the company, Bitmain Technologies

17   Georgia Limited, correct?

18   A    I believe so.

19   Q    And this is the deposit invoice, right?

20   A    1002, yes, it's the same invoice.

21   Q    And then the next page, Invoice 1013, this is the first

22   time you had ever issued an invoice that had Bitmain

23   Technologies Georgia Limited under bill to, correct?

24   A    To the best of my recollection.

25   Q    And then on the next page, Invoice Number 1014, this

1    was the first time you had ever issued an invoice that said

2    bill to Bitmain Technologies Georgia Limited, correct?

3    A    To the best of my recollection.

4              MR. SPARKS:  Move to admit Exhibit 13 into

5    evidence, Your Honor.

6              MR. SHURN:  No objection, Your Honor.

7              THE COURT:  All right, it'll be admitted.

8              (Bitmain's Exhibit 13 admitted into evidence)

9    BY MR. SPARKS:

10   Q    Let's look at Exhibit 7, Page 1.  Do you see the name

11   of the Bitmain entity entered into this agreement?

12   A    Yes.

13   Q    It's Bitmain Technologies Georgia Limited, correct?

14   A    Yes, further referred to as Bitmain in the rest of the

15   document.

16   Q    So Bitmain Technologies Georgia Limited matches the

17   December 9th invoice, correct?

18   A    The first name matches, yes.

19   Q    And let's look at Page 1 of Exhibit 6.  So the hosting

20   services agreement also, you see the name of the entity that

21   entered into that agreement?

22   A    Yes, sir.

23   Q    And that Bitmain Technologies Georgia Limited, correct?

24   A    Yes, and then parenthesis Bitmain.

25   Q    Let's look at Exhibit 15.  You're familiar with this

1    notice, right?

2    A    We're going to Exhibit 15 or Page 15?

3    Q    Exhibit 15.

4    A    Yes, this was sent.

5    Q    And you received this around December 12th, 2024.

6    A    Yes, sir.

7    Q    And after receiving this notice, you were aware that

8    Bitmain considered Orb's direction of the hashrate to a

9    mining pool providing rewards for Orb to be theft, correct?

10   A    If it says that on the page, then it says it on the

11   page.

12   Q    Did you read it?  Take a look at the last sentence in

13   the first paragraph, please?

14           MR. SHURN:  Your Honor, I object.  It's hearsay.

15   It's been admitted into evidence just for the probative

16   value of it was sent, not for the truth of the matter

17   asserted, so there's still -- I have an objection as to

18   hearsay of the document itself.

19           MR. SPARKS:  It's offered to show notice, Your

20   Honor, and not for the truth of the matter asserted, and I'm

21   asking about his understanding in December of 2024.

22           THE COURT:  Rephrase your question.

23   BY MR. SPARKS:

24   Q    You understood after you received this that Bitmain's

25   position was that Orb's actions in directing the hashrate to

1    a mining pool providing rewards for Orb constituted a breach

2    of the agreements and theft, correct?

3              THE COURT:  I think he's answered that.  I think

4    he says that that's what the agreement says.  Is that a

5    different question?

6              MR. SPARKS:  No, Your Honor.

7              THE COURT:  Okay.  Let's move on.

8    BY MR. SPARKS:

9    Q    After you received this, you did not then ask Bitmain

10   or allow Bitmain, I should say, to redirect the hashrate to

11   one of Bitmain's mining pools, correct?

12             MR. SHURN:  Assumes facts not in evidence.

13   There's no fact that they provided him a wallet or hashrate

14   to do it to, so it assumes that he was provided and then he

15   didn't do it.

16             MR. SPARKS:  I think he's just giving testimony at

17   this point.  We dealt with this throughout the deposition as

18   well and it really tainted it.

19             THE COURT:  Go ahead and answer the question.  I

20   don't necessarily -- I'm going to overrule the objection.

21             MR. SHURN:  Thank you, Your Honor.

22             THE WITNESS:  Okay.  Do you mind asking the

23   question again, sir?

24   BY MR. SPARKS:

25   Q    You did not allow Bitmain to redirect the hashrate to

1    one of its mining pools after receiving this notice,

2    correct?

3    A    It wouldn't have been possible.

4    Q    It wouldn't be possible for Bitmain to redirect the

5    hashrate to one of its mining pools.

6    A    They didn't give -- they didn't give an address or

7    anything like that.

8    Q    Why would they need to give you an address if they were

9    the one redirecting the hashrate on their own miners?

10   A    Well, first of all, they never paid the bill and the

11   bill was required to direct any hashrate.  I mean, that's

12   kind of an industry norm.  Like, you got to pay the bill in

13   order to get power and hashrate.  It's not just free.

14   Q    It's the industry norm for someone to go into -- who is

15   a data facility operator to go into another person's

16   machines and redirect the hashrate for their miners and

17   direct all of the mining rewards for their machines to the

18   facility operator's wallet?

19            THE COURT:  Wait a second.  That's multiple

20   questions.  Why don't you just ask one question and let him

21   answer.

22   BY MR. SPARKS:

23   Q    Are you saying it's the industry standard for a data

24   facility operator to go in and redirect the hashrate on

25   machines in its facility?

1              MR. SHURN:  Your Honor, asked and answered.  He's

2     already testified that it's the industry standard to build a

3     test pool.  We've already done that testimony.  We're going

4     over the same ground.

5              THE COURT:  I'm going to let him answer, if you

6     can.

7              MR. SHURN:  Thank you, Your Honor.

8     BY MR. SPARKS:

9     A    So there's two parts to this answer.  Yes, it is the

10    industry norm, especially with hydro cooling, to test the

11    miners and make sure everything is working, and it's also

12    the industry norm for when you send Bitmain's miners to

13    their service center.  They mine to their own wallet on your

14    machine.  It's whoever is paying for the power, sort of,

15    it's kind of like you reap the burden of paying the power.

16    If you agree to pay the power and you're paying the power,

17    then the hashrate goes to something that you control.  But

18    if you're not paying for the power, it's like, you know,

19    theft of oil.  You can't go to a gas station and pump gas

20    without paying for it.

21    Q    So in your mind the person who's committing theft here

22    isn't the person who goes in and redirects the hashrate to

23    take all of the rewards from someone else's miners?

24             MR. SHURN:  Objection, Your Honor.  There's been

25    no redirection of the hashrate.  They set up the computer.

1   There was no change and they were blank computers.  That's

2   what the evidence on the record on redirect.

3          MR. SPARKS:  Your Honor, he's testifying.  And,

4   again, we dealt with this throughout the depositions.  We

5   haven't had a chance to file our motion yet, but this is

6   very inappropriate.

7          THE COURT:  Well --

8          MR. SPARKS:  The problem --

9          THE COURT:  I'm going to overrule that objection.

10  But your use of the word theft, what is theft and what isn't

11  theft.  I think that's a legal conclusion, so why don't you

12  just ask him, you know, kind of the underlying facts.

13  BY MR. SPARKS:

14  Q    The contract prohibits Orb from directing the hashrate

15  to a mining pool providing rewards for Orb, correct?

16         MR. SHURN:  Your Honor, that's two questions,

17  compounded question.

18         THE COURT:  Just state -- just ask him one

19  question.

20         MR. SHURN:  Thank you.

21  BY MR. SPARKS:

22  Q    The contract prohibits Orb from directing the hashrate,

23  correct?

