```
1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
2                          HOUSTON DIVISION

3    ORB Energy Co.                  )  CASE NO:  25-80363
                                     )  Houston, Texas
4            Debtor.                 )
                                     )  Wednesday,
5    ----------------------------)  October 8, 2025
                                        8:01 AM to 11:41 AM
6

7                          FULL HEARING
            BEFORE THE HONORABLE ALFREDO R. PEREZ
8              UNITED STATES BANKRUPTCY JUDGE

9

     APPEARANCES:
10

     For the Debtor:          STEVEN SHURN
11                            Hughes Watters & Askanase
                              TotalEnergies Tower
12                            Total Plaza, 1201 Louisiana Street
                              Houston, TX 77002
13

14   For Jamieson Zaniewski:  KY JURGENSEN
                              BoyarMiller
15                            2925 Richmond Ave., 14th floor
                              Houston, TX 77098
16

17   For Bitmain Technologies Georgia Limited:
                              JACOB SPARKS
18                            KASI CHADWICK
                              MIRANDA GRANCHI
19                            XENNA DAVIS
                              Nelson Mullins Riley & Scarborough
20                            5830 Granite Pkwy #1000
                              Plano, TX 75024
21

22

23

24

25
```

```
 1   Court Reporter:

 2   Courtroom Deputy:

 3   Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
 4                            Mineola, NY 11501
                              Tel: 800-727-6396
 5

 6

 7   Proceedings recorded by electronic sound recording;
     Transcript produced by transcription service.
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1        HOUSTON, TEXAS; WEDNESDAY, OCTOBER 8, 2025, 8:01 a.m.

 2                       (Call to Order)

 3             THE COURT:  It is Wednesday, October 8th, 2025.

 4   We're here for the continued hearing in case number 25-

 5   80363, ORB Energy Co.  So why don't we get appearances of

 6   Counsel, and then we can proceed.

 7             MR. SHURN:  Good morning, Your Honor.  Steven

 8   Shurn, S-H-U-R-N, on behalf of the Debtor in Possession.

 9             MR. JURGENSEN:  Good morning, Your Honor.  Ky

10   Juergensen.  I'm Counsel for Mr. Zaniewski individually.

11             THE COURT:  Thank you.

12             MR. SPARKS:  Good morning, Your Honor.  Jacob

13   Sparks, Kasi Chadwick, Miranda Granchi, and Xenna Davis from

14   Nelson Mullins, on behalf of Bitmain Technologies Georgia

15   Limited.

16             THE COURT:  All right.

17             All right.  Mr. Sparks, are you going to call your

18   witness?  Is that how we're going to proceed?  Or did we --

19             MS. CHADWICK:  Yes, Your Honor.  We're going to

20   call witness (indiscernible) and she's available for cross-

21   examination as well.

22             THE COURT:  Okay.

23             MS. CHADWICK:  We also have an interpreter.

24             THE COURT:  Excuse me?

25             MS. CHADWICK:  We have an interpreter as well.
```

 1              THE COURT:  Okay.  All right.  Put the mic a

 2    little closer to you.

 3              MS. CHADWICK:  Is that better?

 4              THE COURT:  Much better.

 5              MS. CHADWICK:  Okay.

 6              At this time, Your Honor, I offer the proffer of a

 7    witness from China.  Her name is Xin Huang, and she goes by

 8    Sara.

 9              "I, Xin Huang, am authorized to make this

10    declaration on behalf of Bitmain Technologies Georgia

11    Limited, in support of Bitmain's emergency motion to confirm

12    inapplicability of the automatic stay, from relief from the

13    automatic stay, to grant access to Bitmain's property, and

14    for related relief.  I have personal knowledge of the facts

15    stated herein, and I am competent to testify to them.

16              The 2,700 mining servers, the hosted servers,

17    containers, and Bitcoin mined with Bitmain's property are

18    owned by Bitmain, not the Debtor.  Both the Hosting Sale

19    Agreement, the HSA, and the Hosting Services Agreement, the

20    Services Agreement, expressly state that the hosted servers

21    and containers belong to Bitmain.

22              There are several key provisions of the Hosting

23    Sale Agreement and the Hosting Services Agreement.  As an

24    initial matter, the Hosting Sale Agreement expressly

25    provided that Bitmain, not Debtor, was the owner of the

1    property at issue."  That's in Section 5.1, entitled

2    Ownership of Hosted Servers.  "The Hosting Sale Agreement

3    also provided that ORB Energy Co., the Debtor, was not

4    allowed to engage in self-mining with Bitmain's property to

5    mine Bitcoin for itself or otherwise.  And if such conduct

6    were to occur, the consequences included, one, return of the

7    Bitcoin mined, two, bear the hosting fees for that current

8    billing period, and three, immediate termination of the

9    contracts."  And that is in Section 5.4, on page 40.

10           "The Debtor was also covered by the hosting -- the

11    deposit was also covered by the Hosting Sale Agreement, and

12    there was no obligation to pay the deposit until after

13    certain conditions were met at the site."  That's in Section

14    1.3, entitled Deposit.  "Debtor was required to allow

15    Bitmain to run its own monitoring software on the miners,

16    which here was a software called AntSentry."  A-N-T S-E-N-T-

17    R-Y.  That's Section 3.19, entitled Monitoring Software.

18    "And if AntSentry went offline, Debtor had obligations to

19    restore it, or face financial consequences under the

20    agreement."  That's Section 5.6.  "Finally, Debtor was not

21    allowed to obstruct Bitmain's access to the site, and was to

22    allow Bitmain unfettered access to the site."  And that's

23    Section 3.2, entitled Access to the Facility.

24           Then in Section 5.5, "As for the Hosting Services

25    Agreement, that contract never began, given that Debtor

1    immediately began self-mining upon receipt and on-racking of

2    the hosted servers.  Contrary to what Debtor argues now,

3    Bitmain always told Jamieson Zaniewski that he was not going

4    to be -- he was going to be the host, not an owner.

5    Jamieson was expressly told that he was not going to be an

6    operations and maintenance person for at least six months.

7         Specifically, Bitmain wrote on October 31st, 2024,

8    'Due to some third-party restrictions, Bitmain wishes to use

9    a six-month operation period as the milestone for handing

10   over and assessing your operations team.  That is, from the

11   date the mine is powered up, Bitmain will handle the

12   operations for six months.  During the six months, Bitmain

13   will assess the capabilities of your operation team to

14   ensure a smooth transition.'  In fact, the Hosting Sale

15   Agreement was consistent with this reminder, and expressly

16   provided that Bitmain was solely responsible for the

17   operation and maintenance of the hosted servers."  And

18   that's Section 5.2.  "This means that Bitmain, not Debtor,

19   was responsible for the operation and maintenance activities

20   of the hosted servers, including powering them on.

21        Because Debtor was never the operation or

22   maintenance provider under the agreements, Bitmain's

23   personnel was ready and able to power on the hosted servers

24   when Bitmain, not the Debtor, was ready.  To this end,

25   Bitmain's personnel was more than equipped to, one, power on

1    the hosted servers, B, operate and maintain the hosted

2    servers, C, direct the hosted servers hashrate to the

3    appropriate mining pool, and D, direct the mining proceeds

4    to Bitmain's wallet.  To this end, Bitmain's personnel

5    always had the proper mining pool and wallet address

6    information, but Debtor refused to allow them to enter it

7    into the machines.

8              In fact, while ORB references some hack that

9    occurred at the site, that was nothing more than Bitmain's

10   operation and maintenance personnel attempting to override

11   Debtor's improper self-mining, and direct the hashrate to

12   the proper mining pool, and rewards to the proper wallet.

13   And this is what resulted in Bitmain's personnel being

14   ejected from the Debtor's facility, though they had, A,

15   every right to be at the facility, and B, every right to

16   direct the hashrate to the correct mining pool, and mining

17   proceeds to the correct wallet.  Debtor knew it.  It was

18   Bitmain's personnel who did this, and that's why Debtor

19   ejected them from the facility, another violation of the

20   Hosting Sale Agreement, which required unfettered access.

21             Bitmain terminated the party's agreements pre-

22   petition due to Debtor's self-mining, and other breaches.  I

23   sent several notices to Debtor with the intention of

24   terminating our business relationship.  I authorized our

25   legal counsel to reaffirm this termination in July of 2025.

1          I understand Debtor now argues that a certain term

2     sheet is in place.  It is not.  Further, Bitmain informed

3     Debtor in April 2024 that it could not proceed under that

4     document.  Debtor acknowledged this term sheet was not the

5     operative contract when Debtor stated, 'Any sort of document

6     officially endorsed by Bitmain would be great, but if

7     contract will be done soon, maybe we can just wait for

8     that.'  The Hosting Sale Agreement and the Hosting Services

9     Agreement were entered between Bitmain and Debtor.  As seen

10    in the written communications, Bitmain did not pressure for

11    contract execution or project completion, as Debtor now

12    argues.  These were arm's length transactions that Debtor

13    was free to execute, and enter or decline.

14          Debtor breached the contracts by self-mining, and

15    misappropriating all mining proceeds from the first day the

16    hosted servers were powered on, which Debtor should not have

17    done to begin with, as it was not the operations and

18    maintenance provider under the contracts.  Debtor redirected

19    the hashrate to its own wallet, which was also prohibited

20    under our agreement, and retained all mined Bitcoin, using

21    proceeds for its own benefit since late November 2024.  This

22    was the first breach of the party's agreements, and once it

23    was clear that the site was running, operational, and yet

24    Bitcoin was being mined from Bitmain, Bitmain immediately

25    demanded that Debtor cease self-mining.

1           Debtor sent incorrect invoices to Bitmain,

2    delaying payment.  Among other things, the invoices had the

3    incorrect amounts, were sent to individuals not parties to

4    our agreement, and were incorrectly addressed to unrelated

5    non-existent entities.  While Debtor contends it sent the

6    first invoice on September the 4th, 2024, payment was not

7    yet due under the contract."  And that's Section 3.4 in

8    Exhibit A Debtor again sent invoices on November the 27th,

9    2024, but these remained incorrect in that they were

10   addressed to an individual, Ryan Zhao, and not Bitmain

11   Technologies Georgia Limited, and contained a charge not

12   agreed to under the contracts.  Further, Debtor requested

13   Bitmain pay the prepayment fee, which was also not due under

14   the contract.

15           Several communications went back and forth over

16   email, WhatsApp, and WeChat wherein the parties attempted to

17   get the invoices correct so they could be paid.  The correct

18   invoice was not provided until December 9th, 2024, when

19   Debtor sent its invoices to corrected email.  On December

20   10th or 11th, Bitmain requested a credit, as allowed under

21   the Hosted Services Agreement for all Bitcoin self-mined by

22   Debtor, which Debtor refused."  And that's covered in

23   Section 1.1, entitled Setoff.  "Debtor refused this request,

24   notwithstanding that the Hosting Sale Agreement expressly

25   required that all Bitcoin that was self-mined must be

1    returned to Bitmain within seven days."  And that's Section

2    5.4.

3            "Debtor has no contractual possessory recoupment

4    or ownership rights in the hosted servers, containers, or

5    Bitcoin mined therewith.  These are and remain Bitmain's

6    property, as expressly stated in several places of the

7    party's agreement.  Bitmain sent several notices of

8    termination and retrieval of its property, including written

9    reaffirmations of contract termination.  Further, both

10   parties filed lawsuits seeking remedies for breach of

11   contract in the Matagorda County District Court.  Bitmain's

12   lawsuit sought a temporary restraining order, which it was

13   granted on April 8th, 2025 at 1 p.m., without an oral

14   hearing, and allowed Bitmain to retrieve the property at

15   issue from Debtor.  Bitmain went to the site to execute the

16   temporary restraining order the morning of April 10th, 2025,

17   and was denied access by Debtor.  Then, at 11:12 a.m. on

18   April 10th, the same day, again without a hearing, but this

19   time without any affirmative legal filings, the Matagorda

20   County District Court amended the temporary restraining

21   order.

22           I understood from Debtor's conduct that it did not

23   intend to abide by our contracts, or the Court's orders, and

24   that Debtor continued self-mining, refusing to stop,

25   refusing to abide by contract terms, and refusing to comply

1    with several provisions of the Matagorda County Court's

2    orders.  Examples, not disposing of, or improperly using the

3    Bitcoin proceeds, granting access to the site and the hosted

4    servers, allowing Bitmain to operate AntSentry."

5            This concludes the proffer of Sara Wong.

6            MR. SHURN:  Your Honor, so I take the position

7    that a proffer is not a backdoor to allow hearsay in, is not

8    a backdoor to not have personal knowledge, is not a backdoor

9    for all these things.  I understand -- I thought the Court

10   was going to have an interpreter.  I just assumed that under

11   the Federal Rules.  My fault.  Okay?  I just assumed that.

12           So let me say this, because we're going to have an

13   interpreter issue.  I object to the proffer based upon, one,

14   hearsay and lack of personal knowledge with the statements

15   such as, "Bitmain always told this or that, or always said

16   these things."  That's hearsay.  Not admissible, proffer or

17   otherwise.  All that needs to be stricken.  Anything from

18   the proffer that deals with legal conclusions needs to be

19   stricken as well.  A lot of it where she's just reciting her

20   opinion of the contract, she's entitled to have her opinion

21   of the contract.  It's not a legal conclusion, but rather

22   their position as to it.  I get it.

23           Often in there, they said, we gave all these

24   notices, we gave all of this.  Those things aren't in

25   evidence.  I don't know if they exist or not.  But we have

1    the letters that are in evidence, but these other things

2    that are referenced, I've never seen them.  I don't know

3    what they are.  I don't know that they exist, so I object to

4    that as well.

5            The other piece that -- And if I have to take her

6    on voir dire, I will.  I don't think she's an employee of

7    Georgia Bitmain Limited, and I don't understand the nexus

8    between who she's employed by and Georgia Bitmain Limited.

9    And if that's the case, the whole proffer doesn't come in.

10           So that's kind of my global, trying to do it in

11   the simplest, most blunt way.  As opposed to getting real

12   precise, and having to deal with interpreters, those are my

13   thoughts on the subject, Your Honor.

14           THE COURT:  Okay.  Thank you.

15           MR. SHURN:  Thank you.

16           MS. CHADWICK:  Your Honor, well, I mean, to begin

17   with, those seem like items for cross, if he has questions

18   about anything that she testified to.  She's talking about

19   her opinion of the contract.  She's in-house counsel for

20   Bitmain.  She's perfectly equipped to speak to that, and her

21   views of it.  The notice letters that she references were

22   already in evidence, and I can give the Court the exhibit

23   numbers, if that's helpful for Mr. Shurn.  But these are all

24   matters for him to take up on cross or her, which she is

25   available to do.

 1              MR. SHURN:  So Your Honor, if those are the

 2     letters that are in evidence, I withdraw that.  I didn't

 3     realize that that was the reference.  That piece is fine.

 4              Still, it's not a backdoor for hearsay.  Still,

 5     it's not a backdoor for legal conclusions.  That's not a

 6     cross issue.  A cross issue could be the foundation piece,

 7     whether or not she's an employee or not, I agree.  But

 8     allowing hearsay in, that's not what cross is for.

 9              THE COURT:  So let me put it --

10              MR. SHURN:  Yes, sir.

11              THE COURT:  Let me tell you kind of -- To the

12     extent that she is giving legal conclusions, I'm the person

13     who's determining what the law is.  So that just goes to the

14     weight, and you know, I'm not bound by what she says.  To

15     the extent that she is talking about things that happened,

16     unless she's got personal knowledge, or unless it's an

17     admission against interest, then again, that is hearsay.  It

18     goes to the weight.  I think I can make a determination with

19     respect to that.

20              I did not see any emails, or anything with her in

21     the emails before, so I don't know that she had, you know,

22     the personal knowledge.  Just that connection hasn't been

23     made.  But to the extent that you want to take her on cross

24     on the foundation piece -- I didn't realize that she was an

25     in-house counsel until you just said that.  That wasn't in

```
 1    her proffer, and there is no testimony, other than the
 2    representation, that she was acting as an in-house counsel
 3    here, and you know, whether that has privilege implications,
 4    and things like that.  I thought she was, you know, a
 5    participant, a business person.
 6         But with those caveats, you know, I'm going to
 7    accept the proffer, and deal with it as I would any other
 8    testimony.
 9         MR. SHURN:  So Your Honor, I'm thinking real
10    quick.  So everything you said, I agree with a hundred
11    percent.  It's perfect.  So the question I'm grappling with
12    is do I want to address the foundation piece, and who she's
13    employed by, and ask to strike the whole thing?  Given the
14    time we've already spent, the hours and hours we've spent, I
15    will go ahead and leave that alone, and with the caveat you
16    said, I'm fine, and I'm willing to move on, Your Honor.
17         THE COURT:  Okay.  All right.  So I just need to
18    swear her in.  And would she be able to testify that what
19    you said accurately reflects what she would testify?
20         MS. CHADWICK:  Yes, Your Honor.  She's able to say
21    that.
22         THE COURT:  Okay.  So let me -- Is the interpreter
23    with her?
24         MS. CHADWICK:  No, the interpreter is on the Zoom
25    as well.
```

```
 1              THE COURT:  Okay.  Do you know what number?

 2              MS. CHADWICK:  (indiscernible) I can only see

 3    (indiscernible) courtroom and witness stand up here.

 4              Yeah, LingLing is the interpreter.

 5              THE COURT:  Okay.  But is LingLing on the -- on

 6    the phone?  Because there's only two other people on the

 7    phone.  One is an 832 number, and one is a 626 number.

 8              MS. CHADWICK:  LingLing, can you unmute and speak,

 9    please?

10              THE COURT:  I have one number.  I think that's Ms.

11    Huang's number.

12              Is the interpreter here in the United States?

13              MS. CHADWICK:  I believe so, yes.

14              THE COURT:  Okay.  I've unmuted everyone.

15              MS. CHADWICK:  Okay, great.  LingLing, you have to

16    call in to be heard, on the number that's on the Court's

17    website that we sent you.

18              THE COURT:  Okay.  Why don't we just continue, and

19    then we'll come back and do that, when -- She's not going to

20    be able to hear you unless she's called in.  The video

21    system doesn't have any sound.

22              Why don't we take a five-minute break, and see

23    (indiscernible)

24              MR. SPARKS:  Okay.  Thank you, Your Honor.

25    (Brief recess.)
```

```
1    (Back on the record.)

2              THE COURT:  Okay.

3              MS. CHADWICK:  We're ready to proceed, Your Honor.

4              THE COURT:  All right.  All right.

5              So Ms. Huang, would you please raise your right

6    hand?

7              Do you solemnly swear or affirm to tell the truth,

8    the whole truth, and nothing but the truth?

9              MS. XIN HUANG, SARA:  Yes.  Yes, I can swear.

10             THE COURT:  All right.  Thank you.  You may lower

11   your hand.

12             Ms. Huang, you heard your Counsel proffer your

13   testimony.  Is her proffer true and correct, and what would

14   be your testimony if you were testifying here, live, in the

15   courtroom?

16             MS. XIN HUANG, SARA:  Yes, it would be the same.

17             THE COURT:  All right.  Is there anything else you

18   wish to add or subtract from that proffer?

19             MS. XIN HUANG, SARA:  No.

20             THE COURT:  All right.  Okay.  Thank you.  Thank

21   you, Ms. Huang.

22             All right.  So where do we go next?

23             MS. CHADWICK:  We would like to prefer maybe, or

24   (indiscernible)

25             THE COURT:  No --
```

1          MR. SHURN:  No, no.  We're past that.

2          MR. SPARKS:  Yeah (indiscernible)

3          MS. CHADWICK:  Okay.  We can do -- we can do the

4    next proffer, which is Mr. Ming.  He's on the line as well.

