United States Bankruptcy Court
Southern District of Texas
**ENTERED**
December 15, 2025
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 25-80363 |
| ORB ENERGY CO., | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | CHAPTER 11 |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Bitmain Technologies Georgia Limited's ("Bitmain's") Motion (I) to Confirm Inapplicability of the Automatic Stay, (II) in the Alternative, for Relief from the Automatic Stay, (III) to Grant Access to Bitmain's Property, and (IV) for Related Relief.[1]  Debtor, Orb Energy Co. ("Orb"), opposes Bitmain's motion.[2]  For the reasons explained below, the Court grants Bitmain's motion.[3]

## I.    BACKGROUND

This case arises out of a dispute over Debtor's possession of Bitmain's Bitcoin mining servers, hydro cooling containers, and Bitcoin mined with Bitmain's equipment.  Debtor is a Delaware corporation with a principal place of business in Van Vleck, Texas.  Bitmain is a Georgia corporation with its principal place of business in Beijing, People's Republic of China.

---

[1] ECF No. 13.

[2] ECF Nos. 3; 35.

[3] Debtor also moved to assume executory contracts with Bitmain under 11 U.S.C. § 365.  ECF No. 3.  Because the Court concludes that the contracts were terminated, Debtor's motion to assume is denied as moot.

In 2023, Debtor's founder and president, Jamieson Zaniewski reached out to Bitmain seeking to purchase Bitcoin mining servers.[4] Following this initial contact, Zaniewski participated in multiple discussions with Ryan Zhao, a Bitmain representative, about becoming a Bitmain host.[5]  As a Bitmain host, Zaniewski would be responsible for procuring property, building the required infrastructure for a data center, and entering into contracts to provide the necessary utilities for the operation of a data center.[6]  The data center would "host" Bitmain's Bitcoin mining servers by providing a physical site and the required infrastructure for the servers and the hydro cooling containers in which the servers sit to mine Bitcoin for Bitmain's benefit.[7]  In exchange for the provided hosting services, Bitmain would pay Zaniewski for the expenses incurred for hosting the servers plus a premium.[8]

Zaniewski deemed the prospect of a partnership with Bitmain as a lucrative opportunity and began taking steps to become a Bitmain host.[9]  Zaniewski formed Orb, procured real property in Van Vleck, Texas, and obtained a contract with an electricity provider shortly after he began discussions with Bitmain.[10]

On April 11, 2024, the parties executed a document titled "Hydro Cooling Container Hosting Sale Collaboration Term Sheet" (the "Term Sheet").[11]  Under the Term Sheet, the parties would jointly construct a

---

[4] ECF No. 3, at 3.

[5] ECF No. 84, at 43.

[6] *Id.* at 45−46.

[7] Bitcoin is a cryptocurrency that used cryptographic principles to allow owners of Bitcoin to securely transact with each other and to prove ownership of Bitcoin via the Bitcoin Blockchain, a decentralized public ledger.  Individuals mine Bitcoin by using sophisticated computer programs to perform complex, resource-intensive computations which validate past Bitcoin transactions.

[8] ECF No. 35, at 1.

[9] *Id.* at 2.

[10] ECF No. 3, at 3−4.

[11] ECF No. 39-1.

data center in accordance with Bitmain's specifications, and Orb would provide the required utilities and operate the site in exchange for compensation.[12]  Orb would also provide its services at a discount in exchange for title of the hydro cooling containers being transferred to it at the end of the three-year term.[13]  The Term Sheet additionally provided Orb with a right of first refusal in the Bitcoin mining servers.[14]

The parties later executed two separate agreements, the Hosting Sale Agreement (the "HSA") and the Hosting Services Agreement (the "Services Agreement") on June 19, 2024.[15]  The HSA and the Services Agreement concern similar subject matter to the Term Sheet, namely the nature of Orb and Bitmain's relationship.  Both documents contain merger clauses.[16]  And all of the agreements provided that upon adequate preparation of the data center, Bitmain would pay Orb a "Deposit" of over $700,000.[17]  Notably, the HSA provides that delivery of the Bitcoin mining servers will not occur until the data center has passed inspection by Bitmain.[18]

All of the documents unequivocally state that Bitmain owns the Bitcoin mining servers and includes that Orb waives any applicable liens.[19]  Additionally, all documents expressly prohibit Orb from engaging in "self-mining" and provide that Orb will bear all hosting fees for that billing period and provides Bitmain with the right to immediately terminate for any instances of self-mining.[20]  Despite the severe consequences of self-mining, the term is not defined in any of the

---

[12] *Id.* at 1.