24  A    Yes.

25  Q    And the contract prohibits Orb from receiving rewards

1    from the miners, correct?

2    A    Yes.

3    Q    By the time you sent that corrected invoice to Bitmain

4    Technologies Georgia Limited, Orb had already directed the

5    hashrate, correct?

6    A    Yes.

7    Q    Orb was already receiving the benefits from the mining

8    pool, correct?

9         MR. SHURN:  Objection, Your Honor.  The testimony

10   is it went to their wallet, not that they were taking the

11   bitcoin and self-mining.

12        THE COURT:  I think you can clean that up on

13   redirect.

14        MR. SHURN:  Will do, Your Honor.  Thank you.

15        THE WITNESS:  Could you ask the question again,

16   please, sir?

17   BY MR. SPARKS:

18   Q    By the time you issued that invoice on December 9th,

19   the rewards from the mining pool were already being directed

20   to a wallet controlled by Orb, correct?

21   A    Yes, sir.  The miners, once initiated, they shouldn't

22   be shut off because they're cooled with water.  At that time

23   in Texas, the temperatures at night would have been, you

24   know, heading towards the freezing era and being that we

25   just had installed a brand-new antifreeze chemical, which

```
 1    I've never used before, we wanted to make sure -- you're not
 2    supposed to shut these systems off in the winter.
 3              MR. SPARKS:  Your Honor, objection.  Non-
 4    responsive.  Move to strike everything after yes.
 5              THE COURT:  I'm going to let him explain his
 6    answer.  Overruled.
 7              MR. SPARKS:  Exhibit 14 is already in -- I'm
 8    sorry.  Exhibit 15 is already in evidence, correct, Your
 9    Honor?
10              THE COURT:  Correct, yes.  All your demand letters
11    are in evidence.
12    BY MR. SPARKS:
13    Q    Let's look at Exhibit 14, please.  And let's go to Page
14    2, the December -- the beginning of the December 11th email.
15    A    Page 2?
16    Q    Yes, Page 2.  You received this email on December 11th,
17    correct?
18    A    It was sent on December 11th.  I don't see to who.
19    Q    Do you see the email above it?
20              MR. SHURN:  Look, Your Honor.  I object to this
21    just like with the demand letter.  It's fine it comes in
22    evidence, but not for the truth or matter asserted.
23    Statements were made back.  In fact, (indiscernible) all
24    that, but they are -- it is here, say, subject to...
25              THE COURT:  I think he's just asking him if he can
```

1    identify it.

2             MR. SHURN:  Okay, Your Honor, understood.

3    BY MR. SPARKS:

4    A    I mean, this doesn't 100 percent look familiar to me.

5    Q    You were designated as the corporate representative to

6    give testimony at a deposition for Orb Energy, correct?

7    A    Yes, sir.

8    Q    Let's take a look at Exhibit 59.  This is the notice of

9    the corporate representative deposition, correct?

10   A    Yes, sir.

11   Q    Let's flip to the matters for examination starting on

12   Page 4.  You testified at your deposition that you reviewed

13   these matters for examination beforehand, correct?

14   A    To the best of my ability, yes.

15   Q    You also testified that you did nothing to prepare for

16   the deposition, correct?

17   A    So the first phase of it, you are 100 percent correct.

18   I hadn't reviewed all of your documents.  And then before

19   the second phase of it, I was able to review -- I don't know

20   -- or to the best of the my ability, the 30 things that you

21   have here.

22   Q    You testified on day one that you had reviewed no

23   documents in anticipation of the deposition, correct?

24   A    That's pretty much correct.

25   Q    And on day two, you testified that you had, I believe,

1   reviewed the agreements, correct?

2   A    Yeah.  So for day two, I, to the best of my ability,

3   went through and tried to make myself, you know, more --

4   what's the word -- immediately familiar with the subjects

5   and the matters for examination.

6   Q    But you didn't do anything to prepare for the

7   deposition, correct?  You didn't review the documents that

8   would have enabled you to answer questions about those

9   matters for examination, right?

10          MR. SHURN:  Objection, Your Honor.  He's already

11   testified what he did for the first deposition and the

12   second deposition and he said he read the documents for the

13   second deposition to the best of his ability.  Asked and

14   answered those.

15          THE COURT:  Mr. Sparks, do you have a response?

16   How is this relevant?  Tell me how this is relevant to the

17   issues in front of me.

18          MR. SPARKS:  Your Honor, he was given a -- he gave

19   a corporate representative deposition and testified that he

20   did nothing to prepare for it.  And now, he's here today

21   asking like he still can't -- acting like he still can't

22   answer these questions, like he still doesn't know what

23   anything is, and taking cues from his attorney when he

24   stands up and gives these objections and it's extremely

25   frustration.

1          THE COURT:  Well, I mean, the evidence is what the

2     evidence is.  Obviously, I'm going to review it, but I mean,

3     I don't -- I'm not sure what relevance whether he prepared

4     or didn't prepare for a corporate rep deposition is.

5     There's nothing in front of me to address that.  We're

6     talking about, you know, contract assumption or

7     inapplicability of the stay.

8          MR. SPARKS:  I do think that all of this goes to

9     cause, Your Honor, but I understand the Court's point.  I'll

10    move on.

11         Subject to opposing counsel's objection, I would

12    ask that the Court admit Exhibit 14.

13         THE COURT:  14?

14         MR. SPARKS:  The one that we just looked at that

15    opposing counsel said he doesn't object to as long as it

16    doesn't come in for the truth of the matter asserted.

17         MR. SHURN:  Yes, Your Honor, correct.  I mean,

18    obviously, it just stands the other demand letter to the

19    court.

20         THE COURT:  All right.  So this is basically a

21    notice email, okay.

22         MR. SPARKS:  Yes, Your Honor.

23         THE COURT:  It'll be admitted, Exhibit 14.

24         (Bitmain's Exhibit 14 admitted into evidence)

25    BY MR. SPARKS:

1   Q    Let's look at Exhibit 18, please, and we'll flip to the

2   second-to-last page.  Let's look at the December 19th email.

3   You remember exchanging emails with Zhaofeng Zhao, also

4   known as Ryan Zhao around this time?

5   A    Yes, sir.

6   Q    And these emails were about a discussion that you had

7   had earlier, correct?

8   A    I believe so, yes.

9   Q    Bitmain was trying to find a way to --

10          MR. SHURN:  Your Honor, this is 408.  This isn't

11   admissible.  This is 408.

12          THE COURT:  What's the purpose of the admission --

13   what's the purpose of using this?

14          MR. SPARKS:  Notice, to show notice.

15          THE COURT:  Notice of what?

16          MR. SPARKS:  That they were -- that he was on

17   notice that they were willing to do an offset from the

18   deposit.

19          THE COURT:  I mean, you can ask him if he knows

20   that, but this is -- I mean, if Mr. Zhao is going to

21   testify, he can testify as to that.

22          MR. SPARKS:  He was at the meetings as well, Your

23   Honor.

24          THE COURT:  Well, ask him.  You can ask him.  I

25   mean, this an out-of-court communication and it's not being

1    offered as an admission against interest, so ask him if he

2    knows that.

3    BY MR. SPARKS:

4    Q    You participated in discussions with Ryan Zhao,

5    correct, about resolving the hashrate direction issue.