5          THE COURT:  Okay.

6          MS. CHADWICK:  This one's shorter.

7          THE COURT:  Okay.  Who is it the proffer -- who is

8    that the proffer of?

9          MS. CHADWICK:  This is Qi Zhu, and he goes by

10   Ming.

11         THE COURT:  Okay.  Yes, he was just on the line.

12         MS. CHADWICK:  Yes.  May I proceed?

13         THE COURT:  Yes.

14         MS. CHADWICK:  Okay.

15         "I, Qi Zhu, declare under penalty of perjury under

16   the laws of the U.S. that the following statement is true

17   and correct to the best of my knowledge, information, and

18   belief.  I submit this statement in connection with the

19   above captioned matter.

20         I am the owner of a company that is an authorized

21   service provider for Bitmain Technologies Georgia Limited.

22   I own and operate a company that has been hired as a

23   contractor by Bitmain to operate and maintain Bitmain's

24   mining equipment since 2023.  My company was hired as the

25   operation and maintenance services provider for Bitmain, and

1    directed to assist in the setup of the mining site operated

2    by Jamieson Zaniewski, and ORB Energy Co.  However, the

3    miners were activated by ORB's employees at Zaniewski's

4    direction, not me or the members of my team.

5            After the setup of the site, I and other members

6    of my team have visited multiple times.  My team was allowed

7    to do a few things.  One, count and scan the serial numbers

8    on the on-shelf miners.  Two, record miners that did not

9    hash upon power on, dead on arrival miners.  Until Bitmain's

10   personnel directed us to lock the mining pool on December

11   the 9th, my company's personnel was not configured the

12   mining pool on those miners -- has not configured the mining

13   pool on those miners.  To my knowledge, the miners were not

14   pre-configured when they arrived at the site.

15           To activate hashrate functionality, a new wallet

16   setup was required.  However, my team was the operation and

17   maintenance service provider for Bitmain, not ORB, so my

18   team was responsible for directing that hashrate to

19   Bitmain's mining pool, and setting up a wallet for Bitmain

20   to receive the mining proceeds from the miners.  So when

21   ORB's employees turned on the machines, and directed the

22   hashrate to ORB's mining pool, and directed the mining

23   proceeds to ORB's wallet, ORB's employees took unauthorized

24   steps, and interfered with my team's role as operation and

25   maintenance service provider.

1         ORB told me that by using ORB's mining pool, they
2    have been doing a test run, and since Bitmain has not paid
3    them, they cannot allow my team to officially start
4    operating the machines.  Neither I, nor anyone on my team
5    ever directed anyone at ORB to direct the hashrate to ORB's
6    mining pool, or to direct the mining proceeds to ORB's
7    wallet.  Neither I, nor anyone on my team ever condoned or
8    encouraged what we now know ORB's employees have done.  In
9    fact, I mentioned multiple times to Mr. Zaniewski  and the
10   ORB team that running ORB's mining pool on Bitmain's miners
11   is considered a severe violation of the hosting agreements,
12   and running testing for excessive periods of time does not
13   sound reasonable, and might cause legal issues.

14        My team was later removed from the property, after
15   making Bitmain aware that ORB's employees had activated the
16   miners, had directed the hashrate to ORB's mining pool, and
17   had directed the mining proceeds to ORB's own wallet.  We,
18   however, have always had Bitmain's proper mining pool and
19   wallet information, and would have made it available to ORB,
20   but they didn't want it.

21        ORB later said they removed us from the site for
22   lack of training, but this is untrue.  My team and I are
23   highly experienced with miners.  I have worked in this field
24   since 2021.  My team has been with me since nearly the very
25   beginning.  Our company undergoes monthly evaluations by

1    Bitmain, and is recognized as an authorized service

2    provider.  It is false to say we are unqualified.  Moreover,

3    while working on the site, and configuring the miners and/or

4    the containers, my team followed the manufacturer's

5    instructions for such work.

6          ORBs claim that Bitmain failed to provide

7    personnel or wallet address is false.  ORBs employees

8    directed the hashrate to ORBs mining pool, and directed the

9    mining proceeds to ORBs wallet since the very beginning, and

10   neither I, nor anyone on my team ever told them to do so,

11   nor did we assist them in doing it.  In fact, my team was on

12   site since late November 2024, and we told ORB's employees

13   that we are ready to configure the miners for Bitmain's

14   pool.  But ORB's employees did not input the correct wallet

15   and pool information, instead choosing to mine their own

16   test pool and wallet.  Zaniewski indicated that ORB would

17   continue mining for its own benefit because of the dispute

18   over payment with Bitmain."

19          That concludes the proffer.

20          MR. SHURN:  So Your Honor, I object to any proffer

21   of this witness.  This witness speaks perfect English.

22   There's no reason for a proffer, they can testify.  I

23   believe they reside in California.  I understand when

24   somebody needs an interpreter to expedite things.  I'm

25   absolutely fine with that.  But this is an adverse witness

1    for my client, saying a lot of things my client 100%

2    disagrees with.  And so this needs to come out through

3    testimony, not through a proffer.  And I'm fine if they want

4    to do it remote, and he's here right now, but I object to

5    any proffer.  There is no practical reason for it, and no

6    legal reason for it.

7            MS. CHADWICK:  Your Honor, both these witnesses,

8    their native language is Chinese, and if I'm going to give -

9    -

10           THE COURT:  My native language is Spanish, so --

11           MS. CHADWICK:  If I'm going to give sworn

12   testimony -- I speak Spanish as well, and I'm not going to

13   give sworn testimony in anything other than my native

14   language, because I want it to be right, and I bet that's

15   how these witnesses feel.  Proffer is perfect -- It's in

16   your rules online that proffers are appropriate for direct

17   exam, and he can take all this up on cross.  These witnesses

18   are available, and ready to answer his questions.

19           THE COURT:  Well, we do admit proffers if it's

20   uncontested testimony, or if we're looking at, you know,

21   something on an expedited hearing, this is a full trial.  I

22   can understand, you know, in a situation where somebody has

23   given an opinion, or an expert witness has given an opinion,

24   where you could do a proffer and then, you know, allow the

25   cross-examination.

1              And with respect to, you know, counsel in China, I

2    can understand that.

3              MS. CHADWICK:  I can do a quick direct, if you

4    want.

5              THE COURT:  Yeah, why don't you do that?

6              MS. CHADWICK:  Okay.

7              MR. SHURN:  Thank you, Your Honor.

8              MS. CHADWICK:  I guess we'll need to swear him in.

9              THE COURT:  Yes.

10             Mr. Zhu, would you raise your right hand, please?

11             Do you solemnly swear or affirm to tell the truth,

12   the whole truth, and nothing but the truth?

13             MR. QI ZHU, MING:  Yes, I can.

14             THE COURT:  All right.  Thank you.  All right --

15   DIRECT EXAMINATION

16   BY MS. CHADWICK:

17   Q    Mr. Zhu, what is your native language?

18   A    Chinese.

19   Q    Are you employed?

20   A    Yes, I'm employed.

21   Q    What do you do for work?

22   A    We are a contractor for operation and maintenance for

23   miners, for mining facilities.

24   Q    Have you been to the ORB Energy Co. site?

25   A    Yes.

```
 1   Q    Were you the operation and maintenance provider for

 2   that site?

 3   A    Yes.  We were the supplier, yes.

 4             THE COURT:  Go ahead, Mr. Shurn.

 5             MR. SHURN:  Thank you, Your Honor.

 6             So I mean, I object to the extent that's a legal

 7   conclusion.  If they want to say that Bitmain hired him to

 8   function in that role, that's fine.  But not (indiscernible)

 9             THE COURT:  Yeah.  Sustained.

10             MR. SHURN:  Thank you, Your Honor.

11   BY MS. CHADWICK:

12   Q    What was your job as to the ORB facility?

13   A    According to the agreement that we had with Bitmain,

14   based on their instruction, we were to go to the facility,

15   and operate and maintain these mining machines.

16   Q    Were you able to do that?

17   A    Not this time.  We did not do that at the ORB facility.

18   Q    Why not?

19   A    After we got to the facility, ORB kept on telling us

20   that they had not resolved the payment disputes with Bitmain

21   yet.  Therefore, our work could not start.

22             MS. CHADWICK:  Your Honor, should I pause with the

23   screen, or --

24             THE COURT:  Yes, hold on.  I don't know what's

25   going on.
```

```
 1              MS. CHADWICK:  Okay.

 2              THE COURT:  I'm going to exit from the video.  So

 3   please, come back into the video.  Let me -- I'm going to

 4   exit out of it, and come back in.

 5   (Brief recess.)

 6   (Back on the record.)

 7              THE COURT:  All right.  Let's go back on the

 8   record.

 9              Go ahead, Counsel.

10   BY MS. CHADWICK:

11   Q    What were you allowed to do at the ORB site?

12   A    We did two things.  One thing we did was that we were

13   counting how many miners were on the shelf, and whether the

14   number of miners on the shelf were consistent in terms of

15   the numbers to how many that Bitmain had already sent out or

16   shipped out.  That we did.  And also, we were checking on

17   the miners that were on the shelf to see which ones that

18   were not operating, and were not able to generate the

19   hashrate.

20   Q    Were you allowed to input Bitmain's mining pool

21   information?

22   A    No.  We were told at the last minute that Bitmain's

23   mining pool cannot be inputted.

24   Q    By who?

25   A    Jamieson, Jamieson was one of two people who told us,
```

1    and the other person was Parker, his partner.

2    Q    What's the name of your company?

3    A    NexaNode, N-E-X-A-N-O-D-E, NexaNode Data Services.

4    Q    Were you able to input Bitmain's wallet address?

5         MR. SHURN:  Objection, Your Honor.

6         THE COURT:  Go ahead, sir.

7         MR. SHURN:  Yeah.  Being able to, meaning does

8    somebody physically prohibit them, meaning they lack the

9    skill to do it?  It's an ambiguous question.  I don't

10   understand (indiscernible)

11        THE COURT:  Sustained.  It's ambiguous.

12   BY MS. CHADWICK:

13   Q    Do you have the skill to hook up the miners to the

14   correct mining pool?

15   A    Of course.  Of course I have that capability.

16   Q    What makes you say that?

17   A    Ever since 2021, we have been providing operation and

18   mining services for mining facilities, and to set up the

19   mining pool was a basic skill for the service.

20   Q    When do you normally set up the mining pool?

21   A    Typically within a few minutes after the miners were

22   put on the shelf and were powered up.

23   Q    Were you prohibited from setting up the mining pool of

24   the hosted servers at the ORB facility?

25   A    At the time, what we were told was that because Bitmain

1    had not made the payment, therefore we were not to provide

2    operation and maintenance services to these miners, and we

3    were not to set up the mining pool for these miners either.

4    Q    Did ORB always allow you on the site?

5              MR. SHURN:  Objection, Your Honor.

6              The "you on the site," he means him, physically,

7    he means his employees, he means the company?  Which is it?

8              THE COURT:  Ambiguous.  Sustained.

9    BY MS. CHADWICK:

10   Q    Did ORB always allow NexaNode to enter the facility?

11   A    Prior to December either 10th or the 11th, I no longer

12   recall whether it was the 10th or the 11th, but before that

13   date, ORB allowed us to enter the facility.

14   Q    What happened on the 10th or 11th?

15   A    When we were going to enter the facility on that day,

16   we were not able to enter.  Jamieson, in the group chat, in

17   which Bitmain was in the group chat, and ORB was in the

18   group chat as well, the three parties were in the group

19   chat, Jamieson said that the personnel that we sent to the

20   site were not technically capable, and that they had

21   requested Bitmain to send other people that are more

22   technically capable.

23   Q    Do you agree that your people were not technically

24   capable?

25   A    I do not agree.

1   Q     Why not?

2   A     The first reason was that our team technically had the

3   capability to provide all operation services for all

4   maintenance and operation maintenance-related work.  And

5   secondly, the reason that we were not allowed to go into

6   this facility was because we listened or abide by the

7   instructions given by Bitmain, name and provided the mining

8   tools to some of the miners.  However, that was not allowed

9   by this facility.

10          MS. CHADWICK:  That concludes the direct.

11          THE COURT:  Okay.  Thank you.

12          MR. SHURN:  Thank you, Your Honor.

13          THE COURT:  Go ahead.

14   CROSS-EXAMINATION

15   BY MR. SHURN:

16   Q     Sir, how many times did you go to the ORB facility?

17   A     I believe at least four times, or five times.

18   Q     Okay.  How many times did you bring a translator with

19   you?

20          MS. CHADWICK:  Objection.  Relevance.

21          THE COURT:  I'm going to overrule the objection,

22   this -- the objection.

23          Go ahead.  What was the answer?

24   BY MR. SHURN:

25   Q     I did not bring one.

1    Q    Okay.  So you talked with Mr. Jamieson -- or Mr.

2    Zaniewski, I apologize for that, without a translator.

3    Correct?

4              THE INTERPRETER:  Jamieson -- What's the name that

5    you just said, you corrected?  Was it Jamieson?

6              MR. SHURN:  Yeah.  So say Mr. Zaniewski.  I

7    apologize.

8              THE COURT:  Mr. Zaniewski.

9              MR. SHURN:  Yes.

10   BY MR. SHURN:

11   A    Yes.

12   Q    Okay.

13             MR. SHURN:  Your Honor, I ask that we don't use a

14   translator.  If he was able to do all these interactions,

15   and now testify, I think he can testify in English, if they

16   had all these transactions that were in English.  To me,

17   it's part and parcel of the same.  Otherwise, I think the

18   testimony has to be stricken.

19             MS. CHADWICK:  Your Honor, I hate to bring this

20   up, but this has been a pattern of xenophobic, kind of

21   offensive behavior.  If this man wants to testify in his

22   native language, to give sworn testimony before this Court,

23   that is his right, and he should be allowed to do that.  He

24   wants to get it right.

25              testify in English.  THE COURT:  Yeah, I'm going

1    to allow him to testify.  I think it goes to the weight of

2    the evidence.

3           MR. SHURN:  Very good, Your Honor.  Thank you.

4    BY MR. SHURN:

5    Q   Sir, isn't it true that you told Jamieson on at least

6    one occasion to only switch the test pool over to Bitmain

7    once Bitmain pays the deposit?  Isn't that correct?

8    A   Okay, I think the logic of the question is a little bit

9    of weird.  Let me explain a little bit, if it's possible,

10    because --

11           MR. SHURN:  Your Honor, it's a yes or no question.

12    This is non-responsive.

13           THE COURT:  Sustained.  It's non-responsive.  It's

14    a yes or no question.

15    BY MR. SHURN:

16    A   What you just described is not accurate.

17           MR. SHURN:  Objection, Your Honor.  It's a yes or

18    no question.

19    BY MR. SHURN:

20    Q   Sir, I'll ask you the question again, please.  Isn't it

21    true that you told one or more ORB representatives to only

22    switch from the test pool to Bitmain once Bitmain pays the

23    deposit?  Yes or no, sir?

24    A   Yes.

25    Q   Who owns your company that you work for?

1    A    The owner is Shadow Chen.

2    Q    Okay.  What relationship does he have to the

3    conglomerate of Bitmain?

4    A    Not any personal relationship, but just a relationship

5    between the business.

6    Q    So is it your testimony then that there is no direct or

7    indirect ownership between any Bitmain entity and the

8    company you work for?

9    A    Correct.  There is not.  There is not any direct or

10   indirect relationship in terms of ownership.

11   Q    Okay.  Thank you.  Thank you, sir.  Who is your primary

12   customer, sir?

13   A    Bitmain is one of them.

14   Q    Okay.  And what percentage of your business does

15   Bitmain take up?

16   A    Roughly 30% to 40%.

17   Q    Okay.  And have they ever taken up a greater percentage

18   than 30 or 40%?