[13] *Id.*

[14] ECF No. 39-1, at 10.

[15] ECF Nos. 39-2; 39-3.

[16] ECF Nos. 39-2, at 20; 39-3, at 33.

[17] ECF Nos. 39-1, at 3; 39-2, at 43; 39-3, at 40.

[18] ECF No. 39-2, at 26.

[19] ECF Nos. 39-1, at 9; 39-2, at 11; 40; 39-3, at 24−25.

[20] ECF Nos. 39-1, at 11; 39-2, at 40−41; 39-3, at 25.

documents. Additionally, the documents prohibit Orb from redirecting the hash power of the Bitcoin mining servers to any mining pool not authorized in writing by Bitmain or operating the Bitcoin mining servers without Bitmain's written consent.[21]

The hydro cooling containers were delivered to the data center on or around September 9, 2024.[22] Orb issued its first invoice for the amount of the Deposit four days prior to delivery of the containers on September 5, 2024.[23] This invoice was addressed to Ryan Zhao, a Bitmain representative.[24] The data center seemingly passed Bitmain's inspection in mid-November 2024,[25] and the Bitcoin mining servers were delivered on November 25, 2024.[26]

Bitmain initially raised no issue with the September 5 invoice. On November 28, 2024, WeChat messages from an individual using the name "Zou Kevin Bit" communicated to Zaniewski that "there are no issues with the cooperation deposit, and it is expected to be paid to [Orb] around Monday."[27] Two days later, in the same WeChat thread, Wang Mengjing instructed Zaniewski that he had to address the invoice to "Bitmain Technologies Georgia Limited," not Ryan Zhao.[28] Bitmain assured Zaniewski that it could "complete the payment within one working day after [he] provide[d] the correct invoice."[29] This continued for a few days, with Zaniewski issuing another invoice to just

---

[21] ECF Nos. 39-2, at 38; 39-3, at 23.

[22] ECF No. 84, at 70.

[23] ECF No. 44-4, at 3.

[24] *Id.*

[25] ECF No. 73, at 15.

[26] ECF No. 62, at 54.

[27] ECF No. 44-5, at 286.

[28] *Id.* at 290−92.

[29] *Id.* at 294.

"Bitmain."[30]  Zaniewski transmitted a corrected invoice on December 9, 2024.[31]

Once the containers and mining servers were delivered and set up, in late November or early December 2024, Orb directed the hash rate of the mining servers to a "test pool" and created a "test wallet" for the mined Bitcoin to be stored in.[32]  Bitmain deemed Orb's direction of the mining servers hash rate to the "test pool" to be a violation of the Services Agreement and sent Orb a notice of breach on December 12, 2024.[33]  At this point, Bitmain sought an amicable resolution of the situation and the avoidance of litigation.[34]  However, this outcome never came to fruition.

Prior to Orb's bankruptcy, this dispute was the subject of litigation in the 130th Judicial District Court of Matagorda County, Texas, which began in April 2025.[35]  This led to the state court issuing a temporary restraining order on April 8, 2025, prohibiting Orb from selling any Bitcoin mined by Bitmain's mining servers and interfering with Bitmain's efforts to remove its mining servers from the data center.[36]  However, the state court amended its TRO removing the

---

[30] *Id.* at 293.

[31] ECF No. 44-4, at 19−22.

[32] *Id.* at 72.

[33] ECF No. 25-1, at 116.  The notice sent on December 12, 2024, is entitled "Notice of Breach of the Service Framework Agreement Dated June 19, 2024 Between Bitmain Technologies Georgia Limited and Orb Energy Co."

[34] *Id.*

[35] ECF No. 14-2, at 66.  The Court notes the documents referenced herein were admitted during the evidentiary hearing.  However, at times it refers to the same documents filed in different docket entries as Bitmain's voluminous exhibits at ECF No. 44 were  difficult to load on the Court's computer.