6    A    Among others at Bitmain, yes, across various instances.

7    Q    And you were aware that Bitmain wanted to deduct the

8    mining revenue from the amount of the deposit, correct?

9    A    Yes, sir.

10    Q    And that was Bitmain's proposed solution to this issue,

11    wasn't it?

12           MR. SHURN:  Again, Your Honor, it's 408 settlement

13    discussion.  I don't think that that's admissible because

14    the parties in settlement may admit things or not admit

15    things for the purposes of settlement.  That's why 408

16    excludes those communications --

17           MR. SPARKS:  It's not offered --

18           MR. SHURN:  -- to encourage people to settle.

19           MR. SPARKS:  It's not offered to show liability,

20    Your Honor.

21           THE COURT:  I agree.  Overruled.

22           MR. SHURN:  Thank you, Your Honor.

23           THE WITNESS:  Would you mind asking the question.

24    BY MR. SPARKS:

25    Q    You were aware that that was Bitmain's proposed

1    solution, correct?

2    A    Yes.  And we countered with the solution on the other

3    page.

4    Q    Are you referring to the page immediately before this,

5    your email on December 20th?

6    A    Yeah.  I'm not sure how these emails are actually

7    chronologically ordered.  It's a little bit confusing.

8    Q    And you say -- this is December 20th, so what is this?

9    This is approximately less than three weeks from the date

10   when you directed the hashrate to the mining pool you set

11   up?

12   A    This is on December 19th.

13   Q    Less than three weeks from when you set up the mining

14   pool and directed the hashrate to a wallet controlled by

15   Orb?

16   A    Give or take from the date that we powered on the site

17   and got everything tested.

18   Q    Then you say there will be no deductions for any

19   alleged mining activities to date.

20   A    Where?  I'm lost.  Where are you?

21   Q    In your email down towards the bottom, your last bullet

22   point.

23   A    Yes.  This was -- this email -- so essentially, what

24   happened in the discussions was such and that, you know,

25   Bitmain failed to pay their invoices on time and we, you

1    know, suffered damages of such.  And so, at this point, we

2    were in discussions, settlement discussions to rectify the

3    grievances that both parties had and, yes, Bitmain had some

4    grievances and, you know, what they wanted.  And in our

5    discussions, I made it aware of the, you know, penalties and

6    the damages that our company suffered on behalf of the non-

7    payment issue.

8              MR. SPARKS:  Objection.  Non-responsive.  Move to

9    strike everything after the word yes.

10             THE COURT:  Sustained.

11   BY MR. SPARKS:

12   Q    And you also said you would send an invoice for out-of-

13   pocket expenses incurred due to failures and

14   misrepresentations, right?

15   A    Yes, sir, it says that.

16   Q    And you also demanded payment of the initial deposit,

17   correct?

18   A    Not in this email, it doesn't look like it.

19   Q    Do you see where it says in bullet point number one,

20   "You will pay this in full, along with the initial deposit.

21   You are months behind on it."

22   A    We might be on a different page?

23   Q    First bullet point in your email, second sentence.

24   A    Oh, the second sentence of the first bullet point, yup.

25   Q    And then you say that you will forgive millions of

1    dollars in lost revenue, correct?

2    A    Yes, sir.

3    Q    Orb did not have millions of dollars in lost revenue,

4    did it?

5    A    It did.  So if the site would have powered on by, you

6    know, the time that we received the transformers in May or

7    even in August, we would have received demand response

8    revenue.  And last year, it was paying $50,000 a megawatt

9    per month, so it was a hefty loss for us.

10   Q    So you're demanding lost revenue from May of 2024 in

11   this email?

12   A    I'm not sure the exact date range that we calculated

13   the estimate loss, but it was not unsubstantial -- it was

14   not unsubstantial.

15   Q    When you say we calculated, who calculated?

16   A    Orb Energy.

17   Q    Who at Orb Energy?

18   A    It could have been me.  It was likely me.

19   Q    It could only have been you, right?

20   A    It could have been me and Parker.  Parker is very --

21   he's the one who really dealt with NuEnergen and he

22   understood at that time the demand response energy load

23   resources ERCOT system much better than I because he had

24   been operating for, you know, three years.

25   Q    Let's flip backwards three pages and actually, it

1    starts on the fourth.  January 22nd, 2025 email from

2    (indiscernible) Goodman.  January 22nd of 2025.

3    A    Yes, sir.

4    Q    (Indiscernible) Goodman represented Orb, correct?

5    A    Yes, sir.

6    Q    And on the second page of that email under -- well,

7    starting in the paragraph that says, "As discussed,

8    documentation supports can and will be provided upon

9    request.  But below represents the list and explanation of

10   breaches and resulting damages in totality."  So these are

11   the itemization of damages that you were demanding Bitmain

12   pay, correct?

13   A    This was what we were showing to indicate that we had

14   suffered damages, which Bitmain was not taking into account

15   in their reasoning behind their actions in regards to this

16   site.

17   Q    So included in the amounts that you were demanding are

18   $80,000 in missed mortgage payments?

19   A    It says that, yes.

20   Q    Because Orb wasn't paying its mortgage, was it?

21   A    We fell behind, correct.

22   Q    That mortgage payment is $15,000 a month, correct?

23   A    Yes, sir.

24   Q    So after you issued the corrected invoice in December,

25   there could have been two $15,000 mortgage payments in

1   January -- or in December and January, correct?

2   A     This is on January 27th.  I believe -- and that number

3   is likely a typo of sorts because $80,000 isn't divisible by

4   15.  So since I didn't send this email, I'm not sure how it

5   actually -- how that's actually possible.

6   Q     Let's look at the next page at the top.  Orb was

7   demanding $75,000 for a retainer for legal representation,

8   correct?

9   A     That's what it says here, yes.

10  Q     And Orb was demanding $90,000 for out-of-pocket

11  payroll, correct?

12  A     Yes, sir.

13  Q     And Orb was demanding $4.5 million in lost demand

14  responsive revenue, correct?

15  A     Yes, sir.

16  Q     So after Orb began mining using the hosted servers at

17  the end of the November to January 22nd and having issued a

18  corrected invoice on December 9th, you were demanding that

19  Bitmain pay $6,288,025.20 in damages to Orb, correct?

20  A     I'm not sure if it was that we were demanding that.  I

21  think it's quite unreasonable for us to have assumed we

22  would have gotten any number close to that, but we were in

23  settlement discussions.  And I believe the intention of this

24  email was to show that we incurred damages due to the

25  material representations of Bitmain over the course of a

1   year.

2   Q    Well --

3   A    Forgone revenue is a damage or, listen, it's something

4   to bring up inside of a resolution negotiation.

5   Q    Well, you were in control of the miners at this point,

6   right?

7   A    Orb Energy was.

8   Q    And Orb Energy was in control of all the mining

9   revenue, right?

10  A    Yes, sir.

11  Q    So you could ask for whatever you wanted, right?

12       MR. SHURN:  Objection.  Argumentative, Your Honor.

13       THE COURT:  Sustained.

14       MR. SPARKS:  Your Honor, I would ask to admit

15  Exhibit 18 into evidence.

16       THE COURT:  All right.  So again here, we have

17  parts that are clearly admissions against interests.  So to

18  the extent that we have referred to, like for instance,

19  these pages, Mr. Zaniewski's emails, those will be admitted

20  and the rest of the email is not admitted.