19   A    May I ask the attorney, do I need to answer this

20   question?

21   Q    Yes, you need to answer the question, please.

22        THE COURT:  I think it's a yes or no question.

23   BY MR. SHURN:

24   A    Yes, sometimes, or at a certain point of time, the

25   percentage went over, and became -- it was more than 30% to

1    40%.

2    Q    Okay.  And in fact, it was more than 50% at times.

3    Isn't that correct?

4    A    I did not look into this specifically.

5    Q    Understood, understood.  Understood.  So you had

6    employees there -- So strike that.  Strike that.

7         You're familiar with the gentleman by the name of Tommy

8    Lee.  Correct?

9    A    Tommy Lee does not have any relationship with this

10   facility.  I know somebody with the name of Tommy Lee, but I

11   am not sure whether that's the same person that you are

12   talking about.

13   Q    Okay.  So are you then testifying, or is it your

14   testimony that a gentleman by the name of Tommy Lee, with

15   two other gentlemen, were not present at the site when the

16   servers were delivered?

17   A    My testimony did not cover this part.

18   Q    Okay.  Are you familiar with a gentleman by the name of

19   James?

20   A    Yes.  Yes, I know.

21   Q    Okay.  And who did James take with him to the site?

22   A    Can you please repeat one more time the question?

23   Q    Yes.  I'm sorry, sir.  So you just testified you're

24   familiar with James, and I believe you said he went to the

25   site.  And so I asked, with James, who else went to the site

 1   from your company?

 2   A    Another employee of our company whose last name is

 3   Zheng, Z-H-E-N-G.  I need to look up his name.

 4            MR. SHURN:  And I know we lost him on video.

 5            THE COURT:  He's back.  He's back.

 6   BY MR. SHURN:

 7   Q    So sir, so besides yourself going there on more than

 8   one occasion, but I think not every time, you also sent

 9   James and Mr. Zheng, if I'm pronouncing his name properly,

10   and that's it?

11   A    Correct.

12   Q    Okay.  And it's true that you were not there every time

13   they were present.  Correct?

14   A    Correct.

15   Q    Okay.  Are you familiar with the incident where one of

16   -- and forgive my ignorance, one of the containers with

17   servers had an incident, and it exploded?

18   A    If you're talking about -- Well, I've heard about it,

19   but that was not an explosion.

20   Q    So you heard about it.  Did your employees report to

21   you the incident?

22            MS. CHADWICK:  Objection.  Calls for hearsay.

23            MR. SHURN:  Your Honor, so I'll respond to that.

24   I mean, if he's sending employees out there, they've got to

25   report back to him.  If he's testifying as to what happened

1   out there, he's saying he has personal knowledge.  And if

2   he's not there every time, he only has personal knowledge if

3   somebody told him, so it's problematic with the foundation

4   of his entire testimony, because he wasn't there every time.

5            MS. CHADWICK:  Your Honor, I don't know that he

6   testified about any explosions.

7            THE COURT:  About any what?

8            MS. CHADWICK:  Explosions.

9            MR. SHURN:  He just did.

10           THE COURT:  Well, no.  I think that's the cross-

11  examination.  So I'm going to allow it.

12           MS. CHADWICK:  Okay.

13           MR. SHURN:  And Your Honor, it goes to the

14  qualifications of the people being out there, and not being

15  allowed back on, because they're not acting properly and

16  following best practices.  You wouldn't have explosions if

17  they were following best practices.

18  BY MR. SHURN:

19  Q    So did that incident get reported to you, sir?

20  A    Yes.  Yes.

21  Q    Okay.  To do maintenance and operations, isn't it true

22  that somebody needs to be on site 24 hours a day, not just a

23  few hours here and there?

24  A    That was not true.  For the operation and maintenance,

25  the customary practice is that we would provide 24-hour

1    monitoring, and only when it was necessary that we would

2    send people live, on site, to conduct operations.

3    Q    So there are two types of cooling systems.  Is that

4    correct?

5    A    I do not know what criteria that you use to separate

6    the cooling systems.

7    Q    Sure.  I understand.  Sir, understood and appreciated.

8    So there's air cooling systems, and there's hydro cooling

9    systems.  Is that correct?

10   A    Correct.

11   Q    Okay.  And primarily, your company initially had

12   experience with air cooling systems as opposed to hydro

13   cooling.  Is that correct?

14   A    For both of the systems, we went through training from

15   Bitmain, and we went through their testing as well.

16   Q    Who went through that training?

17   A    Myself, and James.

18   Q    What about Tommy Lee?

19   A    We do not have an employee called Tommy Lee.  The

20   company does not have an employee that's named Tommy Lee.

21   We did not send a Tommy Lee to the site, either.

22   Q    What about Mr. Zheng, if I pronounced his name

23   correctly?  You mentioned him, in addition to James.  Did he

24   go through that training.

25   A    He went through that training.

1    Q    When?

2    A    Mr. Zheng conducted the training on site prior to the

3    machines were started.  But prior to him getting to the

4    site, he obtained training on paper.  And after we got to

5    the site, there was a consultant from Bitmain who

6    demonstrated to him the operation of the Bitmain containers.

7    Q    So the on-the-job training happened on my client's

8    site.  Isn't that correct?

9    A    Yes, the training, with regard to this particular type

10   of containers, happened on the facility.

11   Q    And that's because they're hydro containers as opposed

12   to air-cooled containers.  Isn't that correct?

13   A    Prior to that, they had experience with other --

14        MR. SHURN:  Your Honor, non-responsive.  Yes or

15   no.  I'm sorry, Your Honor.

16        THE COURT:  No, go ahead.  Finish.

17   BY MR. SHURN:

18   A    Prior to that, they had experience with other models of

19   hydro-cooling containers.

20        MR. SHURN:  Okay.  Your Honor, I'll withdraw my

21   probably too premature objection.  I think that's a fair

22   response, even though it was a yes or no question.  And with

23   that, Your Honor, I'll pass the witness.

24        THE COURT:  All right.

25        MS. CHADWICK:  Brief redirect?

```
 1                THE COURT:  Yes.

 2    REDIRECT

 3    BY MS. CHADWICK:

 4    Q    Mr. Zhu, what did you want to say in response to Mr.

 5    Shurn's question about the redirection of the hashrate, and

 6    the deposit?

 7                MR. SHURN:  Well, hold on (indiscernible) I didn't

 8    ask about redirection of the hashrate.  I didn't ask about

 9    redirection of the hashrate.  What I said was that these

10    things were configured and sent to a test pool, and only to

11    switch the test pool over.  I didn't say redirect.  Those

12    are not my words.  That's outside of my cross.

13                THE COURT:  Ask your question again.

14    BY MS. CHADWICK:

15    Q    What did you want to say in response to Mr. Shurn's

16    question about the hashrate, and the deposit?

17    A    Okay.  What I was trying to say was that the question

18    that was asked to me had a little bit of issue with -- in

19    terms of logic.  What I wanted to say was that I was telling

20    Mr. Zaniewski, Jamieson, as soon as Bitmain makes the

21    payment, please let us know so that we can then start the

22    mining, the pools, the mining pools, we can connect them.

23    It wasn't that we told Jamieson that he, that he may switch

24    the pools once Bitmain made the payment.

25    Q    You were asked about an explosion incident.  What
```

1    happened?

2              MR. SHURN:  Objection, Your Honor.  Lack of

3    personal knowledge.  He testified he wasn't there.

4              THE COURT:  Sustained.

5    BY MS. CHADWICK:

6    Q    What were you told about the incident?

7    A    What I was informed was that there was a power outage.

8    The power was cut off at one point.  And the container, the

9    cooling system was not turned back on after the power system

10   went off.  And our employee communicated with the

11   manufacturer of the container, and according to the

12   container's manufacturer's instructions, they told us to --

13             MR. SHURN:  Objection.  Hearsay.

14   BY MS. CHADWICK:

15   A    -- to turn the display of the container into the

16   Chinese language display so that the manufacturer can read

17   what they want to read on the display.

18             THE COURT:  Sustained.

19   BY MS. CHADWICK:

20   Q    This incident happened after ORB was directing the

21   hashrate to its mining pool.  Correct?

22             THE INTERPRETER:  Counsel (indiscernible) what did

23   you say?

24   BY MS. CHADWICK:

25   Q    This incident happened after ORB was directing the

1    hashrate to its mining pool?

2    A    Correct.  Correct.

3              MS. CHADWICK:  I'll pass the witness.

4              MR. SHURN:  I'm done, Your Honor.

5              THE COURT:  All right.  Thank you.

6              Thank you, Mr. Zhu.  You may be excused.

7              MR. QI ZHU, MING:  Thank you.

8              THE COURT:  Anything further?

9              MS. CHADWICK:  Not from me, Your Honor.

10             THE COURT:  Okay.  So do you rest?

11             MS. CHADWICK:  (indiscernible) we rest.

12             THE COURT:  You rest?  Okay.

13             MR. SHURN:  Your Honor, with them resting, I move

14    for directed verdict.  There's a contract in place, they

15    have failed to honor it post-petition, they did not

16    terminate it pre-petition.  It stays in place.  They've got

17    adequate protection.  They can come back here in 90 days and

18    see if the Debtor's able to do something, argue something

19    different, but as a matter of law, there is a contract in

20    place right now.

21             THE COURT:  All right.  I'll carry that, so why

22    don't you put on your witness.

23             MR. SHURN:  Very good, Your Honor.

24             THE COURT:  Okay.

25             MR. SHURN:  So Your Honor, do you mind if I just

1    run to the restroom, and we take a three-minute break

2    (indiscernible)

3            THE COURT:  Oh, absolutely.  Yeah, yes.  Yes,

4    sure.  And I'm going to have to take -- It's 9:20.  I'm

5    going to have -- I have a lunch appointment, so I'm going to

6    try to leave around noon, and come back around 1:00, 1:15.

7    Okay?

8            MR. SHURN:  So Your Honor, what I will try to do,

9    since now it's technically my show, I will try to get done

10   before then.  And hopefully, we can have closing argument

11   before then, Your Honor.  I'll do my best.

12           THE COURT:  Okay.  All right.  Thank you.

13           All right.  Yeah, why don't we -- It's 9:22.  Why

14   don't we come back at 9:30?

15           MR. SHURN:  Thank you, Your Honor.  Appreciate it.

16   (Brief recess.)

17   (Back on the record.)

18           MR. SHURN:  I'm ready, Your Honor.

19           THE COURT:  All right.  Mr. Zaniewski, you're

20   still under oath.

21           MR. ZANIEWSKI:  Thank you, sir.

22   DIRECT EXAMINATION

23   BY MR. SHURN:

24   Q    Sir, are you a lawyer?

25   A    No, sir.

```
 1    Q    Are you CPA?

 2    A    No, sir.

 3    Q    Are you an accountant?

 4    A    No, sir.

 5    Q    Okay.  Did you graduate from college?

 6    A    No, sir.

 7    Q    Okay.  Did you graduate from high school?

 8    A    Yes, sir.

 9    Q    What high school did you graduate from?

10    A    Two.  The New Britain High School, and the Greater

11    Hartford Academy of Math and Science.

12    Q    And where are those located?

13    A    The first one's in New Britain, Connecticut, and the

14    other one is in Hartford, Connecticut.

15    Q    And you attended those simultaneously?

16    A    Yes, sir.

17    Q    And you have degrees from both of those?

18    A    Yes, sir.

19    Q    Okay.  Did you attend college?

20    A    Yes, sir.

21    Q    Where?

22    A    I went to Baruch College, in Manhattan, the Zicklin

23    School of Business.

24    Q    Okay.  For what?  A B.A. in business, or what?

25    A    A Bachelor's of Entrepreneurship.  I believe it was a
```

1    B.B.A., or something like that.

2    Q    But you didn't graduate.  Is that correct?

3    A    Yeah, I have one -- I missed one English, freshman

4    English course that I just never went back to get.

5    Q    Okay.  And what year was that, that you ceased

6    attending that college in Manhattan?

7    A    2011.

8    Q    Okay.  So did you have experience, when you were in

9    college, in this digital currency space?

10   A    No.  In 2011, digital currency was at its infancy.

11   Q    Okay.  So did you have jobs while you were in college?

12   A    Yes, I did.

13   Q    What were those jobs?

14   A    I was a DJ.

15   Q    You were a DJ?

16   A    Uh-huh.

17   Q    Quinceañeras, bar mitzvahs?  Where were you a DJ?

18   A    I DJed at every nightclub in New York City, and across

19   the world as well.

20   Q    Okay.

21   A    Tokyo, all over.

22   Q    Okay.  Were you on TV because you were a DJ?

23   A    Yeah, I was on a TV show on BET, called Master of the

24   Mix.

25   Q    What, just one episode?

1    A    No, the whole season.

2    Q    The whole season.  Okay.  So when did you start having

3    experience in this digital currency space?

4    A    In 2000 -- roughly 2015, I got introduced to the

5    blockchain by friends of mine in Los Angeles.

6    Q    Have you had any success in the digital currency, aside

7    from these issues with ORB and Bitmain?

8    A    Yeah.  I launched a very successful NFT in the bear

9    market of 2022.

10    Q    Okay.  Is this your first lawsuit, where you've been

11    sued?

12    A    Yes, this is my first lawsuit.

13    Q    Did you ever sue anybody before?

14    A    No.

15    Q    Are you surprised you find yourself here today, sitting

16    in Bankruptcy Court and being sued?

17    A    Quite frankly, yes.

18    Q    Is that not where you thought you would be today?

19    A    No, it's not.

20    Q    So you're familiar with Bitmain's motion to lift stay.

21    Is that correct?

22    A    Correct.

23    Q    And in response to that, did ORB Energy add them as an

24    additional named insured on their insurance?

25    A    Yes, sir.

1    Q    Okay.  So let's figure out how this started.  My

2    understanding is you met with a Bitmain representative in

3    Hong Kong at some point in time.  Is that correct?

4    A    Yes, sir.

5    Q    When was that, and who did you meet with?

6    A    In the summer, or the late summer, September of 2023, I

7    met with Ryan Zhao at the Ritz-Carlton in Hong Kong.

8    Q    Where at in the Ritz-Carlton?

9    A    One of the top floors.

10   Q    What did y'all discuss?

11   A    We discussed a partnership with Bitmain, and you know,

12   basically, the ability, if I could find power, for us to be

13   a host, and to be a very large host, if we could find

14   massive amounts of power.

15   Q    What do you mean, find power?  What does that mean?

16   A    So essentially, you know, Bitcoin mining is something

17   that requires a lot of power.  For instance, the site that

18   we have currently, it's operating, you know, give or take 15

19   megawatts, which equates to about 30,000 homes.  And the

20   Texas energy grid, or any grid just readily allows this sort

21   of capacity to be dished out, and so you kind of have to

22   find where the excess generation is on the grid, and then

23   convince a power company to give you a contract in order to

24   pull it.

25   Q    So did you ever question why is Bitmain asking you to

 1   be a host, as opposed to they just do this in China?  Why

 2   come here to you, and do it in Texas?  Did you ever think

 3   about that?

 4   A    Yeah, I did.

 5            MR. SPARKS:  Objection, Your Honor.  Calls for

 6   speculation.

 7            MR. SHURN:  I asked if you thought about it.

 8            THE COURT:  And I think he said yes.  So why don't

 9   you go to the next question.

10            MR. SHURN:  Yes, sir.  Yes, sir.

11   BY MR. SHURN:

12   Q    What did you think about it?

13   A    Well, at the time, China banned Bitcoin mining, so the

14   Chinese can't do it themselves, so it made perfectly logical

15   sense that they were trying to come to America, where we

16   have cheap power, and do it here.

17   Q    So what was your understanding when you met with him --

18            MR. SPARKS:  (indiscernible)

19            THE COURT:  Hold on.

20            MR. SHURN:  Oh, I'm sorry, Your Honor.  I'm sorry.

21   Go ahead.

22            MR. SPARKS:  He's not been proffered as an expert

23   on Chinese law, for one thing.  Also, no foundation for him

24   to have any knowledge about Chinese law.

25            THE COURT:  Well, I don't know that he's talking

1    about Chinese law.  I mean, I think what he said is it's his

2    understanding that they had banned Bitcoin mining, and I

3    don't know that that's interpretation.  He's not giving a

4    legal opinion.  I think he's stating a fact.  So overruled.

5    BY MR. SHURN:

6    Q    So when you met in Hong Kong with Ryan, what was your

7    understanding of what a Bitmain host was?

8    A    You know, essentially a partner that could come or go,

9    find power, build a site, and prepare it for their machines

10   and their cooling systems.

11   Q    Who was at that meeting?

12   A    It was me and Ryan Zhao.  That was it.

13   Q    Nobody else?

14   A    Nobody else.

15   Q    No translators?

16   A    No.

17   Q    Did y'all understand each other?

18   A    Yeah.

19   Q    So when you left that meeting, what was your mindset?

20   What were you thinking?

21   A    I was thinking, wow, this is an incredible opportunity,

22   and this is something that I could actually go and do and

23   execute on.

24   Q    And what do you mean by go and do and execute?  What is

25   it you were setting yourself to go do?

1    A    Find a power contract, purchase a piece of land, and

2    build the infrastructure required to set up a mining

3    operation, and get things like internet going, and a control

4    room, and wiring.  Stuff like that.

5    Q    Well, how did you know you had to do that stuff?  How

6    did you know that those were the steps?

7    A    You know, for one, he gave sort of a requirement list

8    of what the host has to prepare for, and provided, you know,

9    a basic rundown of what the site needs to be.  It has to

10   have access to sufficient water, for instance, in order to

11   operate hydro cooling machines.

12        And I also, I had, you know, Parker, who had been

13   running a facility, and he had been sort of teaching me what

14   it takes to run a facility.