[36] ECF No. 14-3, at 2−5.

provision that prohibited Orb from interfering with Bitmain's efforts to remove its mining servers.[37]

The state court later issued a temporary injunction (the "TI") on May 6, 2025.[38] In the TI, the court found that immediate removal of the Bitcoin mining servers and hydro cooling containers would cause irreparable injury to Orb.[39] And, among other things, the court found that both parties had alleged breach and had a probable right to relief on the merits.[40] The TI allowed Orb to retain possession, operation, and control of the mining servers for a 60 day period, continue mining Bitcoin, and sell Bitcoin to pay for its operating expenses.[41] The TI also required Orb to allow Bitmain to access the data center upon 24 hours written notice and provide Bitmain with records of all its Bitcoin mining activity.[42] The TI was set to expire on July 5, 2025, but was extended to August 5, 2025.[43]

On August 5, 2025, Orb filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[44] On August 6, Debtor moved to assume its contract with Bitmain and determine the appropriate cure amount.[45] Bitmain appeared in this case and filed an emergency motion to deem the automatic stay inapplicable.[46] Bitmain also opposes Orb's motion to assume its contract with it.[47] The Court held a three-day evidentiary hearing on September 30, October 2, and October 8, where

---

[37] *Id.* at 7–11.

[38] ECF No. 39-13.

[39] *Id.* at 1.

[40] *Id.* at 2.

[41] *Id.* at 2–3.

[42] *Id.* at 2–4.

[43] ECF No. 39-14.

[44] ECF No. 1.

[45] ECF No. 3.

[46] ECF No. 13.

[47] ECF No. 14.

the parties presented arguments, documentary evidence, and witness testimony.

## II.   JURISDICTION & VENUE

28 U.S.C. § 1334(a) provides the District Courts with jurisdiction over this proceeding.  28 U.S.C. § 157(b)(1) states that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012).  This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. §§ 157(b)(2)(A) and (B). The Court has constitutional authority to enter final orders and judgments.  *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011).  Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## III.   LEGAL STANDARD

The commencement of a bankruptcy case creates an estate under 11 U.S.C. § 541.  Section 541 provides that the "estate is comprised of all the following property, wherever located and by whomever held: . . . all legal or equitable interests of the debtor in property as of the commencement of the case."  *Martinez v. OGA Charters, L.L.C. (In re OGA Charters, L.L.C.)*, 901 F.3d 599, 602 (5th Cir. 2018) (citing 11 U.S.C. § 541(a)–(a)(1)).  Section 362 of the Bankruptcy Code provides that the filing of a voluntary bankruptcy petition operates as a stay, applicable to all entities, of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  A debtor has a property interest in contractual rights that exist at the time of the commencement of their case.  *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55 (5th Cir. 1993).  However, such rights must have existed as of the commencement of the case.  11 U.S.C. § 541(a).

# IV.    DISCUSSION

The Court must determine whether the automatic stay applies to Bitmain's hydro cooling containers, Bitcoin mining servers, and Bitcoin that are currently in Orb's possession.   This requires the Court to determine (1) whether the contracts between the parties were terminated prior to Orb's petition date, and (2) whether Orb has other rights in the containers, Bitcoin mining servers, and Bitcoin.

Bitmain contends that it terminated the HSA prepetition and that the Services Agreement never began.[48]  Bitmain principally argues that it terminated the contract because Orb engaged in self-mining in violation section 5.3 of Schedule B of the HSA.[49]  Orb argues that it never engaged in self-mining and contends that Bitmain could not terminate the contract because Bitmain's nonpayment of the Deposit constitutes a prior material breach and because at the time of Bitmain's termination the TI was in place.[50]

## A.    Which Contract Controls?

As noted above, there are two or possibly three relevant documents: the Term Sheet, the HSA, and the Services Agreement. These documents are not particularly well-drafted.  While the Court has doubts about whether the Term Sheet constitutes a contract under Texas law, the presence of the entireties/merger clause in the HSA renders the term sheet a nullity.   The HSA contains the following entireties/merger provision:

> This Agreement, together with all appendices, schedules, annexes and exhibits, constitute the full and entire understating [sic] and agreement between the Parties, and

---

[48] *See* ECF Nos. 13, at 2; 13-3, at 449.  This is inconsistent with its initial Notice of Breach of the Service Framework Agreement sent on December 12, 2024.  ECF No. 25-1, at 116.

[49] ECF No. 13, at 8−10.

[50] ECF No. 35, at 3.

supersede all other agreements between or among any of the Parties with respect to the subject matters hereof and thereof.[51]

The Term Sheet and HSA both contemplate Orb providing hosting services at a discounted rate in exchange for compensation and title in the hydro cooling containers vesting in Orb at the end of the Hosting Sale Period.[52]  Thus, because the Term Sheet and HSA both concern the same subject matter, the Term Sheet, to the extent it constituted an agreement, was superseded by the HSA.