21       (Bitmain's Exhibit 18 admitted into evidence)

22       MR. SPARKS:  Thank you, Your Honor.

23       MR. SHURN:  Thank you, Your Honor.

24       MR. SPARKS:  Let's look at Exhibit 17, please.  I

25  believe this has already been admitted, Your Honor.  That's

1   one of the demands.

2            THE COURT:  Yeah, I think that's right.  Exhibit

3   17?

4            MR. SPARKS:  Yes, Your Honor.

5   BY MR. SPARKS:

6   Q    You received this notice of breach on March 27th of

7   2025, correct?

8   A    It looks like it was sent on March 27th.

9   Q    And you received it, correct?

10  A    I'm not sure if I received it on March 27th, but I do

11  remember getting it, yes.

12  Q    And Bitmain is -- Bitmain says, " Orb has barred

13  Bitmain personnel from entering or approaching the data

14  center facility, a direct breach of Article 3.20 of the

15  Schedule B of the agreement, which guarantees Bitmain

16  uninterrupted access to its assets on a 24/7 basis."  At

17  this point, Orb had been barring Bitmain personnel from

18  entering the facility for approximately three months,

19  correct?

20  A    They didn't come for a period of time from December to

21  right around this date.

22  Q    You wouldn't allow them into the facility, correct?

23  A    I'm not sure.  I wasn't at the facility.

24  Q    The employees under your control as the chief executive

25  officer would not allow Bitmain's employees into the

1    facility for approximately three months, correct?

2    A    I'm not sure if they ever tried, so I don't -- I don't

3    know.  I do know.  I mean, Steven Fang showed up or Steven

4    Song, he came to the site in the middle of the time.

5    Q    And the paragraph that starts on December 11th, 2024.

6    Bitmain had again asked Orb to issue a revised invoice

7    reflecting the deduction of the mining revenue from the

8    deposit, correct?

9    A    Yes, sir.

10   Q    And Orb had continued to refuse to do that, correct?

11   A    On December 12th, I believe we had a meeting where we

12   expressed our concerns about this -- about that request in

13   particular.  It wasn't explicitly like a yes, no, we deny or

14   anything like that.

15   Q    Orb never issued a revised invoice deducting the mining

16   revenue from the deposit, correct?

17   A    Not to the best of my recollection.

18   Q    And Bitmain is also demanding that Orb allow it to

19   install Bitmain's firmware on its miners, correct?

20   A    Yes, sir.

21   Q    And as we saw the last time we were here, the contracts

22   allowed Bitmain to install AntSentry on the miners, correct?

23        MR. SHURN:  Objection, Your Honor.  Calls for a

24   legal conclusion.  The contract says what it says, but

25   whether they're allowed to or not is different.

1        THE COURT:  I think they read the contract

2    provision last time.

3        THE WITNESS:  Yeah, it did.  I mean, I could

4    answer the question again the same way.

5    BY MR. SPARKS:

6    A    AntSentry is a software that is ran on a server -- or

7    on a computer outside of the server, so you don't install

8    software on a miner; you install firmware on a miner.

9    AntSentry is not firmware; AntSentry is a monitoring and

10   control software for bitcoin mining servers.

11   Q    The agreement says that the miners are to have

12   AntSentry running on them, correct?

13   A    It would be AntSentry running at the facility, not on

14   them.

15   Q    And Bitmain wanted Orb to allow it to run AntSentry at

16   the facility, correct?

17   A    This document does not say that.

18   Q    The contract said it though, didn't it?

19   A    Yes.

20   Q    And Orb was refusing to allow that, correct?

21   A    I'm not sure where on this page you're referring to or,

22   like...

23   Q    I'm not referring to this page.  I'm asking you a

24   question.  Orb was refusing to allow...

25   A    So, I mean, there's tons of periods of time here.

1    AntSentry was running at the site at the very beginning,

2    right, and then I believe it may have been disconnected.

3    And then during the periods of the temporary injunction and,

4    you know, that whole period, AntSentry was running at the

5    facility.

6    Q    When you say it may have been disconnected, you mean

7    Orb disconnected it, correct?

8    A    Correct.

9    Q    And after Bitmain sent this demand, Orb still did not

10   allow Bitmain to run AntSentry, correct?

11   A    Are you talking about Exhibit 17?

12   Q    Yes.

13   A    Because Exhibit 17, they asked for access to the

14   facility and we granted it to them.  Shortly thereafter,

15   Bitmain personnel came to the site and they were given

16   untethered access to do whatever they wanted.  They

17   connected to the systems, they did all sorts of stuff.

18   Q    They were allowed to direct the hashrate to Bitmain's

19   mining pool?

20   A    No, because they hadn't paid a bill.

21   Q    Let's look at the next page of Exhibit 17.  Bitmain is

22   reiterating that it's the sole opinion and maintenance

23   hosting provider, correct?

24   A    That's what it says on the page.

25   Q    After receiving this notice, Orb still did not turn

1    over operation and maintenance to Bitmain, correct?

2    A    So in or around this period of time, I believe we were

3    speaking with Ryan.  And I believe this period of time would

4    have corresponded to an in-person meeting in Ft. Lauderdale

5    at a Bitmain mining convention where we were in discussions

6    with Ryan.  We spent -- I don't know -- 20 or 30 minutes

7    together or maybe even longer, and he was expressing the

8    sentiment that Bitmain was prepared to power on and resolve

9    the dispute.  And he may have asked me, at one point, to

10   redirect to the hashrate just for one day and Bitmain will

11   pay the bill.  So there was a lot of stuff going on in and

12   around this time.  It was a very -- very active time,

13   unfortunate that it ended up in this.

14            MR. SPARKS:  Objection.  Non-responsive.  Move to

15   strike.

16            THE COURT:  Sustained.

17            MR. SHURN:  Your Honor, would it be possible to

18   take a break?

19            THE COURT:  Yeah.  I was about to ask.  How long

20   do you think you're going to be, Mr. Sparks?

21            MR. SPARKS:  I would hope to be done in another

22   hour, Your Honor.

23            THE COURT:  Okay.  Why don't we take a 15-minute

24   break.  We'll come back at 3:20.

25            MR. SHURN:  Great.  Thank you, Your Honor.

1          (Recess)

2          THE COURT:  We're back on the record in Case

3     Number 25-80363.  You're still under oath, Mr. Zaniewski.

4     Go ahead, Mr. Sparks.

5          MR. SPARKS:  Thank you, Your Honor.  And we

6     already said that Exhibit 17 has been admitted, correct?

7          THE COURT:  17 has been admitted.  You said 18?

8          MR. SPARKS:  Yes.  Let's turn to Exhibit 18,

9     please.

10         THE COURT:  Parts of 18 have been admitted, yes.

11         MR. SPARKS:  Okay, understood.  Let's go to

12    Exhibit 21.

13    BY MR. SPARKS:

14    Q    You received this notice of withdrawal dated April 3rd,

15    2025, correct?

16    A    I believe it was sent to my lawyer.

17    Q    And you're familiar with this document?

18    A    Yes, sir.

19    Q    And Bitmain demanded that Orb allow it to withdraw the

20    hosted servers from the facility, correct?

21    A    That's what it says in that document.

22    Q    And the agreement required Orb to provide access to the

23    hosted servers, correct?