15   Q    Okay.  So your testimony is they gave you instructions.

16   Is that correct?

17   A    That's correct.

18   Q    Okay.  We'll do that in a minute.  Did you guys discuss

19   the term sheet when you were there at that meeting in Hong

20   Kong?

21   A    Yes.  So at that meeting, Ryan presented me with like,

22   you know, version 1 of a term sheet, which at the time was

23   quite confusing to me.  But he walked me through all of the

24   steps, and all of the, you know, complicated jargon and

25   complicated formulas that went into, you know, sort of what

1    this arrangement would entail.

2    Q    Were you excited about the opportunity?

3    A    Absolutely.

4    Q    Why?

5    A    Because I did some math, and Ryan told me that if we

6    got this facility up and running, that there was much more

7    demand from the Bitmain side, up to 500 megawatts.  And I

8    did the math.  If we were to power on a site that was 500

9    megawatts, that company would then produce a net profit of

10   north of $250 million a year, which at a very simple

11   multiple would -- or you know, a very simple 8x multiple

12   would make our company a $2 billion company.

13   Q    So when you say your company, so you're talking about

14   ORB Energy that's the Debtor in this bankruptcy.  Correct?

15   A    Correct.

16   Q    When did you form that company?

17   A    In November of -- I believe it was November 16th, 2023.

18   Q    So that's after this meeting?

19   A    Correct.

20   Q    Okay.  And you're an employee of that company.

21   Correct?

22   A    Correct, CEO.

23   Q    All right.  And you get a salary?

24   A    Yeah.

25   Q    Post-petition you haven't got a salary, have you?

1    A    No.

2    Q    Okay.  So pre-petition, you received a salary.  What

3    were the components of that salary?

4    A    It was basically, you know, kind of paying for my

5    living expenses, etc., while I traveled around, and tried to

6    raise more money so that we could, you know, build more

7    sites, work to getting up to that 500 megawatts.

8    Q    So there was discussion with Bitmain then, between you,

9    about building an additional site on top of the one that

10   we're here today about.  Isn't that correct?

11   A    Yeah, so inside of this contract, it's -- You know, our

12   first site was leg one of a 30-megawatt contract.  And so we

13   were required to build another 15 megawatt site, or somehow

14   get to 30 megawatts.  And then I multiple times asked Ryan

15   the question, and he responded by email, that they still had

16   demand for the 500 megawatts.  So I was actively pursuing

17   finding sites where we could get to that 500 megawatts.

18   Q    So the way I understood your testimony is ORB then

19   needs to go get some real property.  ORB then needs to go

20   get some access to electricity.  ORB needs to get some

21   access to some water.  ORB needs to put together some

22   infrastructure.  Did ORB do any of that?

23   A    Yeah, we did.

24   Q    What did you do?

25   A    We went and we purchased the property in Van Vleck,

1    Texas.  We drilled two wells, with a capability of pumping

2    120 gallons per minute of water.  We leveled the land, built

3    limestone crush-rocked roads.  We hired a concrete guy to

4    build pads for these cooling systems and whatnot to sit on.

5    And we installed a fence, gate, and got internet, and you

6    know, figured out networking, purchased networking servers,

7    and stuff like that.

8    Q    Okay.  And you did all that on reliance on your meeting

9    in Hong Kong?

10   A    Yes.

11   Q    Okay.  Will you please turn to what I filed here as

12   Exhibit 39-4, please?

13            THE COURT:  Okay, hold on a second.

14            MR. SPARKS:  I'm going to object to his -- his

15   legal conclusion there about reliance.  But also, this is

16   irrelevant because it's parol evidence, and we have two

17   contracts that are fully integrated, with clauses that say

18   that they are complete agreements within themselves.  So I

19   just generally object to this testimony, where they're going

20   back and talking about Mr. Zaniewski's recitation of things

21   that supposedly happened in China before these contracts

22   were executed.

23            THE COURT:  Overruled.

24            MR. SHURN:  Thank you, Your Honor.

25   BY MR. SHURN:

1  Q    Will you please turn to 39-4, please, in your binder?

2  I think it's the bigger binder.

3         MR. SHURN:  Mister (indiscernible) could you

4  assist him, please?  I'll botch it up, I'm sure.

5         MR. ZANIEWSKI:  Two binders.  Little binder, big

6  binder.

7         MR. SHURN:  So he needs our binder, Your Honor.

8  Apparently, it's not there.  Mister (indiscernible) is going

9  to give him the binder he was using.

10  BY MR. SHURN:

11  Q    So 39-4, sir, please.

12  A    This goes up to 18.  Or --

13         THE COURT:  Yeah, mine goes up to 18, too.  So is

14  there an exhibit --

15         MR. SHURN:  Four -- four.  So Your Honor, the

16  Docket number is 39, and it's dash four.  I'm sorry --

17         MR. ZANIEWSKI:  Oh, I see it.  I see it.  All

18  right.  Exhibit 4 in the binder.

19         THE COURT:  (indiscernible)

20         MR. SHURN:  Yeah, I would just -- You know, the

21  local rules say you need to reference them by --

22         THE COURT:  Yeah.  Sure.  No, I got it.

23         MR. SHURN:  I'm sorry, Your Honor.  I'm sorry for

24  being confusing.

25  BY MR. SHURN:

1    Q    So 4, which is not technically Exhibit 4, because there

2    is another Exhibit 4, but that's how I've -- Okay.  Okay.

3         So would you please -- So you have it in front of you,

4    sir?  Is that correct?

5    A    Yes, sir.

6    Q    Okay.  Do you see on the first page where if you go

7    three dates down, the first date is 1/27/24, and then it's

8    1/27/24, and then it starts 1/31/24.  Will you please read

9    all the way down through the entry on 2/7/24 at 19.04.00?

10   Which are -- and I'll count the lines for you.  That's one,

11   two, three, four, five, six, seven, eight, nine, ten,

12   eleven, twelve, thirteen, fourteen, I believe it's fifteen

13   lines.

14   A    Okay.

15   Q    And say who's speaking, please.

16   A    Yeah.  RYAN ZHAO:  For your reference, sir.  RYAN ZHAO:

17   AntSpace Introduction V3.5 PDF, 26 pages.  JAMIESON HILL:

18   Got it.  We started LAN preparation in the morning.

19   JAMIESON HILL:  Is there a tech instruction manual for the

20   hydro towers?  RYAN ZHAO:  AntSpace HK3 V2.3-1XLS, two

21   sheets.  RYAN ZHAO:  AntSpace HK3 on-site installation

22   manual V1.3, 20 pages document.  RYAN ZHAO:  Good evening,

23   boss.  Please see the attached documents.  JAMIESON HILL:

24   High voltage work should start soon.  RYAN HILL:  Cool.

25   JAMIESON HILL:  Did you ever figure out if there are

1    AntSpace units in the U.S.?  RYAN ZHAO:  Checking.  Let you

2    know soon.  JAMIESON HILL:  Okay, cool.  Would be a good

3    time so they show up around same time as transformers.  RYAN

4    ZHAO:  Yes, we hope so too.  Because inventory changes

5    quickly, I am verifying the latest data with the team.  When

6    your PPA is ready, we will sign the term sheet, or the TS,

7    as soon as possible to ensure that your project and Bitmain

8    have paper basis.  JAMIESON HILL:  The PPA has been ready

9    for a long time.  We are good for now 15 megawatts at the

10   site 1, like we discussed.  RYAN ZHAO:  All of 15 megawatts

11   offered to Bitmain, or 5 megawatts will give to Merkle?

12   JAMIESON HILL:  --

13   Q    That's sufficient.  That's actually past what I asked

14   you to read, but that's absolutely fine.  Thank you so much,

15   sir.

16        So in that exchange, were they providing to you

17   instructions on what to do?

18   A    Yes, sir.

19   Q    Okay.  Will you please, then, turn to -- And at the

20   top, it's going to say 16 of 43, but the date on it is

21   3/25/24.  Are you on page 16 of 43 yet, sir?  You see the

22   banner across the top.

23   A    I see document page 9 -- Oh, 16 of 43.  Okay, perfect.

24   I got it now.

25   Q    Yes, sir.

1     So will you go down to the line -- it says 3/25/24, but

2     the timestamp on it is 4:44:20.  Will you start reading

3     there, and then read all the way down to -- So you keep

4     reading, and I'll tell you when to stop.  It's hard to

5     explain, and I don't think you'll understand.

6     A    Okay.

7     Q    Please start reading there, sir.

8     A    JAMIESON HILL:  The contract is garbage for me already.

9     JAMIESON HILL:  Everything I negotiated is gone.  JAMIESON

10    HILL:  Did this five times.  RYAN ZHAO:  I am curious about

11    the policy of what's miner is like now.  JAMIESON HILL:

12    Market is hot.  RYAN ZHAO:  Image omitted.  RYAN ZHAO:

13    Fully understand.  RYAN ZHAO:  Sad face.  JAMIESON HILL:

14    I'm done with closing at the deal.  JAMIESON HILL:  It's my

15    biggest annoyance in deals.  It's been 93%, then 95%.  Now I

16    spend all this money, and you want 98%.  JAMIESON HILL:  We

17    can't do it.  JAMIESON HILL:  Sorry.  RYAN ZHAO:  I

18    apologize for any inconvenience caused.  My sincerest

19    apologies.  I will contact the senior management of the

20    group later.  Sorry.  You get some more sleep.  I will try

21    to bring you some good news.  JAMIESON HILL:  Okay, thanks.

22    Q    Okay.  Stop there.  I'll have you stop there.

23         So what did you mean by those statements that, "The

24    contract is garbage for me already," "Everything I

25    negotiated is gone."  What does that mean?

```
 1   A     So essentially, you know, when we started -- Well, when
 2   we started negotiating the contract, we had some points that
 3   we wanted sort of removed, that we wouldn't kind of agree
 4   to, that weren't part of the term sheet.  And at some point
 5   in the final stages of negotiation of this, they basically
 6   created a brand new contract, and then put it in front of
 7   us.  So they sort of reset the negotiation of the contract
 8   with a brand new version of their contract, and took out a
 9   lot of the pieces of the puzzle that we had negotiated to
10   make the contract more even bias.
11   Q     Okay.  So would you please turn to page 31 of 43,
12   please, sir, and go down towards the very bottom?
13         Do you see on the bottom there, there's two lines at
14   6/7/24, and it's dated 15:22:46, and it starts with you
15   saying, "I really need to power -- ?"  Can you read those
16   two lines right there, and then go through the next page,
17   until I tell you to stop?
18   A     Sure.  JAMIESON HILL:  I really need a power on as much
19   as possible.  JAMIESON HILL:  Before summer is finished.
20   Even if we can't get 5 -- even if we can get 5 megawatts up
21   this month, it's better for us than nothing.  Hey, Ryan, can
22   we change the name on Parker's reservation to Roberto --
23   Robert Menendez, please?  Parker has to stay working at the
24   farm, so we'll bring Robert, our incoming CFO.  RYAN ZHAO:
25   Hi, Jamieson.  It's daytime in China now, but it's the
```

1    Dragon Boat Festival, a public holiday, so our progress

2    might be delayed until tomorrow.  I'm pushing for updates.

3    Please bear with us a little longer.

4    Q    Okay.  You can stop there.  You can stop.  So he didn't

5    respond to you with regard to powering on sooner rather than

6    later, did he, in that exchange?

7    A    No.

8    Q    Did you ever tell them that maybe you ought to find

9    another customer, since they switched the terms on you?

10   A    No -- Yes.

11   Q    Okay.  So will you go -- And I apologize for going out

12   of order.  I did a terrible job marking this.  Will you go

13   to page 7 of 43?  Do you see on that, on the date 2/29/24,

14   at 1:25:35, Ryan Zhao starts saying, "Yes, kind of.  I'm not

15   sure will I be available."  Will you read all that down 'til

16   you say, "LOL" at the 2/29/24?  And I'll tell you when to

17   stop, sir.

18   A    Sure.  RYAN ZHAO:  Yes, kind of.  I'm not sure I will

19   be available to come to Houston again for DD.  I will see

20   what's the best way to push forward.  JAMIESON HILL:  If you

21   don't come to Houston to see land, will it kill deal?

22   Should I prepare backup clients?  RYAN ZHAO:  Ha ha, no give

23   to others.  You killing me.  JAMIESON HILL:  I have my whole

24   life on the line for this deal.  Whoa.  Need it to go

25   through.  RYAN ZHAO:  We go through together.  JAMIESON

1    HILL:  And hopefully not get delayed.  Smiley face.  We

2    spending lots of money, so it's a bit stressful just

3    waiting, as I am sure you can understand.  RYAN ZHAO:  I

4    don't think so.  Should be fine.  JAMIESON HILL:  Who knew

5    telephone poles and wire cost $100,000 USD?  Whoa.

6    Q    You can stop there, sir.  So what was that exchange

7    detailing, in your mind?  In your mind, what did you think

8    you were discussing?

9    A    Well, you know, Ryan had to -- Or they basically were -

10   - At that point in time, they were telling me that they had

11   to send somebody to the site to pass some sort of

12   preliminary inspection, and it was -- it was taking long.

13   And I thought that Ryan was going to be the one who would

14   come to this site, and you know, and inspect it or pass it,

15   but he was telling me that he didn't have the time to.  And

16   I was asking him if Bitmain was going to pull out of the

17   deal.

18   Q    Well, why were you concerned Bitmain was going to pull

19   out of the deal?  Why would you ask that?

20   A    Because they were taking a long time.

21   Q    Is that the only time you ever raised about pulling out

22   of the deal?

23   A    No.  I probably asked him multiple times over the

24   course of nine months.

25   Q    So I've heard you use the word "bespoke" before, "This

1    is the bespoke data center."  What does that mean?

2    A    So a bespoke data center is a data center that's 100%

3    completely designed for one client, to the client's

4    specifications.  This data center, for instance, is bespoke

5    because A, one, it was designed per the schematics that were

6    given to us in the HK6 V3 instruction manual, and two,

7    because it cannot take or operate or cool any other

8    computers other than Bitmain's proprietary -- I'm sorry,

9    hydro cooling Bitcoin miners.

10   Q    So what about the concrete pad piece?  How does

11   installing concrete pads fit into it being a bespoke data

12   center?

13   A    So the cooling systems are -- There's one condenser

14   unit, and then there's one computer unit, and those have to

15   be separated six feet from one another so that the pipes

16   that connect the cooling container, to move the cooling

17   liquid and cool it, don't have to be adjusted, or fit on

18   site.

19   Q    So I mean, that's specific, you believe, to their

20   machines.  If you hosted somebody else's machines, it would

21   be configured differently.  Is that your testimony?

22   A    Every cooling system is a bit different.

23   Q    Okay.  Did you, again, ask them at that time, hey, I'm

24   about to put the pads in.  Are we still good?  Is this going

25   to work out?  Should I find another customer?

1    A    Yes, sir.

2    Q    What did they tell you?

3    A    They said, you know, we want your power, we want this

4    collaboration.  Don't give the power to anybody else.

5    Q    Why does he call you "boss" in all of those exchanges

6    that you've read? (indiscernible) "boss?"

7    A    I believe it's some sort of term of gratitude or

8    something.

9    Q    Okay.  So now I need you to turn to what's already been

10   admitted, and it's been referred to as the term sheet.  I

11   think it's Exhibit -- I don't know what exhibit it is,

12   Judge.  I have it marked as 39-1 because I did a poor job.

13   But it's the term sheet we've all been discussing.  Can you

14   find that in your notebook (indiscernible)

15           MR. SPARKS:  It's Exhibit 1.

16           THE COURT:  (indiscernible) Okay, good.  Good.

17   BY MR. SHURN:

18   Q    Will you tell me when you're there, sir?

19   A    I'm here.

20   Q    Okay.  What does it say at the very top?

21   A    Hydro cooling container hosting sale collaboration term

22   sheet.

23   Q    And -- Now, what does it say at the very top, the very

24   top line?

25   A    Bitmain.

1   Q    Okay.  It says Bitmain, doesn't it?

2   A    Yeah.

3   Q    Okay.  And then beneath it, it has a date.  What is the

4   date on it?  It starts with April.

5   A    April 11th, 2024.

6   Q    Okay.  If you go to terms of the agreement, which is

7   number 4, will you read that?  It starts with "A term

8   effective -- "

9   A    "A term effective from the date of execution of this

10   agreement, and expiring the third anniversary of the date on

11   which the first batch of hosted miners are powered on.

12   Commencement date, effective date, August 11th, 2024 -- "

13   Hold on, I'm sorry -- I can't read it.  That's probably

14   2025.  "End date, three-year anniversary of initial date,

15   July 31st, 2027."

16   Q    Okay.  Will you please turn to what's marked on there

17   at the top of that banner 3 of 16, please?  Are you there

18   yet, sir?

19   A    Yes, sir.

20   Q    Okay.  Do you see in the second -- or it's the second

21   box on there, but it's labeled 9, Deposit.  And then, will

22   you read starting on number 2, all the way -- Just do that,

23   read number 2, A through D, sir.

24   A    You mean Deposit 9?

25   Q    (indiscernible)

1    A    Oh, number 2.  Oh, okay.  Never mind.  I see it.

2    Q    See where it says number 2, and it says "Payment time?"

3    A    Yeah, I -- yeah, I got it.  "Payment time, upon the

4    execution of the agreement, and the applicable service

5    order, Party A shall pay the deposit on or before the

6    seventh business day from the completion of the following

7    construction and equipment, and the date Party B has

8    provided Party A with supporting documents to Party A's

9    satisfaction, and upon passing the inspection by Party A.

10        A, the high voltage, medium voltage, and low voltage

11    transformers are at the data center facility.