While there is some ambiguity regarding Bitmain's position with the Services Agreement, by its own terms the contract had not yet taken effect as of the date of Orb's bankruptcy petition.[53]  Section 6 of Appendix I of the Services Agreement provides that "[t]he Hosting Service Agreement shall have a Term effective from the Initial Date and expiring on the [ 2nd ] anniversary of the Initial Date."[54]  The Services Agreement provides that:

> **"Initial Date"** means, without prejudice to the performance of Hosting Sale Agreement, the date the first batch of Hosted Servers set forth in APPENDIX I are powered-on for normal hosting and operation *following the conclusion of Hosting Sale Period*.[55]

The term "Hosting Sale Period" is defined in the Services Agreement as "the period specified in the Hosting Sale Agreement."[56]  The HSA defines "Hosting Sale Period" as "the period of 365 calendar

---

[51] ECF No. 39-2, at 20; ECF No. 39-3, at 33.

[52] ECF Nos. 39-1, at 1; 39-2, at 1, 9.

[53] *See supra* note 33 and accompanying text.

[54] ECF No. 39-3, at 42 (alteration in original).

[55] ECF No. 39-3, at 4 (emphasis added).

[56] *Id.*

days commencing on the Initial date."[57]  The "Initial Date" is defined as "the date the first batch of Hosted Servers . . . are powered-on for normal hosting and operation."[58]

If the Initial Date of the HSA ever did occur, which is doubtful, it occurred in late November or early December when the Bitcoin mining servers were powered on.[59]  And the effective date of the Hosting Service Agreement had not occurred as of August 5, 2025, the date Orb filed its Chapter 11 petition.  Thus, the only contract at issue in this dispute is the HSA.

### B.   Was the HSA Terminated Prepetition?

Bitmain's primary contention is that Orb engaged in "self-mining" in violation of sections 5.3 and 5.4 of Schedule B of the HSA.[60]  Bitmain argues that it terminated the HSA in response to Orb's alleged breach on July 16, 2025, at the latest.[61]

On September 30, 2025, Zaniewski testified that after the Bitcoin mining servers were delivered on or around November 25, 2024, he set up the mining servers as quickly as possible and directed the hash rate to a test pool and directed the mining proceeds to a test wallet controlled

---

[57] ECF No. 39-2, at 4.

[58] *Id.*  Note that the "Effective Date" of the Hosting Sale Agreement is July 19, 2024, whereas the "Initial Date" is defined differently.

[59] Bitmain did not allege in its briefs nor its oral argument that the Initial Date never occurred.  However, whether "normal hosting and operation" ever occurred is unclear.

[60] ECF No. 13, at 8−9.  Additionally, Bitmain contends that Orb also breached section 3.16 of Schedule B of the Hosting Sale Agreement.  ECF No. 47, at 8−9. That section provides:

> Under no circumstances will Hosting Provider redirect the hash power of the Hosted Servers to its own mining pool or any mining pool not authorized in writing by BITMAIN, operate (power-on or power-off) the Hosted Servers without BITMAIN's written consent. ECF No. 39-2, at 38.

[61] ECF No. 13, at 10.

by Orb.[62]  In Bitmain's view, this conduct constituted self-mining and unauthorized redirection of the hash rate.  Bitmain's position is not beyond reproach.  Nowhere in the contract is the term "self-mining" defined.  And whether Orb could *redirect* the hash rate by *directing* the hash rate to a "test pool" is similarly unclear.

Under Texas law, "[w]hether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983).  Courts "interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019) (citation modified).  However, "[c]ontext is certainly a permissible indicator of meaning, and courts must strive to 'harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.'" *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 390 (Tex. 2023) (internal citations omitted).

The term "self-mining" standing alone is admittedly ambiguous.  However, an examination of the HSA as a whole and the provisions that specifically discuss self-mining provide clarity.  Under the HSA, Orb would serve as a host by providing a data center and the required utilities for Bitmain to mine Bitcoin for Bitmain's benefit.  In turn, Bitmain would provide the data center with hydro cooling containers and Bitcoin Mining servers, pay Orb compensation for serving as a host, and eventually transfer title in the containers.[63]

The HSA unequivocally provides that the Bitcoin mining servers are Bitmain's property.[64]  And the contractual prohibition on "self-

---

[62] ECF No. 62, at 61.