24    A    Yes.

25    Q    After receiving this notice, Bitmain sent a team to

1   withdraw the servers on April 7th, 2025, correct?

2   A    Yes, sir.

3   Q    Orb refused to allow Bitmain's team through the gates

4   of the facility, correct?

5   A    Yes.

6            MR. SPARKS:  Move to admit 21, Your Honor, but I

7   do believe we pre-admitted that one as well.

8            THE COURT:  Yeah.  I think the demand letter's

9   admitted.

10           MR. SPARKS:  Thank you, Your Honor.

11           THE COURT:  So 21 is admitted.

12           (Bitmain's Exhibit 21 admitted into evidence)

13           MR. SPARKS:  Let's look at Exhibit 25, please.

14           THE COURT:  I think in the book, the first page is

15   actually the last page.

16           THE WITNESS:  That's correct in my book.

17           MR. SPARKS:  It is in mine as well, Your Honor.

18   We may have given you the bad one.

19           THE COURT:  Exhibit 25?

20           MR. SPARKS:  Yes, Your Honor.  It's correct in

21   mine.  Would you like us to give you a corrected copy?

22           THE COURT:  No, no, that's fine.  I mean, mine,

23   the first page is this and then this is the second page,

24   this is the third page and this is the fourth page.

25           MR. SPARKS:  My apologies, Your Honor.

1          THE COURT:  No, no, it's fine.  I read it

2   correctly, but different pages.  This has been admitted as

3   well.

4          MR. SPARKS:  Thank you, Your Honor.

5   BY MR. SPARKS:

6   Q    You are familiar with this temporary restraining order,

7   correct?

8   A    Yes, sir.

9   Q    And in this paragraph on the first page, Roman numeral

10  I, the Court ordered that Orb was prohibited from preventing

11  Bitmain from entering the facility, correct?

12  A    That's what it says, yes.

13  Q    And specifically for the purposes of removing the

14  hosted servers, right?

15  A    Yes, sir.

16  Q    Let's look at Exhibit 27.

17         THE COURT:  All right.  I am missing Exhibit 25,

18  because this one -- my Exhibit 24, the last page of my

19  Exhibit 24 is actually Exhibit 25.

20         MR. SPARKS:  We'll give you a corrected exhibit

21  right now, Your Honor.

22         THE COURT:  And then behind Exhibit 25 is Exhibit

23  26, and then Exhibit 26 has some -- what is the date of

24  Exhibit 25?

25         MR. SPARKS:  Exhibit 25 is April 8th, 2025.

1             THE COURT:  At 1:00 p.m.?

2             MR. SPARKS:  Yes, Your Honor.  Your Honor, would

3      you like a new book or just a corrected Exhibit 25?

4             THE COURT:  I think I have Exhibit 25.  It starts

5      at the end of 24 and it goes through the first three pages

6      of 26.  And then 26 is the amended temporary restraining

7      order and that goes in Exhibit -- the rest of it goes on

8      Exhibit 26, so I think it's okay.

9             MR. SPARKS:  Okay.  Thank you, Your Honor.  Would

10     you like just a corrected exhibit?

11            THE COURT:  That's fine.  Thank you.

12            MR. SHURN:  So it's incorrect in my book too, Your

13     Honor, because I'm confused when he started saying the

14     dates, the book I received from them.

15            THE COURT:  No, no.  It's all there, but it's just

16     there's a lot of copying here.  Thank you.

17            MR. SHURN:  So just so I understand, the temporary

18     restraining order that it was later amended, what's the date

19     of that restraining order?  Oh, I see.  I'm looking at the

20     wrong page.  It's my fault.  They're flipped.  It's my

21     fault, I understand now.  I get it.  Thank you, Your Honor.

22     I get it.

23            MR. SPARKS:  When everyone's ready, we'll look at

24     Page 2 of Exhibit 27.

25            THE WITNESS:  27?

1          MR. SPARKS:  Yes, 27.

2          THE WITNESS:  The one that they amended?

3          MR. SPARKS:  We are now on the emails that are at

4   Exhibit 27.

5          THE WITNESS:  Okay, got it.

6   BY MR. SPARKS:

7   Q    This is an email that was sent from Orb Energy's

8   attorney, correct?

9   A    It looks to be so, although I don't believe I don't

10  ever -- have not seen this document.

11  Q    You've never seen this before?  After that temporary

12  restraining order was entered, Bitmain's attorneys and team

13  again went to the facility, correct?

14  A    I'm... I'm trying to recall the exact -- I believe your

15  firm went to the facility two times: once with, you know,

16  almost nobody, and then once with a gang of people.

17  Q    And a copy of the temporary restraining order in hand,

18  correct?

19  A    From the cameras, I noticed that, yes.

20  Q    And Orb again refused to allow entry, correct?

21  A    So, yeah, on that day, I believe there was an amended

22  TRO that Judge Fortenberry sua sponte amended.

23  Q    I'm not asking about the amended one.  I'm asking about

24  the original temporary restraining order when Bitmain's

25  attorneys and team showed up at the facility with that

1  original TRO in hand, Orb refused to allow them to enter the

2  facility, correct?

3  A    Yeah.  I do not believe anybody greeted them.

4  Q    They did not open the gate to allow them in, correct?

5  A    Correct.  They showed up twice, your counsel, and the

6  first time some people and the second time a lot of people.

7        MR. SPARKS:  Move to admit Exhibit 27, Your Honor.

8        THE COURT:  But I thought -- and I think you said

9  that he didn't recognize this document.

10        MR. SPARKS:  We can move on.

11        THE COURT:  Okay, thank you.

12  BY MR. SPARKS:

13  Q    Let's look at Exhibit 22.  You're familiar with this

14  application for a temporary restraining order, correct?

15  A    Correct.

16  Q    Let's look at Exhibit 23.  And you're familiar with

17  this original petition, correct?

18  A    Yes, I remember reading it.

19  Q    And you verified an Answer to this petition, correct?

20  A    I believe so, yes.

21  Q    Let's look at Exhibit 28.

22        MR. SHURN:  Your Honor, I object as to relevance.

23  I'm not quite sure how this deals with whether or not the

24  contract was terminated prepetition at this point when we

25  started getting into what the state court pleadings say or

1   don't say, which is obviously hearsay.

2          MR. SPARKS:  These are admissible as judicial

3   records from the court.

4          THE COURT:  I don't think there's any -- what's

5   the relevance?

6          MR. SPARKS:  Oh, it's a breach of contract lawsuit

7   and we're about to see their Answer to that suit and what

8   they said about the contract.

9          THE COURT:  Okay.  I'm going to allow it.

10         MR. SHURN:  Thank you, Your Honor.

11  BY MR. SPARKS:

12  Q    This is the original Answer that you verified, correct?

13  If it would help, you can flip to the very last page of that

14  exhibit, Page 5 of 5.  Are you on Exhibit 28?

15  A    Yeah, I'm in Exhibit 28.  There's only one page.

16         MR. SPARKS:  Your Honor, may I approach the

17  witness?

18         THE COURT:  Yes, go ahead.

19         THE WITNESS:  Can I replace this in the binder?

20         MR. SPARKS:  Yes, you're welcome to swap it out.

21  BY MR. SPARKS:

22  Q    And then when you're ready, please look at the last

23  page, Page 5 of 5.  Do you see here in the last sentence

24  where is says, "I have read the foregoing verified original

25  Answer and affirmative defenses."  Sorry, it's the last two

1   sentences and the last sentence says, "The facts alleged in

2   Paragraphs 2A and 2B are true and correct based on my

3   personal knowledge."  You signed this correct?