12        B, the wiring between the high voltage and low voltage

13    transformer is completed.  The construction of

14    infrastructure, including but not limited to the site's

15    hardening of the data center facility, construction of

16    facilities and buildings are completed, the site protection

17    facilities of the data center are set up, and the data

18    center facility has the capability of basic safety

19    protection."

20    Q    And then start 3, but I just want you to read until it

21    says Article 6.

22    A    Okay. "Upon Party B completes the construction of the

23    facility, and passes the inspection of the site with

24    capability of connecting to power, Party A covenants to

25    deliver the hosted miners to the data center facility of

1    Party B in accordance with the quantity as stipulated in

2    Article 6."

3    Q    Okay.  So were the servers delivered?

4    A    Yes, sir.

5    Q    Okay.  Were the containers delivered?

6    A    Yes, sir.

7    Q    Okay.  Will you please move to page 9 of 16?  You

8    there, sir?

9    A    Yes, sir.

10   Q    Do you see 19, where it says, "Ownership of miners?"

11   A    Yes, sir.

12   Q    And will you read number 1, please.

13   A    "Party B acknowledges and agrees that the hosted miners

14   are assets of Party A, or any third party designated by

15   Party A owner, and owner shall have the property interest in

16   the hosted miners."

17   Q    So that's proprietary, but other than that, I think you

18   read that correctly.

19   A    Oh.

20   Q    And there's similar language to that in the two other

21   agreements as well, isn't there?  Similar.  Not the same,

22   similar.

23   A    Yes, sir.

24   Q    Okay.  Will you then turn the page, I believe, to 10 of

25   16?  And then, at the very top, it says number 20.  And

1   again, what does it say at the very top?  Does it say

2   Bitmain?

3   A    Bitmain.

4   Q    And that's across all these pages.  Isn't that correct?

5   A    That's correct.

6   Q    Okay.  So if you look at 20, where it says transfer of

7   miners, will you read the entirety of number one, please?

8   A    "If owner transfers all or part of the hosted miners,

9   Party B shall have the priority right to purchase on the

10  same terms and conditions.  Owner shall notify Party B of

11  the transaction terms and conditions seven days prior to the

12  plan transfer.  If Party B waives its priority right, fails

13  to respond to the notification, or fails to execute the

14  purchase agreement within seven days since the notification

15  date, owner shall be entitled to transfer the hosted miners

16  to any third party."

17  Q    Okay.  So did they ever say to you, hey, we're about to

18  sell to somebody?

19  A    Yes.

20  Q    They did?

21  A    Yeah.

22  Q    Oh.  Did they give you the opportunity to buy it?

23  A    No.

24  Q    Why?

25  A    I don't know.

```
 1                 MR. SPARKS:  Objection, Judge.  It's hearsay.
 2                 THE COURT:  What's hearsay about it?
 3                 MR. SPARKS:  That they told him that they were
 4      going to tell the miners to somebody, but there's nothing in
 5      evidence on that point.
 6                 MR. SHURN:  (indiscernible) Your Honor.
 7                 THE COURT:  Yeah, to --
 8                 MR. SPARKS:  There's no evidence that the
 9      statement was ever made.
10                 THE COURT:  Well, he's -- well, he's talking about
11      what they told him.  Right?
12                 MR. SPARKS:  Yes, Your Honor.
13                 THE COURT:  Overruled.
14                 MR. SHURN:  Thank you, Your Honor.
15      BY MR. SHURN:
16      Q    So that right of first refusal that you just read, was
17      that important to you?
18      A    Absolutely.
19      Q    Why?
20      A    Because it's -- You know, I wanted to own -- I wanted
21      to own these miners.  When we started this whole thing, this
22      entire partnership was a way for -- You know, I started out
23      with Bitmain as a customer.  I purchased $150,000 of their
24      machines, you know, $110,000 with them directly, and that's
25      how they found me.  And so I wanted to, you know, I wanted
```

```
 1   to be in the business of being a Bitcoin miner.  I wanted to
 2   build a big company, I wanted to go public, I wanted to have
 3   a huge exit, just like, you know, any other tech founder in
 4   San Francisco, or anywhere else.
 5   Q    Sir, will you look at what does Exhibit number -- I
 6   think it's number -- So it's the Host Sale Agreement, the
 7   Hosting Sale Agreement.  It's either 39-2, or it's Exhibit
 8   7.
 9             THE COURT:  39-2.  It's number 2.
10             MR. SHURN:  Very good.
11   BY MR. SHURN:
12   A    Got it.
13   Q    Good, good.  So at the very top of that, what's the
14   name on there?
15   A    Bitmain.
16   Q    Okay.  What's the date of this agreement?
17   A    June 19th, 2024.
18   Q    And you admit this was signed after the term sheet was
19   signed.  Right?
20   A    That's correct.
21   Q    Okay.  If you go down to C on that first page, and
22   you've testified about this already, it talks about
23   products.  Correct?
24   A    Yes.
25   Q    And your prior testimony for Mr. Sparks was that's not
```

1    the miners, that's the containers.  Right?

2    A    Correct, in this agreement.

3    Q    Right, in this agreement, the products are the

4    containers, not the miners.  Correct?

5    A    Correct.

6    Q    Okay.  Will you turn to page 7, please?  So you know,

7    these are definitions in the contracts, and I'm around S and

8    T.  Can you identify for me where self-mining is defined in

9    this agreement?

10   A    It's not.

11   Q    It's not defined, is it?

12   A    No.

13   Q    In your opinion, is mining to a test pool self-mining?

14   A    No.

15   Q    Okay.  So if you go to page 20 of 63, you'll see

16   there's a paragraph 13.1.  It starts with, "Entire agreement

17   and amendment."  Do you see that?

18   A    At 20?  Oh, yes, I -- yes, sir.

19   Q    Okay.  So will you read the very first sentence of

20   13.1?  And also read the subject heading.  Start with

21   "Entire agreement and amendment," please, sir.

22   A    Sure.  "Entire agreement and amendment.  This

23   agreement, appendices, schedules, annexes, and exhibits

24   constitute the full and entire understanding and agreement

25   between the parties, and supersede all other agreements

1   between or among any of the parties with respect to the

2   subject matter hereof and thereof."

3   Q    Okay.  All right.  So are the servers the subject

4   matter hereof?

5   A    No.

6   Q    The containers are.

7   A    Correct.

8   Q    Okay.  Let's go to what I believe is Exhibit 3, which

9   is the Hosting Services Agreement.  Can you please turn to

10  that, sir?

11  A    I'm here.

12  Q    All right.  Well, what does it say at the very top?

13  A    Bitmain v6.6.4.

14  Q    Okay.  Will you turn to page 8 of 50, please, sir?  And

15  it starts -- It's 3.4, Deposit, and it starts with A, and it

16  bleeds onto the next page.  I need you to read all of A,

17  please, sir.

18  A    Sure.  "Payment of deposit.  For each of the batch of

19  hosted servers set forth in Appendix 1, Bitmain shall pay

20  the service provider the deposit in accordance with

21  paragraph 2.2 of Appendix 1 on or before the seventh

22  business day from the date on which Bitmain has provided

23  documentation that the service provider has sufficient

24  procurement that the data center facility has satisfied the

25  conditions of payment of deposits set forth in Exhibit A of

1    Appendix 1, except otherwise agreed by both parties in the

2    Appendix 1."

3    Q    Okay.  And is the Exhibit A to this completed?

4    A    Yes, sir.

5    Q    Okay.  So I need you then to go to page 12 of 50,

6    please, sir.  And do you see where it says 3.6, Invoice

7    Discrepancy Resolution and Payment?

8    A    Yes, sir.

9    Q    So I need you to read B, and then read that i with that

10   as well.  So first read B, sir.

11   A    "Revision against objection and payment.  Bitmain shall

12   be entitled to raise to service provider any objection to an

13   invoice, including its attachments, issued by service

14   provider in accordance with Article 3.6(a) within five

15   business days upon receipt of such invoice."

16   Q    Okay.  So five business days is what this says for them

17   to object upon their receipt.  Is that correct?

18   A    Correct.

19   Q    Okay.  Will you read i, then?

20   A    "Except as otherwise agreed by both parties, in the

21   event Bitmain raises no objection to an invoice or its

22   attachments within the aforementioned period, it shall be

23   deemed that Bitmain has approved the invoice, and Bitmain

24   shall pay to the service provider the hosting fee in the

25   invoice within seven business days after Bitmain's receipt

1    of the invoice subject to the settlement mechanism in

2    accordance with Article 3.6(b)(3).

3    Q    Okay.  I need for you to read, sir -- I need you to

4    stop before the "and."  So you're going to read four --

5    three-and-a-half lines, and you're going to stop with the

6    word "receipt of invoice" on paragraph B2, please, sir.

7    A    "In the event Bitmain raises any objection to an

8    invoice and/or its attachments within the aforementioned

9    period, Bitmain shall pay the undisputed amount of hosting

10   fee within seven business days after Bitmain's receipt of

11   the invoice."

12   Q    Will you go back, sir, to Exhibit 2, please?  And I

13   need you to look at page 40 of 63.

14   A    I'm here.

15   Q    All right.  So you're familiar with this 5.4 section on

16   the bottom of page 40, sir.  Is that correct?

17   A    Yes, sir.

18   Q    Okay.  Look, I want you to read 5.4 all the way through

19   C, the entire thing.  Please read it into the record.

20   A    Okay.  "If hosting provider, including hosting

21   provider's employees, as well as maintenance and operation

22   companies and their employees working with the hosting

23   provider, utilizes Bitmain's hosted servers for self-mining

24   purpose, hosting provider shall return the proceeds of

25   mining to Bitmain within seven calendar days.  Additionally,

1      hosting provider shall bear all hosting fees for the current

2      period, the Operation and Maintenance Service Agreements

3      between the hosting provider and Bitmain, if any, shall be

4      automatically terminated, and Bitmain will take over the

5      operation and maintenance for the hosted servers, and

6      Bitmain shall have the right to immediately terminate all or

7      part of this agreement without incurring any liability for

8      breach of this agreement."

9      Q    Okay.  And it's your testimony that you did not self-

10     mine.  Is that correct?

11     A    That's correct.

12     Q    Okay.  But this gives them a lot of options, A, B, and

13     C.  They could take over the facility, it appears to say, or

14     they could immediately terminate some or all.  Is that your

15     understanding of this?

16     A    Yes, sir.

17     Q    If you self-mine, they have options.

18     A    Yes, sir.

19     Q    Okay.  So I want to talk to you a little bit about the

20     delivery of these items.  So you know, you testified that

21     you built it.  Correct?  In other words, you got the land,

22     you said.  Did you get the electricity?

23     A    Yes, sir.

24     Q    Okay.  And you put in the -- what are they call wells?

25     A    Yes, sir.

1    Q    And the pads, and everything?

2    A    Yes, sir.

3    Q    Okay.  So Bitmain was happy with your construction?

4    A    Absolutely.

5    Q    Okay.  And then they delivered the containers.  Isn't

6    that correct?

7    A    Yes, sir.

8    Q    When was that?

9    A    The containers arrived at our facility on or around

10   September 9th, 2024.

11   Q    How did they arrive?  Someone's car?

12   A    No, on -- They came from China via boat, and then they

13   were put on chassis, and delivered to our site.

14   Q    What are chassis?

15   A    Chassis are basically like a flatbed, that a 20-foot

16   container can sit on, and then it gets pulled by a truck.

17   Q    So it's like a semi-truck, or an 18-wheeler?

18   A    Pulled by a semi-truck, yeah.

19   Q    Okay.  How many semi-trucks showed up on the day to

20   deliver the containers?

21   A    The containers, I believe, took multiple days to be

22   delivered, three or four days.  We unloaded -- There was 30

23   containers in total, and we unloaded, I don't know, five to

24   eight a day, I would say.

25   Q    Well, how many trucks is what I'm asking you?

1    A     Thirty.

2    Q     Thirty trucks?

3    A     Yeah.

4    Q     Okay.  What, you and your -- Parker just picked them

5    up, and moved them?

6    A     No.  We had a crane that lifted them off of the

7    chassis, and placed them onto the pads.

8    Q     So who was there when you were picking these up with

9    the crane, and moving them?  Was a Bitmain representative

10   there?

11   A     There was at one point a guy, Park, that came.  But

12   mostly it was myself, our contractor --

13          MR. SHURN:  I'm not sure who that is, Your Honor.

14   If it's me, I apologize, with the feedback.

15          THE COURT:  I don't know.

16   BY MR. SHURN:

17   A     Okay.  And out contractor, Jimmy, and then, you know,

18   sometimes other sort of employees to kind of help move these

19   20-ton objects into place.

20   Q     Okay.  How many days did it take to move them into

21   place, and to be done with that piece?

22   A     You know, five days a week.  I'm not sure if there was

23   a weekend involved over that.

24   Q     Okay.

25   A     But typically when you ship something, they want all

```
 1    the stuff out of the port within 72 hours.  So we took
 2    delivery as fast as we could.
 3    Q    Okay.  What about the servers?  They were delivered
 4    too.  Right?
 5    A    That's correct.
 6    Q    So Bitmain, I mean, they delivered the servers, they
 7    delivered the containers.  Right?
 8    A    Well, we contracted the delivery service to deliver the
 9    containers, and they handled the delivery of the servers.
10    Q    They, being Bitmain, handled the delivery of the
11    servers?
12    A    Correct.  Yes.
13    Q    And when were those delivered?
14    A    Those were delivered on I believe it was the Monday or
15    Tuesday before Thanksgiving of 2024.
16    Q    Cold that year, or no?  Do you remember?
17    A    It was freezing.
18    Q    Okay.  Who was there on site when these were delivered?
19    A    It was myself, Parker, our contractor, Jimmy, and three
20    or four of our employees.  Also, James and Tommy Lee.
21    Q    Did you have any reason before today to believe that
22    Tommy Lee wasn't an employee or an agent of Bitmain?
23    A    No.
24    Q    He held himself -- Did you interact with him?
25    A    Yeah.
```

1    Q    He touched the machines?

2    A    Absolutely.

3    Q    Did he come with the other Bitmain agents and

4    representatives?

5    A    Yeah, he came with James.

6    Q    Did you have any reason to believe that he wasn't with

7    them?

8    A    No.  He represented himself as Bitmain personnel, and I

9    believe he arrived in the same car as James.

10    Q    Okay.  So how did that unloading happen?  Who was doing

11    that unloading?

12    A    So the servers came in a normal 18-wheeler, and we used

13    a pallet jack to move the pallets to the front of the truck,

14    and then we unloaded with a skid steer.

15    Q    How many 18-wheelers?

16    A    Three.

17    Q    Three 18-wheelers?

18    A    Correct.

19    Q    Okay.  So you guys were unloading them, and then doing

20    what with them?  What were you doing with the servers?

21    A    Unloading them, unboxing them, and placing them on the

22    racks.

23    Q    And turning them on?

24    A    Not immediately, no.  We were instructed to fill up an

25    entire box with miners, connect all the hose, and then pump

1    the cooling liquid in.

2    Q    Who instructed you?

3    A    Park.

4    Q    A Bitmain employee?

5    A    Yes.

6    Q    Okay.  And why is it important to hook all the hoses up

7    before you turn them on?

8    A    Well, if you don't hook the hoses up, water might spray

9    out.  But you want to fill up the system once to avoid

10   things like contamination, and you want the -- So

11   essentially, when you fill these systems up, all of the

12   hoses have air in them, and you want the air to kind of

13   like, dissipate.  You don't want to add more air to the

14   system, which then has to get gassed out by little gas

15   valves, which happens, you know, over the course of I'd say

16   8 hours or 12 hours.

17   Q    What's the purpose of the hydro-cool that you're

18   explaining?

19   A    The hydro-cooling is a more efficient way to cool the

20   miners.  There's not a lot of loud fans, and it allows the

21   chips to operate much more stably than the previous air-

22   cooled versions, which most people used.

23   Q    So is it just to cool them, or is it to regulate the

24   temperature, hot and cold?

25   A    Yeah.  Basically, yeah, hot and cold.  Obviously, when

1    they run, they generate heat, and then the heat keeps them,

2    you know, from freezing.

3    Q    Were you advised by any Bitmain representatives of a

4    freezing incident that may have happened with hydro-cooled

5    miners at another location?

6    A    Yes.  Park showed me a facility, photos of a facility

7    in Oklahoma, where there was a power outage, and the entire

8    facility froze, destroying, you know, millions of dollars of

9    machines and cooling systems due to, basically, water

10   bursting.

11   Q    And that had happened recently?  Or was that 10 years

12   ago?

13   A    That had happened prior to Bitmain inviting me to

14   Spokane, Washington to see a hydro-cooling site.  That

15   happened, you know, just 11 months or 12 months prior.

16   Q    Okay.  So pretty recent.

17   A    The last winter season.

18   Q    So you and the Bitmain representatives, Tommy Lee and

19   his crew, took off these servers right off the trucks,

20   unpacked them, and stuck them inside of the containers, and

21   powered them on.  Is that correct?

22   A    That's correct.

23   Q    So you power on these new servers.  Are they blank?

24   Are they already configured?  How does that work?

25   A    No, the servers, when you initially plugged them in,

1    these servers happened to be never run before, and they were

2    manufactured in December of 2022, and -- Yeah, they don't

3    just, like, start up and start hashing or anything.

4    Q    So what do you do?  Is it called configuring?  Is that

5    the right word?

6    A    Yeah, so you configure them to turn on.

7    Q    And who did that?

8    A    Myself, and Parker.

9    Q    And did the Bitmain representatives know you were doing

10   that when you were doing it?

11   A    Yeah.

12   Q    Okay.  Okay.  And so to run these machines, do they

13   have to be set to a test pool?

14   A    Yeah.  They have to be mining to something, or else

15   they don't generate any heat.