[63] *See* ECF No. 39-2.

[64] *Id.* at 40.

mining" was intended to ensure that any Bitcoin mined by Bitmain's mining servers would be directed to Bitmain.[65]  Section 5.3 of Schedule B of the HSA provides that "Hosting Provider shall not under any circumstances utilizes the Hosted Servers for self-mining purpose."[66] And section 5.4 continues "[i]f Hosting Provider . . . utilizes BITMAIN's Hosted Servers for self-mining purpose, *Hosting Provider shall return the proceeds of the mining* to BITMAIN within 7(seven) calendar days."[67] Thus, the context of the prohibition on self-mining in sections 5.3 and 5.4 of Schedule B of the HSA makes clear that "self-mining" refers to Bitcoin mining wherein Orb—not Bitmain—retains the Bitcoin mined by the Bitcoin mining servers.

Zaniewski's testimony on September 30, 2025, establishes that Orb directed the Bitcoin miners hash rate to a "test pool" and directed the mined Bitcoin to a "wallet" controlled by Orb.[68]  These actions constituted self-mining under the HSA.  Thus, Orb breached the HSA by self-mining as soon as it set up the Bitcoin mining servers in late November or early December of 2024.[69]

Bitmain contends that it sent Orb notices of breach in December 2024, March 2025, and April 2025, and Orb's continued self-mining following these notices resulted in termination of the HSA.[70]  Section 8.2(e) provides that the contract may be terminated "upon BITMAIN

---

[65] *Id.*

[66] *Id.*

[67] *Id.*

[68] ECF No. 62, at 61.

[69] However, Orb did not breach section 3.16 of Schedule B of the Hosting Sale Agreement by "redirecting" the hash rate of the Bitcoin mining servers.  To "redirect" something is the change the course or direction of, which indicates that something must in the first instance have been directed.  *See Redirect*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/redirect (last visited Nov. 19, 2025). The mining servers were never directed in the first instance and thus could not be redirected.

[70] ECF No. 13, at 9–10.

giving a written notice to Hosting Provider to terminate if Hosting Provider breaches any provisions of this Agreement, which breach is not cured within thirty (30) Days after Hosting Provider is notified of such breach BITMAIN."[71]

These notices seemingly do not comply with section 8.2(e) of the HSA because they do not include a notice Orb "to terminate."   The December 12, 2024 notice informs Orb of its breach and provides that if it does not cease self-mining that "Bitmain will protect its rights by any means necessary, including seeking court intervention."[72]   The notice also provides that Bitmain would "take legal action" if Orb refused to meet with Bitmain."[73]   The March 27, 2025 notice similarly informs Orb of its breaches by its self-mining and denying Bitmain personnel access to the data center.[74]   This notice also includes a demand that Orb comply with the HSA and states that "[s]hould ORB fail to adhere to the demands set forth above . . . Bitmain will have no alternative but to immediately withdraw its equipment from the data center facility and pursue all available legal remedies."[75]

Bitmain's April 3, 2025 correspondence entitled "Notice of Withdrawal" similarly does not state that Bitmain terminates the HSA.[76]  However, this notice does state that "Orb has demonstrated that it is not prepared to perform its obligations under the Agreement."[77]  It also provides that Orb has breached sections 3.16, 5.3, and 5.4 of Schedule B of the HSA and states that:

---

[71] ECF No. 39-2, at 16.

[72] ECF No. 44-4, at 26.

[73] *Id.*

[74] *Id.* at 70.

[75] *Id.* at 71.

[76] *Id.* at 111−12.

[77] *Id.* at 111.

Despite Bitmain's repeated attempts to proactively engage in discussions with Orb since the above-mentioned breaches, the parties have failed to reach a resolution that is acceptable to Bitmain. As such, Bitmain is exercising its right to withdraw all Bitmain Property, including but not limited to all Hosted Servers, from the Data Center Facility.[78]

Section 5.4(c) of Schedule B of the HSA provides Bitmain with a right to immediately terminate the contract if Orb engages in self-mining.[79] While Bitmain's April 3, 2025 notice of withdrawal may not have explicitly stated that it terminated the HSA, this notice effectively terminated the contract. The doctrine of substantial compliance when applied to notice requirements "serves the important purpose of preventing parties from engaging in bad-faith 'gotcha' tactics to avoid their own contractual obligations based on a technicality." *City Choice Grp, LLC v. TMC Grand Blvd Land Co.*, No. 24-BC11A-0002, 2025 WL 3164075, at *6 (Tex. Bus. Nov. 8, 2025) (internal quotations omitted).