4   A    Yeah, it looks to be so.  But my signature doesn't

5   actually look -- it looks a little bit weird.  I don't know

6   if you're scanning system did that.

7   Q    Did you sign this verification that says, "I declare

8   under penalty of perjury the following statements are based

9   on my personal knowledge and are true and correct."

10   A    Yes, sir.  I believe -- I believe I remember signing

11   this document, although the signature does not necessarily

12   look like mine, but I believe I did.

13   Q    Let's look back at Paragraph 2A that's referenced there

14   in your verification.

15   A    Where am I going, sir?

16   Q    Page 1, Paragraph 2A.  This was the paragraph that you

17   specifically verified, correct?

18   A    Yes, sir.

19   Q    It says, " Orb asserts there was a failure of

20   consideration with respect to the hosting services agreement

21   and the hosting sales agreement," correct?

22   A    That's what it says.

23   Q    This is not the only time that you have alleged that

24   the agreements were invalid, correct?

25            MR. SHURN:  Objection.  Calls for a legal

1    conclusion.

2          THE COURT:  Sustained.

3    BY MR. SPARKS:

4    Q    This is not the -- you have also personally stated

5    words coming out of your own mouth that the agreement was

6    invalid, correct?

7          MR. SHURN:  Objection.  Calls for a legal

8    conclusion.

9          THE COURT:  I think he's only asking if he's used

10   those words.  I don't think he's asking for a legal

11   conclusion.

12          MR. SHURN:  Thank you, Your Honor.

13   BY MR. SPARKS:

14   A    I don't recall, sir.

15   Q    Do you recall your deposition?

16   A    Yes, sir.

17   Q    The first day of your deposition on separate 18th,

18   2025, correct, you remember that?

19   A    I remember the day, yes, sir.

20   Q    Do you remember when I asked you, do you agree that

21   there was a violation of Section 3.16 for Orb to direct the

22   hashpower of the hosted service to its own mining pool?

23   A    That was two weeks ago?  I don't necessarily remember

24   the question or remember answering it.

25          MR. SPARKS:  Your Honor, I would like to show him

1    a copy of this transcript.

2            MR. SHURN:  Your Honor, that's an improper

3    foundation to do an impeachment.  He's not followed the

4    procedure.

5            MR. SPARKS:  I'm happy to follow the procedure,

6    exactly.  Everybody seemed confused when I did it last time.

7    I can show it to Mr. Shurn and then take it to the witness.

8            THE COURT:  Why don't you do that.

9            MR. SHURN:  Okay.  Okay.

10           THE COURT:  All right.  You may approach.

11           MR. SPARKS:  Thank you, Your Honor.  Please read

12   your answer starting at the bottom of the page and going

13   over to the top of the next page.

14           THE COURT:  I think he just wants you to read it

15   and not to read it out loud.

16           THE WITNESS:  Okay.  Where am I starting, sir?

17   Thank you, sir.  Okay.

18   BY MR. SPARKS:

19   Q    What was your answer to that question?

20           THE COURT:  Repeat the question.

21           MR. SPARKS:  Yes, Your Honor.  Do you agree that

22   there was a violation of Section 3.16 for Orb to direct the

23   hashpower of the hosted servers to its own mining pool.

24           MR. SHURN:  So I objected at the deposition, Your

25   Honor, to the form of that question because it calls for a

1    legal conclusion.

2              THE COURT:  Okay.  But I thought the question that

3    you had asked originally was not that question that you were

4    trying to impeach him on.  I thought you had asked him had

5    he ever said that it was invalid, so I don't understand how

6    this is impeachment.

7              MR. SPARKS:  That was his answer to that question,

8    Your Honor.  His answer was, "And again, my belief remains

9    the same.  The contract was invalidated by Bitmain's first

10   breach and failure to perform by paying a deposit.

11   Therefore, the contract and the clauses in it are, you know,

12   subject to all sorts of rights."

13             THE COURT:  All right.  So then why don't you just

14   ask him if he's ever said that.

15   BY MR. SPARKS:

16   Q    Did you make that statement, Mr. Zaniewski?

17   A    I believe so.

18             MR. SPARKS:  Your Honor, I would move to admit

19   Exhibits 27 -- I'm sorry -- 22, 23, 27 and 28, which are all

20   documents that were filed in the Matagorda County

21   proceeding.  The Court can take judicial notice of all

22   those.

23             THE COURT:  All of the temporary restraining

24   orders, the amended temporary restraining order, the

25   clarification, those are already in.  So the other ones are

1    your motions and your verified petition?

2           MR. SPARKS:  Oh, I'm sorry, 27 was not one of

3    those, Your Honor.  It's 22, which is Bitmain's verified

4    emergency application for temporary restraining order and

5    temporary injunction.

6           THE COURT:  Okay.  That'll be admitted for the

7    purposes of the fact that you filed it, not for the truth of

8    the matter.

9           (Bitmain's Exhibit 22 admitted into evidence)

10           MR. SPARKS:  Thank you, Your Honor.  And 23 is

11    Plaintiff's verified original petition for injunctive

12    relief.

13           THE COURT:  It'll be admitted on the same basis.

14           (Bitmain's Exhibit 23 admitted into evidence)

15           MR. SPARKS:  And 28 is the verified original

16    Answer signed by Mr. Zaniewski.

17           THE COURT:  All right.  That's admitted as an

18    admission against interest.

19           (Bitmain's Exhibit 28 admitted into evidence)

20    BY MR. SPARKS:

21    Q    Let's take a look at Exhibit 36.  Do you remember

22    signing this declaration in connection with that Matagorda

23    County proceeding?

24    A    Yes, sir.

25    Q    Let's take a look at Page 2, Paragraph 7.  Do you see

1    where it says beginning in June 2025, Orb installed

2    approximately 70 CKB minors at the data center?

3    A    Yes, sir.

4    Q    Those 70 CKB miners, are they listed on Orb's

5    bankruptcy schedules?

6    A    No, they're not owned by Orb.

7    Q    Who were they owned by?

8    A    Myself and Parker.

9    Q    Are they listed on Orb's statement of financial

10   affairs?

11   A    I believe they are listed and there's a compensation

12   amount listed in our cure formulation, which was attached to

13   one of the documents which we amended on Monday.

14        MR. SHURN:  Objection, Your Honor.  First off,

15   this totally says on its face, I personally purchased.  So

16   he's confusing the witness by asking about Orb's bankruptcy

17   schedules when this is not saying that Orb purchased them;

18   it's saying he purchased them.  And he just said he and

19   Parker own them, so, of course, it would not be listed as an

20   asset on the bankruptcy schedules.  But my witness is

21   unfamiliar with bankruptcy.  He's confused.

22        MR. SPARKS:  I asked him about the statement of

23   financial affairs, Your Honor, which lists property held for

24   another person.

25        THE COURT:  Well, I'm not sure that's property

1    held by another person.  Why don't you just ask him are

2    these miners listed in any of your bankruptcy filings.  I

3    think that's what you want to know.

4             MR. SPARKS:  Yes.

5    BY MR. SPARKS:

6    Q    Are these miners listed in any of your bankruptcy

7    filings?