16   Q    So you need to turn them on to stop the freeze, and to

17   turn them on to stop the freeze, they've got to mine them

18   somewhere.  Is that correct?

19   A    That's correct.

20   Q    Okay.  So before the servers showed up, you issued an

21   invoice for the deposit, didn't you?

22   A    Yes, sir.

23   Q    And you issued it to -- Where did you send it?

24   A    I believe I sent it to Ryan Zhao.  He asked for it.

25   Q    You sent it to Ryan Zhao, what, out of QuickBooks?  How

1    did you send it?

2    A    Yeah.  It was created in QuickBooks, and then it was

3    sent to him.

4            MR. SHURN:  Your Honor, is 39-9 already admitted

5    into evidence?  I think it is.  That's how I have it marked.

6    But I don't know.

7            THE COURT:  Yeah, I believe it is.

8            MR. SHURN:  Okay.

9    BY MR. SHURN:

10   Q    So, sir, would you -- And I think it's in both books.

11   It's 39-9.  It would be -- Can you locate it?  It's a three-

12   page document.  It's --

13   A    I have it.

14   Q    Oh, you have it?  Okay.  So I mean, initially you sent

15   this invoice, and it didn't say Bitmain Technologies Georgia

16   Limited, it just said Bitmain.  Isn't that correct?

17   A    Yes, sir.

18   Q    Did they give you an instruction manual of how to

19   invoice?

20   A    No, sir.

21   Q    So you just put the name that was on all the contracts?

22   A    Yes, sir.

23   Q    Do you have the right address?

24   A    Yeah.

25   Q    Are you aware of any other Bitmain entity at 900 Old

1    Roswell Lakes Parkway in Roswell, Georgia?

2    A    No, sir.

3    Q    Okay.  When did you first send this invoice to them?

4    A    The first version of it would have been prior to the

5    arrival of the boxes.  I think the exact date is within the

6    first third of September of 2024.

7    Q    All right.  How many days went by before Bitmain made

8    any complaint about your invoice in any way?

9    A    Roughly -- roughly three months.  Ninety days.

10    Q    Three months?  Not five days, or seven days?

11    A    No.

12    Q    Okay.  Hmm.  If you go to the third page, 3 of 3, it

13    has on there, and it's labeled, and I'll say that maybe it's

14    a misnomer, I don't know.  I didn't label it.  But it says,

15    "Proof of invoice being delivered and opened by Bitmain 18

16    times."  What's all that about?

17    A    Yeah, so when we send the invoices, QuickBooks logs

18    when -- Quickbooks logs when -- Quickbooks logs when an

19    invoice is opened by the recipient, and it shows here that

20    it was opened on 9/4, 9/5, 9/9, 9/14, 10/8, and then it

21    started -- And then it was open again on 12/8, and then a

22    bunch more times after that.

23    Q    All right.  So more than five or seven days went by

24    after they received it before they complained that you

25    didn't -- that you used their trade name, and you didn't add

```
1    Technologies Georgia Limited.  Isn't that correct?

2    A    That's correct.

3    Q    Yeah.  So somehow you guys ended in loggerheads, and

4    the lawyers get involved sometime in December.  Is that

5    correct?

6    A    Yes, sir.

7    Q    So in December, there's this dispute between the

8    parties.  But did you think at that time that it wasn't

9    going to work out?

10   A    No, sir.

11   Q    Did they ever ask you to shut off the machines?

12   A    They didn't.

13   Q    Any of those letters from the lawyers, did they say

14   shut off the machines?

15   A    I don't recall all of those letters, yeah.

16   Q    We'll go through them in a second.  So a lot has been

17   said, apparently, about an offer.  Were they offered for

18   you, or to take possession of and take control of $200,000

19   in which you say was mined to a test pool as a credit

20   towards them, and they paid the rest of the invoice.  Is

21   that correct?

22   A    Yes, sir.

23   Q    So implicit in that is the invoice is undisputed.  They

24   just want a credit.  Isn't that so?

25   A    Yes, sir.
```

1    Q    Did they pay the undisputed amount?

2    A    No, sir.

3    Q    Ever?

4    A    No.

5    Q    Was it due within five or seven days?

6    A    Yes, sir.

7    Q    They didn't pay it, did they?

8    A    No.

9    Q    Okay.  So the first lawyer letter you got is December

10   12th.  Is that correct?  So, sir, that's Exhibit -- I

11   believe it's 15.  Is that right?  That's how I have it

12   marked.

13            THE COURT:  It's not Exhibit 15.

14            MR. SHURN:  What is it, Your Honor?  I apologize.

15            THE COURT:  Hold on a second.

16            MR. SHURN:  All right.  Thank you.

17            Hey, can you guys tell me, so I know what all

18   those letters are marked?  I have what they filed with the

19   Court, and it doesn't have it.  That way I'm not wasting the

20   Court's time.

21            THE COURT:  Which one (indiscernible)

22            MR. SHURN:  Because I believe they're only in

23   their exhibits, and it may be in their exhibit book as

24   number 15.

25            THE COURT:  (indiscernible)

```
 1              MS. CHADWICK:  (indiscernible) Exhibit 15.

 2              MR. SHURN:  Right.  So if you could go to their

 3      book for Exhibit 15, at least I can get that in front of the

 4      witness, Your Honor.  And it has already been admitted.  I

 5      just apologize, I don't --

 6      BY MR. SHURN:

 7      A    I'm here.

 8      Q    So why don't you sit there and read this to yourself,

 9      and then tell me whether or not it says to shut off the

10      machines.

11      A    It does not specifically say, shut off the machines.

12      It just says --

13      Q    Okay, that's fine.  That's fine.  I didn't ask what it

14      says.  I said, does it say shut off the machines?  In your

15      opinion, did Bitmain want the machines operating?

16      A    Yes.

17      Q    Right.  Isn't the whole goal of this whole thing is for

18      mining to occur?

19      A    Yes.

20      Q    Okay.  And your site worked.  Is that correct?

21      A    Yes.

22      Q    Okay.  So let's now turn to what's marked as Exhibit

23      17, which is the March 27th, 2025 letter.  And I want you to

24      look at that, too, and I want you to tell me whether or not

25      they said to shut off the miners.
```

 1   A     March 27th?

 2   Q     Yes, sir.  That is correct.  And I think it's in their

 3   exhibit book at number 17.

 4   A     Okay.  I read it.

 5   Q     Now does it say, "Shut off the machines?"

 6   A     No.

 7   Q     All right.  Let's go to April 3rd communication,

 8   please, sir.  Do you have that?  It's marked as Exhibit 21

 9   in their book.  Do you have that in front of you, sir?

10   A     Yes, sir.

11   Q     Okay.  Do you see on there that it references that 5.4

12   section of the agreement?

13   A     Yes, sir.

14   Q     And we read that out loud.  Right?

15   A     Yes, sir.

16   Q     And you testified that your understanding of the

17   contract was Bitmain had options.  They didn't just have to

18   terminate, they could have done something else.

19   A     Yes, sir.

20   Q     Okay.  I want you to read this letter, and I want you

21   to tell me, one, if it says, we terminate, and then two, if

22   it says, "Shut off the machines."

23   A     Okay.  I finished it.

24   Q     Okay.  Does it say, "We terminate -- ?"

25   A     No, sir.

1    Q    Does it say you, ORB, shut off the machines?

2    A    No, sir.

3    Q    It does say they're going to come out there, though,

4    and get their stuff, doesn't it?

5    A    Yes, sir.

6    Q    That's what it says.  Right?

7    A    Yes, sir.

8    Q    Did they, in fact, go out there?

9    A    Yes, sir.

10    Q    With tractor trailers?

11    A    No, sir.

12    Q    With cranes?

13    A    No, sir.

14    Q    Who went out there?

15    A    Ms. Kasi Chadwick, along with about 20 people in

16    unmarked vehicles, drinking alcohol, and passing around

17    cigarettes.

18    Q    Cigarettes?  Okay.  Okay.

19            MR. SHURN:  Your Honor, I filed this morning

20    rebuttal exhibits, Exhibits 1, 2, and 3, and Exhibit 1 of

21    that are the automatic pictures that were taken by the

22    security system from the company.  And they're stamped

23    4/10/2025, and these are the people that showed up, and I

24    move to admit that in the evidence.

25            MR. SPARKS:  We object because he hasn't laid the

1    predicate to get these in yet, Your Honor.

2              THE COURT:  Okay.  Why don't you lay a predicate?

3              MR. SHURN:  Well -- Yeah, that will be a little

4    difficult.

5    BY MR. SHURN:

6    Q    Who took these pictures?

7    A    The pictures were generated by our CCTV.

8    Q    In your opinion, do you have any reason to believe that

9    your CCRTV doesn't take proper pictures of what's adequately

10   depicted and what is really happening?

11   A    No.

12   Q    Do you believe, then, with your testimony, that these

13   pictures properly depict the scene on the morning of April

14   4th -- I'm sorry, on the morning of April 10th, 2025.

15   A    Yes, sir.  I watched these live video streams on the

16   monitors of the CCTV in real time.

17   Q    Okay.

18             MR. SHURN:  Your Honor, I move to admit them.

19             MR. SPARKS:  We object based on optional

20   completeness, Your Honor, because he just said these are

21   from a video that they haven't produced.  It's selectively

22   taken still frames from a video, and they brought them in

23   here and excluded the rest of the video, so we don't know

24   what's on it.

25             THE COURT:  Well, I mean, if you want him to

1    produce the video, you can ask him to do that, and we'll

2    hold the evidence open to see the whole video.  But to the

3    extent that he's testified that he watched the whole video

4    real time, and that these depict accurate frames, on that

5    basis, I'm going to allow it in.  To the extent that you

6    want the video produced, and you want to put that all in

7    evidence, I'll hold the evidence open until that happens.

8            MR. SPARKS:  Yes, Your Honor.  And we do.  Because

9    for instance, they've excluded the part where somebody was

10   walking up to the camera with a temporary restraining order

11   on this day.  So we would like that.

12           THE COURT:  Well, I mean, it is -- The video will

13   show it is what it is.  But I'll let you --

14           MR. SHURN:  Your Honor, I will withdraw admitting

15   these in the evidence, and I would just rely on his

16   testimony that no semi trucks pulled up, and 20 people or so

17   showed up with unmarked clothes, and no means of cranes or

18   anything to remove it.  I'll withdraw the pictures, Your

19   Honor.

20           THE COURT:  All right.

21           MR. SHURN:  That's fine.  That's fine, Your Honor.

22   Thank you.

23   BY MR. SHURN:

24   Q    When is the first time you ever testified in court?

25   A    The first, the first hearing we had in Matagorda

1   County, ORB Energy v. Bitmain.

2   Q    Okay.  Were you also there at the temporary injunction

3   hearing that was on the 28th and 29th of April?

4   A    Yes, I believe that's the first time I testified in

5   court.

6   Q    Okay.

7         MR. SHURN:  Your Honor, this morning I filed

8   rebuttal evidence on the issue of whether or not the

9   contracts were terminated pre-petition.  And on page 120 --

10  BY MR. SHURN:

11  Q    So sir, do you have that in front of you?

12  A    Where am I going?

13  Q    You're going to go to page 120, line 9 through line 12,

14  and you're going to read that to the Court.

15        THE COURT:  It's Exhibit 2.  Exhibit 2.

16        MR. SHURN:  Yeah, I'm sorry, Your Honor.  Rebuttal

17  Exhibit 2, in the small notebook.  Yes, sir.  I apologize.

18  BY MR. SHURN:

19  A    Small notebook, and where am I going?

20  Q    Page 120, sir.  So it's marked at the top.

21  A    120 -- okay, got it.  (indiscernible)

22  Q    And then on page 120, you're going to read line 9

23  through 12.

24  A    I am missing page 120, unfortunately.

25        THE COURT:  No, it's the first -- it's the very

1    first page.

2              MR. ZANIEWSKI:  Oh, it is?  Okay.

3              THE COURT:  (indiscernible) the very first page.

4              MR. SHURN:  (indiscernible)

5              THE COURT:  They made it easy.

6              MR. SHURN:  (indiscernible) both places?

7              THE COURT:  Yeah, it's in there.

8    BY MR. SHURN:

9    Q    Are you there, sir?

10   A    Yeah.  Yes, sir.

11   Q    Okay.  Thank you.  So will you read the question from

12   Mr. Jurgensen, and the answer by the Bitmain representative,

13   which is line 9 through 12, sir?

14   A    Line 9, Question:  As you sit here today, to your

15   knowledge, as a corporate representative for ORB Energy, has

16   Bitmain ever actually terminated the Hosting Sale Agreement?

17   Answer:  No.

18   Q    Okay.  So if we go to what's marked as Exhibit 38 --

19   A    In their binder?

20   Q    Yes, sir, that is correct.

21             THE COURT:  Who was that testifying?

22             MR. SHURN:  Steven Feng, Your Honor.  Their

23   corporate representative at the hearing.

24             THE COURT:  Then the question doesn't make sense

25   to me.  Because it says, "As corporate representative for

1    ORB Energy."

2              MR. SPARKS:  Your Honor, their corporate

3    representative (indiscernible)

4              MR. SHURN:  Oh -- Oh, I misread it.  I misread it.

5    I withdraw that, Your Honor.

6              THE COURT:  Okay.

7              MR. SHURN:  I misread it.  I apologize.  I

8    apologize.  I misread that.  So -- understood.  Understood.

9    And I can have Mr. Parker testify to that.  I apologize.

10   That's -- that's on me.

11             THE COURT:  Okay.

12   BY MR. SHURN:

13   Q    At that hearing, did the Bitmain representative testify

14   that the contract was terminated?

15   A    They did not.

16   Q    Okay.  If you go to the July 16th correspondence, which

17   is marked as Exhibit 38, do you see that?  It's in their

18   book, their binder book.

19   A    I have 38 here.

20   Q    Okay.  And do you see three lines down, where it says,

21   "Is and remains terminated?"

22   A    I --

23   Q    Do you see that, or no, on Exhibit 38?  On the

24   (indiscernible)

25   A    Yes, sir, I see it.

1    Q    Okay.  In any of the previous correspondence that you

2    have now read, did any of it say it was terminated?

3    A    No, sir.

4    Q    Okay.  At the time of July 16th, was there already

5    State Court orders in place restraining action?

6    A    Yes, sir.

7    Q    Okay.  Did those court orders expressly say that

8    Bitmain could terminate?

9    A    No, sir.

10   Q    And the termination pursuant to that 5.4 section,

11   that's based upon self-mining.  Right?  Do we need to go

12   back to the contract to refresh your memory?

13   A    Oh, Section 5.4?  Yes, sir.

14   Q    Right.  And did you self-mine?

15   A    No, sir.

16   Q    Okay.  Okay.  So I need you to turn to my rebuttal

17   Exhibit 3, which is a letter from -- this is a letter from

18   your attorney, who at the time was representing ORB and you

19   individually.  And I want you to read it into the record.

20   It's obviously a lawyer's writing, but I'd like for you to

21   read it into the record.  It's Exhibit 3, from beginning to

22   end, please.

23   A    "Re cause 25F0135 ORB Energy Co. v. Bitmain

24   Technologies Ltd et al, 130th District Court, Matagorda

25   County, Texas, July 18th, 2025.

1          Dear Kasi, I am in receipt of your letter dated July

2     16th, 2025, titled 'Reformation of Contract Termination -- '

3              MR. SPARKS:  Your Honor, I object.  This is

4     hearsay.

5              MR. SHURN:  It is, but so are all the other

6     letters.  And we allowed them in.  They're all written by

7     lawyers, and they're hearsay.

8              THE COURT:  Let me read it -- Let me read it.

9              MR. SHURN:  Yeah, it's a response to her letter

10    from July 16th, that we just went over.

11             MR. SPARKS:  I think the critical difference

12    between this letter and the letter we just went through is

13    the former letter was a termination notice, and this is a

14    legal argument against a termination.

15             MR. SHURN:  Well, it's not a termination notice.

16    It's you saying it is, and remains.  It doesn't -- Nowhere

17    on there -- That's not -- That's a legal letter.  Just like

18    this is a legal letter, and this is in response to it, and

19    it shows the state of mind of the parties at the time in

20    July.

21             THE COURT:  Yeah, I'm not going to -- I'm going to

22    admit it, but not for the truth of the matter.

23             MR. SHURN:  Right.  Right.

24             THE COURT:  You know, just the fact that they

25    responded, and took the contrary position.  That's it.

```
 1            MR. SHURN:  Exactly.  Exactly, Your Honor.  And

 2    that's the only reason why I want to admit it.  I realize

 3    it's a letter from a lawyer, it's not a fact.

 4            THE COURT:  Yeah, I'm not going to admit it for

 5    the truth of the matter, just that they disputed the letter.

 6    That's it.

 7            MR. SHURN:  Very good.

 8    BY MR. SHURN:

 9    Q    So, sir, if you would just start again, just start

10    with, "Dear Kasi -- "

11    A    "Dear Kasi, I am in receipt of your letter, dated July

12    16th, 2025, titled Reformation of Contract Termination.  For

13    the reasons stated below, we dispute that Bitmain has

14    terminated either the Hosting Sale Agreement or the Hosting

15    Services Agreement, both of which remain in effect.  Your

16    letter incorrectly refers to alleged oral discussion, and

17    written communications allegedly stating that the Hosting

18    Sale Agreement has been terminated.  You also incorrectly

19    state that the Hosting Service Agreement never began.

20            First, Bitmain has never sent any communications,

21    written, verbal, or otherwise terminating either agreement.

22    Your client's cooperation representative admitted -- your

23    client's corporate representative admitted as much under

24    oath -- under oath at the temporary injunction hearing on

25    April 28th.
```

1      Second, there is no merit to your claim that the

2   Hosting Service Agreement never began.  That is patently not

3   true for many reasons, not the least of which is that

4   Bitmain made partial performance under the agreement by

5   delivering the servers, and demanding the benefit of a

6   contract.  Moreover, Bitmain materially breach the

7   agreements by failing to pay the amounts due to ORB Energy,

8   and such breach operates as a waiver of any attempt to

9   terminate, as stated in your letter.