Bitmain's intent to withdraw its property from Orb's data center evinces that it intended to discontinue its relationship with Orb altogether. Indeed, performance of the HSA by either party is impossible if the servers Orb was to host were removed from its possession. And on July 16, 2025, for the avoidance of doubt after Orb contested whether Bitmain had terminated the HSA in the state court proceedings, Bitmain provided a correspondence to Orb entitled "Reaffirmation of Contract Termination" that stated that the HSA "is and remains terminated."[80] This was done in response to attempts at "gotcha" tactics by Orb who argued that Bitmain never said the contract was terminated despite Orb being told that Bitmain wished to

---

[78] *Id.*

[79] ECF No. 39-2, at 41.

[80] ECF No. 44-4, at 454.

discontinue its relationship with Orb and later attempted to collect its property.

Orb, on the other hand, contends that Bitmain could not terminate the HSA because it materially breached the contract before the Bitcoin mining servers were delivered to its data center by not paying it the Deposit.[81] Orb also contends that at the time Bitmain sent the reaffirmation of termination, the state court TI was in place and prevented termination.[82]

First, as noted above, the HSA was terminated by Bitmain on April 3, 2025, five days before the TRO was entered and over a month before the TI was issued.  The TRO and TI merely preserved the status quo.  *N & A Properties, Inc. v. PH Steel, Inc.*, 656 S.W.3d 556, 567 (Tex. App. 2022).  The status quo at the time these orders were entered did not include a ongoing contractual relationship between Orb and Bitmain.

Next, Orb's position that Bitmain's prior material breach prevented it from terminating the contract in response to Orb's self-mining is not supported under Texas law.  It is hornbook law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.  *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).  However, if the non-breaching party opts to treat the contract as continuing after the breach, he is deprived of any excuse for terminating his own performance.  *West Loop Hospitality, LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 491 (Tex. App. 2022).  Orb cannot claim that Bitmain's alleged breach excused its duty to comply with the terms of the HSA while simultaneously treating the contract as continuing and taking actions expressly prohibited by the contract.

---

[81] ECF No. 35, at 4.

[82] ECF No. 84, at 112.

Here, it is undisputed that Bitmain never paid Orb the $740,275.20 Deposit set forth in the HSA. Section 1.3(a) of Schedule B of the contract provides that:

> BITMAIN shall pay to Hosting Provider the Deposit . . . on or before the seventh (7th) Business Day from the date on which BITMAIN has been provided documentation that Hosting Provider has sufficient procurement that the Data Center Facility has satisfied the conditions of payment of Deposit set forth in Schedule A to this Agreement[.][83]

Schedule A provides four conditions of payment of the deposit:

(1) The high-voltage, medium-voltage and low-voltage transformers arrived at the Data Center Facility;
(2) The wiring between high-voltage and low-voltage transformers is completed;
(3) The construction of infrastructure, including but not limited to site hardening of the Data Center Facility, construction of facilities and buildings are completed and hydro ANTSPACE containers arrived at the Data Center Facility; and
(4) The site protection facilities of the Data Center Facility are set up, and the Data Center Facility has the capability of basic safety protection.[84]

On October 2, 2025, Zaniewski testified that Orb believed the data center passed inspection on or around November 10, 2024.[85] Orb expected that payment of the Deposit would be forthcoming following its data center passing inspection.[86] Bitmain does not contest that the data center passed inspection or that it did not pay the Deposit.

---

[83] ECF No. 39-2, at 26.

[84] *Id.* at 25.

[85] ECF No. 73, at 15.