8             THE COURT:  That you're aware of.

9    BY MR. SPARKS:

10   A    Not that I'm aware of.

11   Q    Let's take a look -- actually, in that same paragraph,

12   it says, "These servers run on the same electricity as the

13   Bitmain servers.  I have not used the proceeds of any

14   bitcoin mined from the Bitmain service to pay for

15   electricity or any other expenses for these servers."  Was

16   that true on July 9th of 2025?

17   A    Yes, that was likely true.

18   Q    On July 9th of 2025, Orb had been selling bitcoin that

19   had been mined from the hosted servers for eight months,

20   correct?

21   A    Seven?

22   Q    And Orb had been using the proceeds from that bitcoin,

23   the sale of that bitcoin to pay for, among other things, the

24   electric bill, right?

25   A    Yes, sir.

1   Q    Including the electricity used by these CKB miners,

2   right?

3   A    So on this day, I do not believe a bill would have been

4   paid since those miners were installed.

5   Q    The June bill had not been paid by July 9th?

6   A    No.

7   Q    Okay.  After this was signed, did Orb use proceeds from

8   the sale of bitcoin mined with the hosting servers to pay

9   the entire electric bill at the facility?

10   A    Yes, sir.

11   Q    Including the electricity used by the CKB miners,

12   correct?

13   A    Yes, sir.

14          MR. SPARKS:  Your Honor, I would ask to admit

15   Exhibit 36.

16          THE COURT:  Any objection?

17          MR. SHURN:  Your Honor, I believe it's hearsay,

18   but it's obviously a statement against interest.

19          THE COURT:  Yeah, an admission against interest,

20   so it'll be admitted.  Exhibit 36 is admitted.

21          (Bitmain's Exhibit 36 admitted into evidence)

22          MR. SHURN:  Thank you.

23   BY MR. SPARKS:

24   Q    Let's look at Exhibit 38, please.  You're familiar with

25   this notice dated July 16th, 2025, correct?

1    A    Yes, sir.

2    Q    Okay.  You understood that it was Bitmain's intent to

3    terminate the contract, right?

4         MR. SHURN:  Objection, Your Honor.  Calls for

5    speculation.

6         THE COURT:  Hold on.  It's actually behind Tab 37

7    for me.  I'm sorry.  Ask your question again.

8    BY MR. SPARKS:

9    Q    Mr. Zaniewski, you understood that it was Bitmain's

10   intent to terminate the contracts, correct?

11        MR. SHURN:  Objection, Your Honor.

12        THE COURT:  Yeah.  I'm going to sustain it just on

13   the basis of the word intent.  I mean, you can ask him what

14   the contract stated -- what the letter stated.  I mean, I

15   think the letter speaks for itself, you know.  It's pretty

16   clear what they were saying.

17        MR. SPARKS:  Understood.

18   BY MR. SPARKS:

19   Q    You understood that Bitmain was saying that it was

20   terminating or had terminated the agreements, correct?

21   A    So this letter to my layman's understanding, you know,

22   without being a lawyer, says that it -- says that the

23   contract was terminated and it lists some reasons why it may

24   have been terminated.  But this letter does not say that the

25   contract was terminated or is this letter a letter of

1   termination; it does not say we terminate.

2   Q    How about here where it says, on the third line of the

3   first paragraph, is and remains terminated?

4   A    I don't -- I just don't believe this to be true.

5           MR. SPARKS:  Your Honor, this has already been

6   admitted into evidence.

7   BY MR. SPARKS:

8   Q    Let's take a look at Exhibit 57.  On Page 1, Box 1

9   here, this $4.7 million.  Do you see that?

10  A    Yes, sir.

11  Q    Is this the revenue Orb generated from selling bitcoin

12  mined with the hosted servers?

13  A    I believe so, yes.

14  Q    Please turn to Page -- it's actually the spreadsheet

15  after Page 6.  First actually, let's look first at Page 8,

16  Box 21.  Do you see where it says the Debtor currently holds

17  2.92 bitcoin for Bitmain with the current estimated value at

18  approximately $333,000?

19  A    Yes, sir.

20  Q    Is that accurate that the Debtor was holding 2.92

21  bitcoin for Bitmain?

22  A    So I believe we amended this and then it may have

23  actually been accurate -- I'm sorry -- inaccurate and at

24  that time.  So the statement that you went to first here, I

25  believe that was prepared on, like, give or take July 30th,

1    and it was entered into here and it was not corrected and

2    updated.  But we have since updated some of these numbers by

3    the CPA or we've corrected the errors that we had.

4              THE COURT:  Your Honor, I'm going to object, non-

5    responsive and move to strike everything after inaccurate

6    when he started talking about something else.

7              THE COURT:  All right, sustained.

8    BY MR. SPARKS:

9    Q    In Box 21, do you see the file stamped at the top of

10   that page, August 20th, 2025?

11   A    Yes, sir.

12   Q    Okay.  In Box 21 where it says the Debtor currently

13   holds 2.92 bitcoin from Bitmain, was that accurate on August

14   20th of 2025?

15   A    I do not believe so.

16   Q    Okay.  Let's look back at the page before Page 7 and

17   after Page 6, which is this spreadsheet.  Now besides the

18   2.92 bitcoin that we just saw in Part 11, does this

19   spreadsheet reflect all of the bitcoin mined by the servers

20   since December of 2024?

21   A    Up until July 30th.  Like I said, there were some

22   errors in it and I believe we've worked it out to correct

23   anything that may have been improperly filed or notified.

24   Q    Yes.  After your deposition, Orb Energy amended its

25   statement of financial affairs, correct?

1    A     We submitted the amendment, I believe, on Monday.

2    Q     The night before the hearing, the amendment you're

3    referring to?

4    A     Yes, sir.

5    Q     At the meeting of creditors, you testified under oath

6    that the bitcoin sold reflected on this spreadsheet, plus

7    the bitcoin held reflected in Part 11, equaled all bitcoin

8    mined by the servers since December of 2024, correct?

9    A     Yes.  I do remember testifying to that, and it was

10   later found that I was actually incorrect.

11   Q     Incorrect by a couple of million dollars?

12   A     I mean, the numbers are large here.  We're doing our

13   best to get to the bottom of the accounting.

14   Q     You were the one in charge of the books and records at

15   Orb, correct?

16   A     Up until we hired David Bott.

17   Q     Before this bankruptcy case was filed, you were the

18   only person at Orb that was in charge of the books and

19   records, correct?

20   A     Yes, sir.

21   Q     Let's look back at the hosting services agreement at

22   Exhibit 6.

23   A     What page?

24   Q     We're going to be in the first couple of pages in the

25   recitals.  Do you see here in the recitals, the section that

1    starts with the word whereas?

2    A    On what page, sir?

3    Q    Page 1.

4    A    Yes.

5    Q    And then do you see where it references the hosting

6    sale agreement specifically?

7    A    Yes, sir.

8    Q    And you testified that you've read this agreement,

9    correct?

10   A    Yes, sir.

11   Q    And that was before you signed it?

12   A    Yes, sir.

13   Q    Does it reference the term sheet anywhere in this

14   agreement?

15   A    I don't recall.

16   Q    Let's look at Exhibit 7.  You testified that you read

17   this before you signed it, correct?

18   A    Yes, sir.

19   Q    Does this refer to the term sheet anywhere in this

20   agreement?