10      The two agreements are fully integrated into one

11   another, and should be read as a single agreement.  My

12   client is entitled to recoupment in connection with his

13   claims under the agreements.

14      Your letter also attempts to invoke Section 5.4 of the

15   Hosting Sale Agreement, to claim that the termination was

16   effective upon the so-called self-mining.  Of course your

17   client knew about, and ratified ORB Energy's operation of

18   the servers since they were first delivered in November of

19   2024.  It was only after ORB demanded payment for the

20   amounts past due that Bitmain made this allegation.

21   Accordingly, the alleged attempt at termination under 5.4 is

22   ineffective.

23      Nothing in this letter is intended to be full or

24   complete statement of all my client's rights, claims, or

25   obligations in connection with the foregoing.  Nothing

1    stated or omitted from this letter is intended as a waiver

2    of any rights or claims, all of which are expressly

3    reserved.

4              MR. SHURN:  Pass the witness, Your Honor.

5              THE COURT:  All right.  Should we take a five

6    minute break?

7              MR. SPARKS:  Please.  Yes, Your Honor.

8              THE COURT:  Okay.  So it's 10:44, and we'll come

9    back at five minutes to noon.

10             MR. ZANIEWSKI:  Am I still under oath?

11             THE COURT:  You're still under oath, yes.  Yes.

12   And you know, obviously don't discuss your testimony.

13   (Brief recess.)

14   (Back on the record.)

15             THE COURT:  Please be seated.

16             All right.  Mr. Sparks, you can proceed.

17             MR. SPARKS:  Thank you, Your Honor.

18   CROSS-EXAMINATION

19   BY MR. SPARKS:

20   Q    Mr. Zaniewski, you testified earlier that you thought

21   about pulling out of the deal with Bitmain.  Right?

22   A    Yes, sir.

23   Q    But you didn't pull out, did you?

24   A    No, sir.

25   Q    And you signed the Hosting Sale Agreement, dated June

1   19th, 2024?

2   A   Yes, sir.

3   Q   And you signed the Hosting Services Agreement dated

4   June 9th, 2024?

5   A   Yes, sir.

6   Q   And you testified earlier that you read both of those

7   agreements before signing them.  Right?

8   A   Yes, sir.

9   Q   You looked at box 9 in the term sheet with your

10  attorney earlier, relating to the deposit.  Correct?

11  A   Yes, sir.

12  Q   Let's look at Exhibit six, page 3.

13  A   In your binder?

14  Q   Yes, please.  And do you see that this agreement

15  defines "deposit?"

16  A   What page?

17  Q   Page 3, the definition of the word "deposit."  Do you

18  see it?

19  A   Yes, sir.

20  Q   Okay.  Let's look at page 10.  Actually, starting on

21  page 9, do you see that this agreement governs delivery of

22  the hosted servers?  In the middle of that page, subsection

23  C.

24           MR. SHURN:  Objection, Your Honor.

25  (indiscernible) the word "govern."  It may address it.

```
1    BY MR. SPARKS:

2    Q    Do you see that it -- Yeah, I'll withdraw and restate.

3    Do you see that this agreement addresses delivery of the

4    hosted servers?

5    A    Delay in delivery of the hosted servers.

6    Q    Yes.  Now let's flip to -- And do you see down there,

7    in C1, where this agreement also addresses the deposit?

8    A    Yes, sir.

9    Q    And let's flip over to the next page.  Do you see in

10   subsection E and subsection F that this agreement also has

11   other provisions governing -- or addressing the deposit?

12   A    Yes, sir.

13   Q    Let's flip to page 40, please.  Do you see Section 2.2?

14   A    Yes, sir.

15   Q    And here it addresses and contains a breakdown for the

16   deposit.  Correct?

17   A    In the Services Agreement, yes.

18   Q    And you were the person responsible for invoicing.

19   Correct?

20   A    Yes, sir.

21   Q    And you understood that this agreement had provisions

22   relating to the deposit.  Correct?

23   A    Yes.

24   Q    Your attorney also showed you box 20 -- Your attorney

25   also showed you box 20 in the term sheet, that related to
```

1    ownership of the miners.  Correct?

2    A    I believe so, yes.

3    Q    Let's look at page 24.

4    A    This is the Services Agreement, sir?

5    Q    Yes, please.  And do you see Section 8, titled, "Title

6    and Ownership of Hosted Servers?"

7    A    Yes, sir.

8    Q    Do you believe that ORB Energy has a right of first

9    refusal to purchase the hosted servers?

10   A    That's what was promised to me, sir.

11   Q    Can you show me that in this agreement?

12   A    It's not in this agreement, sir.

13   Q    Okay.  Let's look at Exhibit 7, and we'll go to page

14   39.  And do you see at the bottom, Section 5, titled, "Title

15   and Ownership of Hosted Servers?"

16   A    Yes, sir.

17   Q    Okay,  Going over to the next page, do you believe that

18   this agreement contains the right of first refusal to

19   purchase the miners?

20   A    There is no language talking about first right of

21   refusal in this section, sir.  To the best of my knowledge.

22   Q    Earlier, when your attorney was showing you the term

23   sheet, you testified that Bitmain told you they were

24   transferring the miners.  Correct?

25   A    Yes, sir.

1    Q    Was that in writing?

2    A    Yes, sir.

3    Q    You don't have that writing with you today, do you?

4    A    It was an email.  I could pull it up on a phone, if

5    you'd like.

6    Q    Okay.  But you didn't look at it earlier with your

7    attorney, did you?

8    A    I believe I did send it to my attorney.  Not earlier.

9    Q    Did you look at it today with your attorney?

10   A    No, sir.

11   Q    Bitmain didn't notify you of the transaction terms and

12   conditions specifically, did it?

13   A    I'm sorry, what you just said confused me.

14   Q    Did Bitmain notify you of the transaction terms and

15   conditions for that transfer of the miners?

16   A    No.  The email stated that they would be -- that they

17   were to pick up the servers, and that they would be, like,

18   made ready for sale.

19   Q    Okay.  Did ORB respond within seven days?

20   A    I do not believe so, although I'm not sure what the

21   legal team at that time did.

22   Q    All right.  What was the date of that communication?

23   A    It would have been the day that -- I believe it was the

24   day Kasi Chadwick showed up for the first time to the site.

25   Q    And sitting here today, the hosted servers are still at

1    the facility.  Correct?

2    A     Correct.

3    Q     Let's look at -- Or while we're in Exhibit 7, let's go

4    to page 20.  Do you see the section titled, "Entire

5    Agreement and Amendment?"

6    A     Yes, sir.

7    Q     Is the term sheet an appendix to this agreement?

8    A     No, sir.

9    Q     Is it a schedule to this agreement?

10   A     No, sir.

11   Q     Is it an annex to this agreement?

12   A     I don't know what an annex is, sir.

13   Q     Is it attached to this agreement at all?

14   A     No, sir.

15   Q     And no, it's also not an exhibit to this agreement.

16   Right?

17   A     I do not believe so.

18   Q     Let's go to Exhibit 6, page 20.  That's the wrong page.

19   One moment, please.  That would be page 33, please.  And you

20   understand we're now in the Hosting Services Agreement.

21   Right?

22   A     Yes, sir.

23   Q     And you see Section 16.1?

24   A     Yes, sir.

25   Q     Is the term sheet an appendix to this agreement?

1    A    No, sir.

2    Q    Is it a schedule to this agreement?

3    A    No, sir.

4    Q    Is it an exhibit to this agreement?

5    A    I do not believe so, no.

6    Q    Is it an annex to this agreement?

7    A    Again, I don't know what that word means.

8    Q    It's not attached to this agreement in any way.  Right?

9             MR. SHURN:  Your Honor, I object, unless he means

10   physically attached.

11            MR. ZANIEWSKI:  Yeah, I --

12            MR. SPARKS:  I mean physically attached.

13            THE COURT:  Yeah, I think that's the question.

14            MR. SHURN:  Yes, sir.

15   BY MR. SPARKS:

16   A    Physically attached, no, sir.

17   Q    And you mentioned earlier that you took a salary from

18   ORB during 2024?

19   A    Yeah.  We're working out with the CPA what that

20   actually was.

21   Q    Do you remember when I took your deposition on

22   September 18th, 2024?

23   A    Yes, sir.

24   Q    Do you remember testifying that you did not take a

25   salary because that wasn't possible, because there was no

1   revenue?

2   A    Yes, sir.

3   Q    And you caused ORB Energy to loan funds to you

4   personally as well.  Right?

5            MR. SHURN:  Objection, Your Honor.  Calls for a

6   legal conclusion.

7            THE COURT:  I'm going to overrule that.  I think -

8   -

9            MR. SHURN:  And just so you know, it was booked as

10   a loan in the account (indiscernible)

11            THE COURT:  Okay, well -- But I mean, he can

12   testify if he knows the answer to the question.

13   BY MR. SPARKS:

14   A    Do you mind asking me that question again, sir?

15   Q    You caused ORB to loan funds to you personally?

16   A    Certain payments in there between me and -- myself and

17   the company, they were booked in certain ways that may have

18   been errorous, and the CPA is working to sort all of those

19   issues out.

20   Q    You're referring to times when you transferred money

21   from ORB accounts to your personal accounts.  Correct?

22   A    Correct.

23   Q    Those funds that you transferred were proceeds of

24   Bitcoin that was mined with the hosted servers.  Correct?

25            MR. SHURN:  Objection.  At what point in time,

1    Your Honor?  2025, 2024, I need a (indiscernible)

2    BY MR. SPARKS:

3    A    Between December 2024 until the petition date, the

4    funds that you transferred from ORB's account to your

5    account were proceeds of Bitcoin, mined with the hosted

6    servers.  Correct?

7    A    Some of which could have been, yes, sir.

8    Q    ORB didn't have any other revenue.  Right?

9    A    No, but we did have cash on hand at certain points.

10   Q    And you testified earlier that this is a bespoke

11   facility, designed just for Bitmain-specific servers.

12   Right?

13   A    Yes, sir.

14   Q    But you also testified last time we were here that you

15   have CKB miners at the facility also.  Right?

16   A    They were added after the State -- after we entered

17   into the State hearing, they were added into actually a

18   Bitmain-branded box as well, and they are all Bitmain-

19   branded servers.

20   Q    So you have CKB miners at the facility also?

21   A    Currently, yes.

22   Q    And they're operating?

23   A    Yes, sir.

24   Q    And those were not supplied to you under these

25   agreements that we see here, the Hosting Sale Agreement or

1   the Hosted Service Agreement.  Correct?

2   A    No, but the purchase of them was how we got here to

3   sign these things.

4   Q    You purchased those CKB miners in 2023?

5   A    Yes, sir.

6   Q    You testified earlier that Parker helped you understand

7   what it takes to operate a data center facility.  Right?

8   A    Yes, sir.

9   Q    Parker had been operating a data center facility?

10  A    Yes, sir.

11  Q    And he helped you design and construct the facility in

12  Van Vleck, where the hosted servers are located?

13  A    Yeah.  We designed it together.  Or we put it together,

14  and did all the work together.

15  Q    You testified that the rewards from the mining pool

16  were directed to a wallet controlled by ORB.  Right?

17  A    I believe I said a wallet in our possession.

18  Q    Who at ORB has access to that wallet?

19  A    I do.

20  Q    And you set it up, too.  Right?

21  A    Yes, sir.

22  Q    So you're the only person with access to the wallet?

23  A    Yes, sir.

24  Q    And ORB doesn't have a corporate resolution stating

25  that the wallet address is owned by ORB, does it?

1    A    I have never drafted one, no.

2    Q    Does it have an operating agreement saying that the

3    wallet is owned by ORB?

4    A    Nothing in writing, sir.

5    Q    So when you say it's controlled by ORB, what you mean

6    is that's how you characterize it.  Right?

7         MR. SHURN:  Objection, Your Honor.

8    (indiscernible) any control of it.  He says he has access to

9    it, and we fought over control and dominion (indiscernible)

10   hearing objection as to, you know, a legal conclusion.

11        THE COURT:  Ask your question again?

12   BY MR. SPARKS:

13   Q    When you say that that wallet is in ORB's possession,

14   that's your characterization.  Correct?

15   A    I don't know what the word characterization means in

16   your question.

17   Q    It's not documented anywhere that ORB has possession of

18   that wallet.  Correct?

19   A    Not except in sworn testimonies.

20   Q    The wallet where the mining proceeds are going right

21   now is a wallet that you set up on April 10th.  Correct?

22   A    No.

23   Q    When did you set up that wallet?

24   A    That address was generated on or about the petition

25   date.

1   Q    And before that, you had a different wallet?  Or ORB

2   had a different wallet?

3   A    Yes, sir.

4   Q    And that wallet was the one that you set up on April

5   10th.  Correct?

6   A    On or about, yes.

7   Q    And you set that up on April 10th, 2024 because you

8   found out that there was a temporary restraining order

9   application filed.  Correct?

10       MR. SHURN:  Your Honor, this is starting to go

11  beyond my direct.  They already got to put on their case.  I

12  object.  Beyond the scope.

13       THE COURT:  Well, what is this responsive to in

14  the direct?

15       MR. SPARKS:  His testimony that they weren't self-

16  mining.

17       THE COURT:  Testimony that they weren't self-

18  mining.

19       MR. SPARKS:  Yes, Your Honor.  He testified that

20  ORB was not self-mining, but ORB is the only person

21  receiving any benefits from the mining into multiple

22  different wallets, every one of which Mr. Zaniewski has set

23  up for himself.

24       THE COURT:  Okay.  I'll let you ask a couple of

25  questions, but I think that's more of a legal argument than

```
 1    it is factual development, and it is beyond the scope of the
 2    direct.  But go ahead.
 3                 MR. SPARKS:  Understood, Your Honor.  Thank you.
 4    BY MR. SPARKS:
 5    Q    And so you set up a wallet on April 10th, after the
 6    application for a temporary restraining order was filed.
 7    Correct?
 8    A    On or about that date.
 9    Q    And before that, you were using a different wallet
10    address.  Right?
11    A    Yes, sir.
12    Q    How much Bitcoin was remaining in that wallet on April
13    10th, when you set up a new one?
14    A    I couldn't recall.
15    Q    Earlier, you testified that Robert Menendez was ORB's
16    CFO?
17    A    Intended.  I don't know if he ever ended up with that
18    title, so to speak.
19    Q    But he --
20                 MR. SHURN:  Your Honor, this goes beyond, too.  I
21    didn't talk about -- I don't even know who that is.  And
22    this goes beyond my direct examination of him.
23                 THE COURT:  It was in one of the -- it was in one
24    your documents that you showed him as to who was going to
25    meet with Ryan Zhao.  Parker was going to go, and then they
```

1    said, no, it's probably going to be Robert Menendez, who is

2    anticipated to be my CFO.  I think that's what the document

3    says.

4            MR. SHURN:  I withdraw the objection.  I

5    apologize, Your Honor.

6    BY MR. SPARKS:

7    Q    So Robert Menendez is one of ORB's employees?

8    A    Yes, sir.

9    Q    But he's not the CFO?

10   A    I don't know.  I don't think we've really given him

11   that title.  The services that he does isn't really

12   deserving -- His services and his capabilities aren't

13   deserving of that exact title.

14   Q    His job is to source capital for ORB Energy?

15   A    His primary goal is to source capital, yes.

16   Q    But he hasn't actually found any sources of capital for

17   ORB Energy since 2024.  Correct?

18           MR. SHURN:  Objection.  Your Honor, this goes

19   beyond direct.

20           THE COURT:  Yeah, how does that -- how does that -

21   - What is that responsive to?

22           MR. SPARKS:  Just that they have this CFO that we

23   have not heard anything about before, Your Honor.

24           THE COURT:  Well, he didn't -- That's not the

25   testimony.  He said, I anticipate -- you know, he said he's

1  going to be his CFO, and he's testified that he didn't

2  become.  So I'm going to sustain the objection.

3          MR. SPARKS:  Okay.  Thank you, Your Honor.

4          BY MR. SPARKS:

5          Q    You told Bitmain that Ming's team at NexaNode

6  was permanently banned from the data center facility.

7  Right?

8          MR. SHURN:  Your Honor, again, this is beyond my

9  direct.  They did this during their direct of him.  They've

10 already done this, and I didn't address any of this.

11         MR. SPARKS:  Well, I'm pretty sure he did talk

12 about Ming's team in his direct, or his attorney's direct

13 today.

14         THE COURT:  Well, go ahead and ask -- Answer the

15 question.  I'm going to overrule the objection.  But again,

16 I don't think he talked about Ming's team.  I think he

17 talked about Johnny Lee, and --

18         MR. ZANIEWSKI:  Tommy Lee, and --

19         THE COURT:  Tommy Lee, and James.

20         MR. ZANIEWSKI:  James, yeah.

21         THE COURT:  I think that's who he talked about.

22 But I don't know if that's Ming's team or not.  But go

23 ahead, ask your question.

24 BY MR. SPARKS:

25 Q    You believe that Tommy Lee was part of Ming's team.

1    Right?

2    A    He was represented as such.

3    Q    And you believe that the other person, Johnny, was also

4    part of Ming's team?

5    A    There were two people, Tommy Lee, and James.  And then

6    after that, James quit, and they sent somebody else, and I

7    do not recall his name.

8    Q    Okay.  And you believed that they were part of Ming's

9    team.  Right?