[86] *Id.*

The evidentiary hearing and parties' briefs featured much discussion about the invoices Orb issued to Bitmain. Bitmain argues that it did not pay the Deposit because Zaniewski issued some invoices that were addressed to the improper person(s), included the wrong amount, or were issued prematurely.[87] Bitmain also contends that its failure to pay the Deposit within seven days was not a material breach because time was not of the essence.[88] Orb retorts that Bitmain failed to object within five business days as required under section 1.5(b)(1) of Schedule B of the Hosting service agreement, and as such the invoices were due within seven days of receipt.[89] Orb also contends that Bitmain's failure to pay the deposit was a material breach.[90]

However, neither argument about the invoicing procedures is controlling. Under the HSA, the parties agreed to the use of the Prepayment Billing Method as the billing method for the Hosting Fee.[91] Under the Prepayment Billing Method, "the Deposit shall be applied as the Prepayment for the first Billing Period."[92] While section 1.5(a) of Schedule B of the HSA does provide for Orb to issue invoices, the invoices contemplated in section 1.5(a) are for the Hosting Fee, not for the Deposit. Section 1.5(a) provides:

> Hosting Provider shall issue the invoice of the Hosting Fee for the previous Billing Period to BITMAIN within seven (7) Business Days from the end of such Billing Period, with (i) the Reconciliation Statement for such Billing Period; and (ii) the supporting documents proving the Power Consumption for the such Billing Period (including but not limited to, photos of the Separate Meter showing the Power Consumption at the end of such Billing Period, invoice of

---

[87] ECF No. 47, at 11–17.

[88] *Id.* at 15.

[89] ECF No. 84, at 67–68, 110–14.

[90] ECF No. 35, at 3.

[91] ECF No. 39-2, at 44.

[92] *Id.* at 28.

such Billing Period issued by the relevant power supplier to the Hosting Provider, and payment receipt indicating Hosting Provider made the due payment of such Billing Period to such power supplier) as attachments to the invoice.

The HSA distinguishes the Deposit and Hosting Fee in multiple places. The terms are each defined separately in section 1.1.[93] Schedule A has different conditions of Prepayment of the Hosting Fee and payment of the Deposit.[94] And applying the Deposit as the Prepayment for the first billing period only further establishes that payment of the Deposit and Prepayment of the Hosting Fee are discrete.[95] It is not clear in the HSA whether Orb was required to issue an invoice for the Deposit, and absent a specific requirement, the Court declines to impose one. Given the ambiguity, the Court construes the ambiguity against Bitmain as the drafting party and adopts the interpretation least burdensome to Orb. *McKenna v. Caldwell*, 387 S.W.3d 830, 834 (Tex. App. 2012). Thus, the Court concludes that Orb was not required to issue an invoice for the Deposit for the Deposit to be due under the HSA.

Bitmain does not refute Orb's position that the data center passed inspection, nor does it dispute that the Conditions of Payment of Deposit outlined in Schedule A of the HSA were satisfied. Indeed, the delivery of the Hosted Servers specified in section 1.3(c) was conditioned on Bitmain being "provided documentation evidencing that Hosting Provider has sufficient procurement to operate the Data Center Facility and that Hosting Provider has completed the construction of the Data Center Facility and passed the inspection of the Data Center Facility by BITMAIN."[96] And the Conditions of Payment of Deposit outlined in

---

[93] *Id.* at 3–4.

[94] *Id.* at 24–25.

[95] *Id.* at 28. *See also id.* at 42–43.

[96] *Id.* at 26.

Schedule A all relate to Orb satisfactorily completing preparation of the data center.[97]

Although Bitmain did breach the HSA by not timely paying the Deposit, this breach whether—material or immaterial—did not prevent Bitmain from terminating the HSA, even if Bitmain's termination was ultimately wrongful. The determination of whether a breach is material, is determined by the trier of fact. *Bartush-Schnitzius Foods Co v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 437 (Tex. 2017). As a general matter, a delay in payment is typically not a material breach because time is not of the essence, even if a date is stated for performance. *See Texas Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 814 (Tex. App. 2018).

If the breach was material, Orb had options—it could have ceased performance and sued for damaged, or it could have continued performance and sued for damages. *Myriad Dev., Inc. v. Alltech, Inc.*, 817 F. Supp. 2d 946, 963 (W.D. Tex. 2011). If the breach was immaterial, Orb's performance was not excused, but it still had the right to sue for damages. *Id.* at 964.

Instead of exercising its contractual remedies, Orb purportedly treated the HSA as continuing, as evinced by its motion to assume, but Orb immediately breached the contract by engaging in conduct expressly prohibited under the HSA. This was not permitted. In *Henry v. Masson*, the 1st District Court of Appeals stated, "If the non-breaching party elects to treat the contract as continuing after a breach and continues to demand performance, it obligates itself to perform fully." 333 S.W.3d 825, 841 (Tex. App. 2010).