21   A    I don't recall.

22   Q    You're not aware of anywhere in this agreement where it

23   references the term sheet?

24   A    No, sir.

25   Q    In this hosting -- let's go back to Exhibit 6, please.

1    Let's look at Page 19 -- actually, I'm sorry, it's not 19.

2    It is 24.  In the section, title and ownership of hosted

3    services, do you see that section?

4    A    Yes, sir.

5    Q    We looked at an almost identical provision in Exhibit

6    7, hosting sale agreement, correct?

7    A    The agreements are quite identical.

8    Q    And on that same page at the top, do you see Section

9    620?

10   A    Yes, sir.

11   Q    Access to data center facility.  Again, almost

12   identical to the provision that we looked at in Exhibit 7,

13   correct?

14   A    To the best of my knowledge or recollection.

15   Q    And let's look back at 6.16, one page earlier.  Do you

16   see the section titled restrictions re Bitmain property?

17   A    Yes, sir.

18   Q    And where it says, "Under no circumstances will service

19   provider redirect the hashpower of the hosted service to its

20   own mining pool or any mining pool not authorized in writing

21   by Bitmain, operate, power on or power off the hosted

22   servers without Bitmain's written consent, remove any

23   Bitmain property from the data center facility."

24   A    I see it written there, yes.

25   Q    That is almost identical as well to the language we

1    looked at in Exhibit 7, correct?

2    A    I can't recall.

3         MR. SPARKS:  Your Honor, may I have one moment to

4    confer with my colleagues?

5         THE COURT:  Sure.

6         MR. SPARKS:  Almost done, Your Honor.

7    BY MR. SPARKS:

8    Q    Look at Exhibit 49, please, and we're going to go to

9    Page 57.

10   A    This is a bill, sir?  Oh, yeah.

11   Q    Yes.  This is one of Orb Energy's electricity bills,

12   correct?

13   A    Correct.

14   Q    This reflects a payment on July 7th of 2025, correct?

15   A    Yes, sir.

16   Q    Of $544,170.87?

17   A    Yes, sir.

18   Q    The declaration that we looked at earlier when we were

19   looking at that, you testified that when that was signed on

20   July 9th, Orb had not paid any electricity bills that

21   included those CKB servers, correct?

22   A    Hold on one second.  Let me review the document.  So

23   this would be the -- this would be the bill from, I believe,

24   05/31 to 06/30, so it's the bill for June.

25   Q    And the CKB miners were installed in June, correct?

1  A    I believe so.  So this bill that you're looking at

2  would have been paid on or around July of that month -- I'm

3  sorry -- at the end of July.  So the bill for June, because

4  we're post-pay, so the bill for June, it doesn't actually

5  get paid until the end of July.

6  Q    So in Exhibit 36, Paragraph 7 of your declaration where

7  you testified -- where you swore, "I have not used the

8  proceeds in any bitcoin mined from the Bitmain servers to

9  pay for electricity or any other expenses for these

10  servers," that was false when you made that statement,

11  correct?

12  A    Incorrect because the bill that may have included those

13  servers was not paid on July 7th.

14  Q    This bill is for June, correct?

15  A    Yes, I believe so.

16  Q    You installed the CKB miners in June, correct?

17  A    I believe so, although I'm not 100 percent certain the

18  exact date.  I wasn't there.

19  Q    So that statement was false when made, correct?

20          MR. SHURN:  Objection.  Argumentative, Your Honor.

21          THE COURT:  Argumentative, and that's not the way

22  I'm reading this.  The $544- payment was for a prior bill.

23  This bill is due on July 25th.  I don't know if it was paid

24  on July 25th, but the June amounts were due on July 25th,

25  not -- and that's the date of this statement.  So the

 1   payment on July 7th is not for this bill; that's the way I

 2   read this.

 3           THE WITNESS:  Yeah.  That could be -- so Jackson

 4   has a -- I'm sorry, if I could speak to the matter.

 5           THE COURT:  No, no.  Let him ask a question.

 6           THE WITNESS:  Okay, sorry.

 7           THE COURT:  If I'm reading it incorrectly, let me

 8   know, but that's the way I read it.  So basically, it says

 9   if you pay by 7/25, you get a $21,000 discount, and if after

10   7/25, it's $487-.

11   BY MR. SPARKS:

12   Q   The service period for this bill was May 31st, 2025 to

13   June 20th of 2025, and June 20th, 2025 to June 30th, 2025,

14   correct?

15   A   Yes.

16   Q   So it's a total of 30 days that encompasses all of

17   June, right?

18   A   Correct.

19           MR. SPARKS:  Does that answer your question, Your

20   Honor?

21           THE COURT:  No, I understood that.  But I think

22   there's -- so the way that I read this document, I mean,

23   your issue is whether the statement that he made on July

24   25th is incorrect on the basis of this invoice.

25           MR. SPARKS:  Yeah, July 9th, yes.

1          THE COURT:  Okay.  On the basis of this invoice,

2     and I think that this doesn't show that the invoice was paid

3     on July 9th.  That the amount that was paid, the $544-, was

4     for a prior invoice, not a June invoice.  The June invoice

5     would have been due on July 25th, which is after the date.

6     That's the way that I read this of the affirmation.

7          MR. SPARKS:  I understand.  I understand, Your

8     Honor.  Pass the witness.

9          THE COURT:  Okay, thank you.  Mr. Shurn, do you

10    want to take a few minute break and then we got to figure

11    out how long we're going to go.

12         MR. SHURN:  I do, Your Honor.  I do.  You know, I

13    don't know how long Your Honor or the staff wants to stay.

14    I'd almost prefer just to start fresh at 8:00 a.m. on next

15    Wednesday.

16         THE COURT:  At 8:00 a.m. next Wednesday, we're

17    going to do his witnesses.  Do you have an objection to

18    taking your witness out of turn because I don't want to keep

19    your witnesses?

20         MR. SHURN:  I'm happy to do that.

21         MR. SPARKS:  No, we don't have an objection to

22    taking them out of turn.  I mean, I don't want to keep

23    anybody here that doesn't want to be here.

24         THE COURT:  No, no.  I mean, we're prepared to go.

25    I mean, if you're telling me your direct testimony was going

1    to be an hour, then I'd say let's do it.  But if you're

2    saying it's going to be --

3            MR. SHURN:  It'll be a bit, Your Honor.

4            THE COURT:  Okay.  So why don't we then, we'll

5    take him out of turn.  We'll come back.  And you're still

6    under oath and can't discuss your testimony.  But we'll take

7    it -- we'll have your witnesses first because I don't want

8    to keep them.  They're going to be already in the middle of

9    the night, so...

10           MR. SPARKS:  Understood.

11           THE COURT:  And we'll just take them out of turn.

12           MR. SHURN:  I think that makes sense, Your Honor.

13   I appreciate that.  Thank you.

14           THE COURT:  All right.  So we'll be in recess

15   until 8:00 a.m. next Wednesday.

16           MR. SHURN:  Yes, Your Honor.  Thank you.

17           THE COURT:  Thank you.

18           MR. SPARKS:  Thank you, Your Honor.

19       (Proceedings adjourned at 4:14 a.m.)

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2

 3     I certify that the foregoing is a correct transcript from

 4     the electronic sound recording of the proceedings in the

 5     above-entitled matter.

 6

 7

 8

 9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  October 6, 2025
```