10   A    That's how they were presented to me.

11   Q    Okay.  And you told Bitmain that Ming's team from

12   NexaNode was permanently banned from the data center

13   facility.  Right?

14   A    Yes, sir.

15            MR. SPARKS:  Pass, Your Honor.

16            THE COURT:  Okay.  I actually have a question.

17   Can you go to Exhibit 6, page 9?  And I may not -- And if

18   you look at the middle of the page, under C, the little 1 in

19   the hole?

20            MR. ZANIEWSKI:  Mm-hmm.

21            THE COURT:  And that talks about service provider,

22   which is ORB, deducting.  Did you -- did you ever deduct

23   monies from the deposit?

24            MR. ZANIEWSKI:  So to the best of -- No.

25            THE COURT:  Okay.  That's all I wanted.  Because

1  this talks about you deducting money, not Bitmain deducting

2  money.

3          MR. ZANIEWSKI:  I could explain (indiscernible)

4          THE COURT:  No, that's fine.  That's all.  I got

5  confused.  I thought this authorized Bitmain to deduct, but

6  it's actually the service provider.

7          MR. SHURN:  Correct, Your Honor.  Correct.

8          THE COURT:  All right.

9          MR. SHURN:  We rest, Your Honor.  I have nothing

10  further.  We rest.

11          THE COURT:  All right.  Mr. Sparks?

12          MR. SPARKS:  I guess (indiscernible) Are we ready

13  for closing arguments, Your Honor?

14          THE COURT:  If you all are, we've got -- It's

15  11:20.  I probably have to head out around noon.  Do you

16  think MR. SPARKS:  That might be -- that might be a tall

17  order, Your Honor.

18          MR. SHURN:  I would love to, Your Honor.  I'll go

19  first, and I'll go fast.  And then we can give them all the

20  rest of the time.  I'm happy to do that.

21          THE COURT:  All right.  Let's get started.  So you

22  can step down, Mr. Zaniewski.

23          MR. ZANIEWSKI:  Thank you, sir.

24          THE COURT:  Let's get started.  And if I have to

25  rest, we'll just come back right back after lunch.

1              MR. SHURN:  And I'll try to go as fast as I can,

2     and he can have all the additional time.  It's no problem,

3     Your Honor.  I don't need the full time.  And I will try to

4     be faster than I was on my opening.

5              From ORB's standpoint, it's very simple, if you

6     don't pay, you can't get your way.  If you fail to pay under

7     the contract, you can't go and try to exercise all these

8     different rights, you can't try to terminate, you can't do

9     any of this stuff, because you're in default for nonpayment.

10    They received the invoice back in September, had a limited

11    number of days to object to it, on any ground.  We want a

12    different name on it, it's premature, it's this, it's that,

13    they didn't do any of that.  They didn't do any of that.

14             What's undisputed is they failed to pay.  And

15    then, when they felt like they needed to pay, they had

16    endless excuses.  There's always an excuse.  They're

17    endless.  You should have done it like this, you should have

18    done it like that, if it just would have been like this, it

19    would have all worked out.  And all that sounds pretty good

20    on the surface, until you realize, yeah, but they never paid

21    anything.  And they didn't even pay the good faith amount

22    they didn't dispute, and they were required to.  So they

23    paid nothing.  They dropped off the servers, they dropped

24    off the miners, you know, the servers and the containers,

25    they sent some people over there to help out, but they never

1    paid anything, ever.  And they were required to under the

2    contract.

3            And so the material breach by failing to do that

4    resonates through this whole thing.  They continued to be in

5    breach.  That's not what my guy bargained for.  The benefit

6    of his bargain was to have the repeat cash flow coming in.

7    That's not what he got.  He got the opposite.  He got the

8    opposite of you're a thief, and you're stealing our Bitcoin

9    because you're liquidating it to pay for the real property.

10   You're liquidating it to pay for the electricity.  But

11   that's where the hosting fees are supposed to come in and

12   pay for those things.  It's not for free.  If you don't pay,

13   you just can't get your way.  It just doesn't make any

14   business sense that they don't have to pay, yet they have

15   all the full rights under the contract.  It just makes no

16   sense.  It makes no business sense at all.

17           And termination couldn't happen pre-petition, one,

18   because they weren't self-mining.  They weren't self-mining.

19   So then they can't exercise 5.4.  But even if they were

20   self-mining, prior to the injunctions, they never said we

21   terminate.  What they said was, we want to come get our

22   stuff.  And then they showed up without cranes, without

23   semi-trailers, but with 20 people.  I could speculate what

24   20 people could do.  They could take over the facility.  I

25   don't know.  But it's interesting that I didn't see tools.

1    He didn't testify to tools.  He didn't testify to trailers.

2    He didn't testify to cranes.  So you know, just because I

3    say something doesn't mean that's what I'm doing.  That just

4    means that's what I say.  And I think it's very difficult

5    when it doesn't match up.

6           And I think that's part of the problem, is this

7    just doesn't match up over and over again.  You should have

8    done this, you should have done that.  Had you done it,

9    everything was fine, but you didn't do it, so therefore you

10   lose.  It's just filled with that excuse over and over

11   again, yet it remains, they did not pay.  They never paid.

12   To this date, they didn't pay the undisputed amounts,

13   voluntarily, and that's very problematic.

14          So when you take all that, okay, the contracts

15   aren't terminated.  They're in existence.  Well, then the

16   stay applies, because they're trying to get what?  Property

17   from the Estate.  And so with no self-mining, with no

18   finding pre-petition of any self-mining by any court, I

19   mean, it's almost implicit in the State Court ruling, by

20   allowing what they did, that the contracts weren't

21   terminated, or the judge wouldn't have let them do what they

22   did, or there was no self-mining.  And so they never had a

23   determination, ever.  Quite the opposite.  And when they

24   finally say, okay, we terminate, the injunctions were in

25   place.  They couldn't terminate.  And plus, they were in

1    breach for never paying.  They can't exercise that right.

2    Contract law doesn't allow that.

3         So the Debtor has contractual rights.  The Debtor

4    has possessory rights.  The Debtor has recoupment rights.

5    The Debtor asserts it has rights of first refusal.  The

6    testimony was, we told you we were going to sell to

7    somebody, but we didn't tell you the terms.  Well, you can't

8    match the terms if you're not told what they are.  I mean,

9    for a ROFR to work, it has to all work.  It can't just be a

10   little bit, and go, gotcha, I'll pull the rug out from

11   underneath you.

12        So stay applies, no cause exists, and they're

13   adequately protected.  The testimony is the electric bills

14   are current.  The testimony is that they've been named as an

15   additional name Insured.  There was no evidence that they

16   have abused the computers, or are doing anything like that.

17   There was allegations in the pleading, but there's no

18   evidence.  So again, if you don't pay, you don't get your

19   way.  The Debtor performed.  The Debtor built this.  The

20   Debtor spent a year-and-a half building all this, making it

21   for them.  And then they dropped the stuff off.  There's a

22   contract.  There's a deal.  They performed to some extent,

23   but they never paid any bills.

24        So Your Honor, as a result of that, There's

25   contracts in place, they never paid the invoices.  The five

1    and seven days and all those periods came and went, they

2    didn't object.  Those are deemed good invoices, and they at

3    the very least needed to pay the amount that they admit was

4    good, but they paid nothing.  The stay should not be lifted,

5    Your Honor.  Thank you.

6            MR. SPARKS:  Thank you, Your Honor.

7            The Debtor, in its motion, and in its response to

8    our motion, is claiming that there are three agreements here

9    that are integrated agreements, the term sheet, the Hosting

10   Sale Agreement, and the Hosting Services Agreement.  The

11   term sheet is not a part of the agreements between the

12   parties.  The Hosting Sale Agreement and the Hosting

13   Services Agreement both have clauses stating that they are

14   complete, and supersede all other agreements and

15   negotiations between the parties.  And they also both

16   reference each other, without any reference to the term

17   sheet in either agreement.  Both of those agreements say

18   unequivocally that Bitmain owns the hosted servers, that ORB

19   waives any statutory or common law liens, and that ORB is

20   not allowed to claim any right, title, or interests in any

21   of Bitmain's property, or permit any other person to do so.

22           The Hosting Sale Agreement does contemplate a sale

23   of property to ORB, and it defines what that property is in

24   Schedule D.  It's AntSpace Container Supercomputing Data

25   Centers, or the cooling containers that we've been hearing

1    about.  It is not the hosted servers.  The Hosting Sale

2    Agreement says in Section 5.4, that if ORB utilizes

3    Bitmain's hosted servers for self-mining, ORB is required to

4    return the proceeds of the mining to Bitmain, and ORB has to

5    bear all the hosting fees for the current billing period, so

6    there's no set-off.  The operation and maintenance

7    agreements between ORB and Bitmain would be terminated, but

8    we never actually even got to that point because there was

9    at least a three-month period during which Bitmain was the

10   operation and maintenance provider before it would be

11   transitioned to ORB, and ORB began self-mining immediately

12   upon receipt.  So no matter what happens, Bitmain is the

13   operation and maintenance provider under these agreements.

14          The third consequence of engaging in that self-

15   mining is that Bitmain has the right to immediately

16   terminate all or part of the agreement without incurring any

17   liability for that breach.  That is obviously a different

18   form of termination than the agreement otherwise

19   contemplates, which requires notice, which requires 30 or 60

20   days notice.  When there is self-mining involved, there is

21   no such notice period contemplated by the agreement.  It's

22   Bitmain shall have the right to immediately terminate all or

23   part of this agreement.

24          The agreement could not be more clear that

25   regardless of whether or not ORB believed that Bitmain had

 1    paid an invoice, they could not redirect the hash power of

 2    the hosted servers to its own mining pool, or to any mining

 3    pool not authorized in writing by Bitmain.

 4            And yet that's exactly what Mr. Zaniewski did.

 5    And he testified that he believed Bitmain was in breach

 6    before the hosted servers were delivered.  If that was the

 7    case, Your Honor, if Bitmain had materially breached the

 8    agreements at issue, then ORB had a few options to proceed

 9    under Texas law.  They could have been excused from

10    performing, terminated the contract, and sued for damages.

11    But they did not do that.  Or they could have demanded

12    Bitmain's continued performance, which would have required

13    ORB's reciprocal performance under the contract, and the

14    contract would have remained in full effect.  Well, they

15    certainly didn't do that.  They breached the contract half a

16    dozen different ways that we've looked at throughout this

17    hearing.

18            If they had elected to terminate the contracts,

19    then the contracts would have been terminated.  If they had

20    elected to continue the contracts in full force and effect,

21    then they would have had to comply, and they didn't, so then

22    their breach would have allowed Bitmain to terminate.  And

23    that's exactly what Bitmain did.  And we saw the notice.

24    The reason that the notice is phrased the way that it was is

25    because Bitmain had been telling them that the contract was

 1   terminated immediately for self-mining, and the Debtor

 2   refused to accept that, including statements in Court.  The

 3   hearing where Bitmain said that to the Court, unfortunately,

 4   we don't have a transcript.  Thankfully, we do have the

 5   notice that was sent immediately afterwards that says the

 6   contract was and remains terminated.  That was the point in

 7   that notice, is that they had been saying that over and over

 8   and over again, ORB wouldn't accept it, so finally sent the

 9   notice in writing, it is terminated, and remains terminated,

10   because Bitmain had been trying to tell them that it was

11   terminated in the State Court proceeding.

12            Even if Bitmain had breached by not paying the

13   invoice, by not -- And I guess today, now the position has

14   changed, and it's now that Bitmain didn't follow the

15   procedures in the contract for disputing an invoice.  Well,

16   I think it's axiomatic that you have to send Bitmain an

17   invoice before Bitmain is obligated to pay an invoice.  And

18   if you send an invoice to Ryan Zhao at his email address,

19   and you don't even copy the Bitmain billing address, and you

20   make the invoice out to Ryan Zhao, and then a single word,

21   "Bitmain" underneath, without the name of the entity that's

22   actually named in the agreements, that is not an invoice

23   that Bitmain could pay or had an obligation to dispute,

24   because you never sent it to them.  You sent it to one

25   person at a massive corporation, who was not the billing

1    contact, and you didn't make it out to be billed to the

2    correct entity.

3         But let's just assume for a moment that they had

4    done it correctly, and they had sent an invoice that was

5    payable before they started self-mining.  Which I think the

6    evidence here is clear, the self-mining started around

7    November 28th.  The first invoice issued to Bitmain

8    Technologies Georgia Limited was -- I believe it was around

9    December 9th or 10th.  It was well over a week later.  So

10   the evidence is crystal clear on that point, I believe.

11        But let's just say, for the sake of argument that

12   Bitmain had breached.  According to the Texas Supreme Court

13   in Jones v. City National Bank, 166 Southwest 442 at page

14   443, it is not the law that a creditor, without a lien, and

15   without consent of the owner, may seize a Debtor's property,

16   and sell the same for purpose of discharging his debt.

17   Gardner v. Jones, 570 Southwest 2d, 198 at 199

18   (indiscernible) creditor was out of line, he had no right to

19   seize Jones' properties for the purpose of discharging the

20   claimed indebtedness.

21        I'm sorry, Judge, that first case was the Fort

22   Worth Appellate Court, and the second one was the Houston

23   Appellate Court, State Appellate Court.  And you can find a

24   mountain of cases like that.

25        Now, ORB couldn't act as judge, jury, and

1    executioner if it believed that Bitmain had breached the

2    contract, and just go and unilaterally decide, without going

3    to court, to seize all of Bitmain's property, take control

4    of its miners, and then steal 7% to $10 million worth of

5    Bitcoin.  Which we really don't know how much that is

6    because the initial schedules that they filed were, I would

7    say, admittedly inaccurate at this point, since after we

8    ferreted out that there were undisclosed wallets at Mr.

9    Zaniewski's deposition, they amended the night before the

10   hearing so they wouldn't have to answer to that.  As well as

11   apparently the weekend before the hearing, going and

12   starting to comply with Texas law for the first time, when

13   all of the things that they had not done, like designating

14   registered agents, and filing franchise tax reports, and

15   filing federal tax returns, and doing all of the other

16   things -- So they had no right to do that under any

17   circumstance, and doing it gave Bitmain the right to

18   terminate, and Bitmain did terminate.  So there is no

19   contract today for the Debtor to assume.

20          So let's talk about what evidence we have from

21   this hearing, the undisputed facts.  ORB believed Bitmain

22   was in breach before the servers were delivered.  ORB

23   immediately directed the server's hashrate to a mining pool

24   not approved in writing by Bitmain.  ORB received the mining

25   rewards from the hosted servers to a wallet controlled by

1    ORB, which Mr. Zaniewski has changed three times, at

2    different times.  Mr. Zaniewski transferred mined Bitcoin

3    from the wallet to his personal Coinbase account.  Mr.

4    Zaniewski is the only person with access to the wallet.  Mr.

5    Zaniewski sold mined Bitcoin through his personal Coinbase

6    account.  He used those funds to pay his personal credit

7    card bills.  He used those funds to either loan himself

8    money, or pay himself a salary, depending on how they're

9    characterizing it now.

10           He caused ORB to use the proceeds from the Bitcoin

11   sales to pay ORB's entire electricity bill, even though Mr.

12   Zaniewski has 70 CKB miners he personally owns that are also

13   using electricity at the site.  ORB disconnected AntSentry,

14   Bitmain's monitoring software from the hosted servers, even

15   though the contract explicitly requires that to be on the

16   miners at all times, and then refused to allow Bitmain to

17   reinstall it.  ORB refused to allow Bitmain access to the

18   hosted servers for months at a time, which the contract

19   prohibits.  And they claim that that was because the

20   contractors were not competent.  There is no evidence of

21   that, except for Mr. Zaniewski's testimony.  What the

22   evidence shows is that Bitmain had an operation and

23   maintenance service provider, they sent them out to the

24   site, ORB kicked them out, and Ming testified that that was

25   after they tried to enter the correct mining pool

1    information into the servers.

2          ORB never provided an invoice to the correct

3    entity until after they'd already begun self-mining.  And

4    when Bitmain tried repeatedly for months, as we saw in the

5    notices, to pay the deposit, if ORB would just deduct the

6    amount of the mining proceeds, Mr. Zaniewski refused to

7    issue a new invoice, refused to make that deduction, and

8    instead demanded that Bitmain pay the entire deposit, but

9    also over $6 million in fictitious damages that he and his

10   attorney had conjured up, which are nothing more than a

11   ransom after they've taken control of Bitmain's property.

12         So Your Honor, there is no executory contract to

13   assume.  They have no right of possession of the miners of

14   the Bitcoin.  They are not entitled to any offsets.  If they

15   were to have some -- If Bitmain were to be forced to stay in

16   a contract with them, there is no right of offset.  And ORB

17   is not -- ORB is not a good faith Debtor.  ORB has fled to

18   bankruptcy in this instance, not as a Debtor that is honest,

19   but unfortunate and looking for a fresh start, but as

20   somebody who's desperate to avoid the consequences of their

21   actions, including theft of over $10 million in assets from

22   my client.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.  Anything further, Mr.

25   Shurn?

1              MR. SHURN:  I have nothing further, Your Honor.

2     No.

3              THE COURT:  All right.  All right, we will --

4     Thank you for your presentation.  I'll take this under

5     advisement, and issue a ruling.

6              MR. SHURN:  Very good, Your Honor.  Thank you.

7              THE COURT:  Thank you.  All right.  We are in

8     recess.

9

10              (Proceedings adjourned at 11:41 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    <u>CERTIFICATION</u>

2

3

4    I certify that the foregoing is a correct transcript from

5    the electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8

9

10

11   Lindsay Peacock

12

13

14

15

16

17

18

19   Veritext Legal Solutions

20   330 Old Country Road

21   Suite 300

22   Mineola, NY 11501

23

24   Date: October 10, 2025

25