While the Court does acknowledge that Bitmain's nonpayment placed Orb in a precarious position after it had expended significant sums in preparation to perform under the HSA, this nevertheless did

---

[97] *Id.* at 25.

not justify its course of conduct.  While perhaps the legal remedies available to Orb were inadequate, it still could have sought equitable relief.  However, in response to Bitmain's breach, Orb directed the Bitcoin mining servers hash rate to a pool not authorized by Bitmain and directed the proceeds of the mining to a wallet Orb controlled.[98] Orb's actions were not permitted by law.  And the equities cannot ratify Orb's conduct as "one who comes to court seeking equity must come with clean hands."  *In re EGL Eagle Global Logistics, L.P.*, 89 S.W.3d 761, 766 (Tex. App. 2002).

Bitmain was permitted to terminate the HSA prepetition and did so at the latest on April 3, 2025.  Bitmain's failure to pay the deposit was a breach of contract, and Orb may be entitled to recover damages, perhaps even substantial damages, but it did not give Orb carte blanche to do whatever it wanted with Bitmain's property or prevent Bitmain from terminating the contract.

C.    *Does Orb Have Any Other Rights in the Hydro Cooling Containers, Miners, and Bitcoin?*

Aside from contractual rights, Orb contends that it has other rights in the containers, Bitcoin mining servers, and Bitcoin mined with Bitmain's equipment.[99]  These asserted rights include, possessory rights, recoupment rights, rights of first refusal ("ROFR"), and ownership of the containers.[100]  Aside from Orb's bare representations that such rights exist, little, if any evidence was presented during the three-day evidentiary hearing to demonstrate the existence of any such rights.

---

[98] *See supra* note 62 and accompanying text.

[99] *See* ECF No. 35.

[100] *Id.* at 3.

Turning to Orb's purported possessory rights, any such right that may have existed was expressly waived in section 5.1(b) of Schedule B of the HSA.[101]  That section provides:

> Hosting Provider hereby waives any statutory or common law lien or right of distress in or to the BITMAIN Property or any part thereof and agrees that BITMAIN may at any time remove the BITMAIN Property from the Data Center Facility in compliance with this Agreement.[102]

Next, Orb's assertion that it has recoupment rights in the containers, miners, and Bitcoin is not supported by the law.  Texas courts interpret recoupment "as a defensive doctrine confined to a narrow situation involving the assertion of a contract cause of action by the plaintiff and available only to reduce or satisfy the plaintiff's claim." *United States ex rel. Ramadoss v. Caremark Inc.*, No. SA-99-CA-00914-WRF, 2008 U.S. Dist. LEXIS 71299, at *32 (W.D. Tex. Aug. 27, 2008). An examination of the Texas case law on the doctrine of recoupment highlights how recoupment can only be asserted defensively and provides no affirmative claim or right to possession. *See e.g., FDIC v. Graham*, 882 S.W.2d 890 (Tex. App. 1994); *Bray v. Bray*, No. 04-98-00633-CV, 1999 WL 391874 (Tex. App. June 16, 1999).

As discussed above, Orb has no ROFR in the Bitcoin mining servers.  While the Term Sheet did include a ROFR, the Term Sheet was superseded by the HSA, and the HSA does not include any such right.[103]

Lastly, Orb does not have ownership of the hydro cooling containers.  Section 1.1 of Schedule D of the HSA provides that: "[t]he Parties hereby agree that legal and beneficial title and ownership of the Products shall pass to the Purchaser upon conclusion of the Hosting Sale Period provided that the terms and conditions of this Agreement are

---

[101] ECF No. 39-1, at 40.

[102] *Id.*

[103] *See supra* Section IV.A.

fulfilled."[104]  As noted above, if the Hosting Sale Period ever did begin, which is doubtful, still as of mid-November 2025, the Hosting Sale Period has not concluded.  And clearly, the terms and conditions of the HSA have not been fulfilled.  Thus, Orb is not the owner of the hydro cooling containers.

## CONCLUSION[105]

For the reasons explained above, the Court holds that the HSA was terminated prepetition and that the automatic stay does not apply to Bitmain's property that is currently in Orb's possession, custody, or control.

A separate order will be issued.

SIGNED 12/15/2025

Alfredo R Pérez
United States Bankruptcy Judge

---

[104] ECF No. 39-2, at 47.

[105] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.